```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

****************************************************************

KEITH BABIN, ET AL.

                                Civil No. 18-7378
VS.                             Section "D"(3)
                                New Orleans, Louisiana
                                October 28, 2019


PLAQUEMINES PARISH

****************************************************************

```
                  TRANSCRIPT OF JURY TRIAL
         HEARD BEFORE THE HONORABLE WENDY B. VITTER
                UNITED STATES DISTRICT JUDGE
                          DAY 1
```

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:           JOSEPH G. KOPFLER
                              KOPFLER & HERMANN
                              7910 MAIN STREET
                              SUITE 400
                              HOUMA, LA 70360

                              CHARLES J. STIEGLER
                              STIEGLER LAW FIRM, LLC
                              318 HARRISON AVENUE
                              SUITE 104
                              NEW ORLEANS, LA 70124


FOR THE DEFENDANT:            ERIC R. MILLER
                              KULLMAN FIRM
                              4605 BLUBONNET BOULEVARD
                              SUITE A
                              BATON ROUGE, LA 70809

                              ALEXANDER C. LANDIN
                              KULLMAN FIRM
                              1100 POYDRAS STREET
                              1600 ENERGY CENTRE
                              NEW ORLEANS, LA 70163

```
Official Court Reporter:       Nichelle N. Drake, RPR, CRR
                               500 Poydras Street, B-275
                               New Orleans, Louisiana 70130
                               (504) 589-7775


     Proceedings recorded by mechanical stenography,
transcript produced via computer.
```

I N D E X

|                      | Page |
|----------------------|------|
| VOIR DIRE            | 10   |
| JURY INSTRUCTIONS    | 102  |
| OPENING STATEMENTS   | 109  |

E X A M I N A T I O N S

| Witness | Page |
|---------|------|
| KEITH BABIN | |
|    DIRECT EXAMINATION BY MR. KOPFLER | 129 |
|    CROSS-EXAMINATION BY MR. MILLER | 151 |
|    REDIRECT EXAMINATION BY MR. KOPFLER | 165 |
| KEVIN BURGE | |
|    DIRECT EXAMINATION BY MR. STIEGLER | 168 |
|    CROSS-EXAMINATION BY MR. MILLER | 207 |
|    REDIRECT EXAMINATION BY MR. STIEGLER | 218 |

1           **P R O C E E D I N G S**

2                   (Call to order of the court.)

3    THE COURT:  Good morning, everybody.  This morning we have

4    18-7378, *Babin et al. versus Plaquemines Parish* set for

5    trial.

6           Counsel, is everybody ready for trial?

7           MR. MILLER:  Yes, Your Honor, defendants are ready.

8           MR. STIEGLER:  Yes, Your Honor.

9           THE COURT:  I had a couple of things that I wanted to

10   go over with all of you prior to trial beginning.  So let me

11   just go over those.

12          Number one, just a reminder, and I know we discussed

13   this in the pretrial order, all challenges for cause for

14   jurors will happen up at the bench.  So after the

15   questioning, if you recall, I will do the voir dire

16   questioning -- oh, good morning.

17          MR. KOPFLER:  Good morning.

18          THE COURT:  So I'm going over a few housekeeping

19   matters to make sure we're all on the same page.

20          I will do the voir dire.  Before we end with the voir

21   dire, I will call you up here to see if you have additional

22   questions that you either want me to ask or I'm open to you

23   asking them at that time, but we'll discuss those at the

24   bench.

25          Challenges for cause will be made at the bench.  So

1    please do not make any challenges for cause because it could

2    taint the jury pool except up at the bench.  And we hadn't

3    discussed this, but, of course, Thursday is Halloween.  I

4    would like to tell the jury pool when they come up that we

5    have talked and we've all agreed that the jury will be out

6    for that day by five o'clock at the latest, at the absolute

7    latest.  And hopefully we can get them out more earlier which

8    might help relieve their minds if they have family or any

9    other plans for that day.

10          Any objection to that?

11          MR. MILLER:  No, Your Honor.

12          MR. KOPFLER:  No, Your Honor.

13          I want to confirm the witnesses because I'm going to

14   read the witness list to the jury -- the jury pool and ask if

15   they know anybody.  So we're going to have the four

16   plaintiffs, Mr. Babin, Mr. Burge, Mr. Dismukes, and Ms. Tate

17   and Mr. Patrick Harvey, Ms. Jonathan Butcher, Ms. Emily Sylve

18   -- is that how you say her name?

19          MR. MILLER:  Sylve.

20          THE COURT:  Sylve.  Mr. Roy Robichaux and Ms. Gina

21   Meyer.

22          MR. MILLER:  Yes, Your Honor.

23          THE COURT:  Am I missing anybody on either side?  No?

24          MR. MILLER:  No.

25          THE COURT:  So I was also going to say I will

1    normally address the lead counsel but Ms. Linzy is not here.

2    So who am I addressing for the defendants?

3            MR. MILLER:  That would be me, Your Honor.

4            THE COURT:  Mr. Miller, I will address you.

5            And for the plaintiffs?

6            MR. KOPFLER:  Mr. Kopfler.

7            THE COURT:  Mr. Kopfler.

8            Okay.  I'm going to go over the voir dire in a

9    moment.  You submitted joint voir dire questions and I'm

10   going to put on the record that of those questions I have

11   incorporated all of them except for Nos. 14, 15, 17, and 18.

12   And I'd just like to advise you, some of those I thought were

13   overly broad and others getting into too much personal

14   information or was not relevant at all for this -- for

15   questioning in having a fair and impartial juror.  All the

16   other questions I either incorporated as they were written

17   and submitted by you or for questions 11, 12, 13, 16, and 25,

18   I incorporated those in another format but still incorporated

19   them.  So I want to put that on the record.

20           The statement of the case I adopted as is, the joint

21   statement of the case that was submitted and that's what will

22   be read to the jury pool as soon as they come up.

23           And then, finally, you have proposed some jury

24   instructions for the closing, which each side has objected to

25   those -- each other's closing instructions.  So I am going to

1  suggest we have a charging conference back in chambers,

2  perhaps maybe today after -- after we finish and perhaps

3  tomorrow, a final one.  And we'll discuss those in more

4  detail.  Okay.  And then I'll make a definitive ruling on the

5  jury instructions and the jury questions that will be put to

6  the jury and we'll proceed from there.

7       Any questions before we begin?

8       MR. MILLER:  And, Your Honor, we each have three

9  peremptory challenges?

10       THE COURT:  That's correct.  So we're going to pick

11  six jurors and two alternates.  So you will have three

12  preemptory challenges for the six jurors and then you'll each

13  have one additional preemptory challenge for the alternate,

14  for one of the two alternates.  Understood?

15       MR. MILLER:  Yes.

16       THE COURT:  And if you recall, either Melissa or

17  Cheri or together, after we do our challenges for cause, then

18  they will go between you, beginning with the plaintiff, on

19  the preemptory challenges, back and forth and then I will

20  excuse everybody at one time.

21     Any questions?  Mr. Kopfler?

22       MR. KOPFLER:  No questions, Your Honor.

23       MR. MILLER:  Your Honor, we just have one preliminary

24  matter as to the plaintiff's demonstrative exhibits they

25  provided on Friday.  It's my understanding they intend in the

1  opening to show photographs of what purports the trailer

2  where the plaintiffs stayed, or at two or three of the

3  plaintiffs stayed and we would object as to the relevance of

4  that because where they stayed or the condition they stayed

5  isn't really pertinent to this claim for overtime.

6       THE COURT:  Mr. Kopfler?

7       MR. KOPFLER:  Of course, part of our obligation is to

8  prove that the work they performed was for the benefit of the

9  benefit of the people Plaquemines Parish, their employer.

10  The converse of that is the defendants are going to try to

11  show during the standby time, the plaintiffs, particularly

12  those three, except Ms. Tate, were performing work for the

13  benefit of themselves.  So the working conditions,

14  particularly in a station where they're required to stay, is

15  very relevant.

16       THE COURT:  So I'm not sure that I got this exhibit.

17  This is from -- the plaintiff submitted these Friday?

18       MR. KOPFLER:  Yes.

19       MR. MILLER:  These are the demonstrative exhibits per

20  your order that the parties were to provide by noon on Friday

21  to each other.  And I don't think they're going in as an

22  exhibit, but they were going to show the jury these

23  photographs.

24       THE COURT:  I understand.  So what you exchanged with

25  each other?

1          MR. MILLER:  Correct.

2          THE COURT:  And not to come in.  And so how many

3   pictures are we talking about?

4          MR. KOPFLER:  Maybe with -- we got a map of the

5   Parish of Plaquemines and the photos of the dwelling I think

6   are about 10 or 11 pictures.

7          THE COURT:  So, Mr. Miller, I'm going to -- if that's

8   an objection, I'm going to overrule your objection.  I do

9   think he should be allowed to use those and I assume you're

10  going to ask people about those --

11         MR. KOPFLER:  Sure --

12         THE COURT:  So they can --

13         MR. KOPFLER:  Sure.  They were taken by Mr. Burge.

14         THE COURT:  Thank you.

15         Anything else?

16         All right.  The jury should be coming up in a few

17  minutes.

18         I notice that we have some people in the audience and

19  so I want to take the opportunity now to say that -- welcome

20  to court and I'm -- the counsel already knows this and

21  anybody who is part of the party or part of this trial, not a

22  party, but please be careful about who you speak to outside

23  of the courtroom, especially while we're picking the jury.

24  The jury, even once we pick them, will be going in and out.

25  They're allowed to leave for lunch and come back.  And so I

1  will give the jury an instruction, that even though we're a

2  friendly city, people aren't going to say good morning and

3  good afternoon to you because you don't know who's a juror

4  and who's not a juror.  So I would just ask if you don't know

5  somebody, please don't speak to them.  I know that's not in

6  our normal nature, but I say that to everybody.

7       All rise.

8                    (Jury enters courtroom.)

9                         VOIR DIRE

10      Good morning.  Thank you on behalf of everyone here

11  for being here for jury service.  Your service is greatly

12  appreciated.

13      I'm Wendy Vitter.  You're in federal district court,

14  Division "D".

15      This morning we have for trial a civil case

16  proceeding to trial which is expected to last five working

17  days, through the end of this week.  The attorneys for the

18  parties have agreed to the following statement as a very,

19  very broad overview of the case that will be presented to

20  you, the jury that will be chosen.

21      If at any time during this process, you can't hear

22  what I have to say or what one of the attorneys has to say,

23  please raise your hand and let me know.

24      Okay.  This lawsuit was filed by four paramedics and

25  emergency medical technicians working for Plaquemines Parish

1    who claim that they should be paid for overtime.  The

2    plaintiffs are assigned to particular regions of the parish

3    and are assigned seven-day on, on-call shifts during which

4    time they are subject to responding to any emergency medical

5    calls that come in during that region at any time 24 hours a

6    day.  The plaintiffs claim they should be paid for all these

7    on-call standby hours including overtime pay for hours worked

8    over 40 hours in the payroll week.

9          The Parish, Plaquemines Parish, the defendant, claims

10   that the plaintiffs are paid for 18 hours per day per

11   seven-day shift whether on an emergency room call or not and

12   are allocated six hours of unpaid sleep time per day.

13   Therefore, the Parish contends the plaintiffs are not

14   entitled to any additional pay, nor any overtime hours for

15   hours worked over 40 in the payroll workweek for their sleep

16   and standby time.

17         Now, the statement I just gave you was to give you a

18   brief overview of the type of case that will be presented.

19   It is not evidence and should not be considered as evidence.

20   It's for you, the jury, to determine the facts in this case

21   from the evidence that will be presented to you.

22         I'll explain more in the jury instructions but will

23   caution you now that the evidence comes only from testimony

24   and exhibits introduced during the trial.

25         Mr. Kopfler is a plaintiff attorney.

1          Mr. Kopfler, would you please stand introduce

2    yourself and any co-counsel and your clients to the jury?

3          MR. KOPFLER:  Certainly, Your Honor.  My name is

4    Joseph Kopfler.  I'm with the law firm of Kopfler & Hermann.

5    I've been practicing in Houma, Louisiana, where my office is

6    for 42 years.

7          This is my co-counsel Charles Stiegler.  He's an

8    attorney here in New Orleans.

9          We have the pleasure of representing Joshua Dismukes,

10   who's from Golden Meadow, Louisiana; Kevin Burge who is from

11   Norco, Louisiana; and Keith Babin from Schriever or Bayou

12   Blue, Louisiana.  Barbara Tate's been detained in traffic.

13   She lives in Baton Rouge.  She will be here shortly.

14         THE COURT:  Thank you, Mr. Kopfler.

15         Mr. Miller, would you please introduce anyone at your

16   table and co-counsel --

17         MR. KOPFLER:  Thank you, Your Honor.

18         THE COURT:  -- and yourself.

19         MR. MILLER:  Good morning.  My name is Eric Miller.

20   I am the attorney for Plaquemines Parish.  I'm with the law

21   firm the Kullman firm.  My co-counsel is Alex Landin, also

22   with my firm and our client representative is a fire chief

23   Jonathan Butcher with Plaquemines Parish.

24         THE COURT:  Thank you.

25         I'd like to take a moment to introduce my staff and

1    the people who work in the courtroom.

2          My law clerk is Frannie Montegut.  My judicial

3    assistant is Marie Furman.  She is not in the courtroom right

4    now, but you might see her coming in and out.  The case

5    managers are Melissa Verdun and Cheri Strouder.  The court

6    reporter is Ms. Nichelle Drake.

7          The parties, the plaintiffs and the defendant in this

8    case have a right to have this case tried by a qualified,

9    fair, and impartial jurors.  Some cases are best heard by a

10   judge and some cases are best heard by a jury.  This case is

11   best heard by a jury.

12         A qualified and impartial jury is one which is

13   responsible and capable and which will without fear, favor,

14   bias, prejudice, sympathy or passion objectively hear and

15   decide the issues to be tried and render its verdict based

16   solely on the evidence presented at this trial and the law

17   applicable to the case as given to you by the Court.

18         A juror's qualifications and impartiality may not be

19   assumed without inquiry and the inquiry, which we are about

20   to make, is known as the voir dire examination.  It's a

21   time-honored process by which the qualifications and

22   impartiality of jurors may be determined.  Its purpose is to

23   develop the truth about a juror's competency for the case

24   before us and his or her frame of mind and ability to do his

25   or her sworn duty in accordance with the juror's oath.

1          Your answers to the questions which I will ask will

2    enable me to determine whether a juror should be excused for

3    cause either on my motion or upon motion of a party.  Your

4    answers will also allow counsel to make intelligent use of

5    their peremptory challenges.  Peremptory challenges are

6    challenges which the law gives each party to exercise without

7    assigning any reason for the challenge.  You should

8    understand therefore that your answers to the questions asked

9    must be complete and truthful.

10         Each of you is under compulsion to disclose upon a

11   general question any and all matters which might tend to

12   disqualify you for any reason from sitting on this case.

13   While the scope of the questions may be broad, it is your

14   affirmative duty to honestly and conscientiously answer the

15   questions asked and to make your answers as full and complete

16   as possible under the circumstances.

17         False or misleading answers may result in the seating

18   of a juror who might have been discharged by the Court for

19   cause or stricken through the exercise of a peremptory

20   challenge and could result in a miscarriage of justice.

21   Consider each question very carefully and don't wait until

22   after you're selected and sworn as a juror to disclose

23   something that ought to be made known at a time a question is

24   propounded or one question suggests to you some other reason

25   for disqualification.  If you believe you should offer some

1    answer for consideration, please do so.

2         While the questions that I ask will be addressed to

3    all of you collectively, they must be considered by you as

4    though directed to you individually.  Please know that our

5    purpose in this voir dire examination is not to embarrass

6    anyone.  If appropriate, you are welcome to discuss answers

7    at the bench with myself and counsel.

8         Our clerk is now going to administer an oath to the

9    entire venire.  So the questions that I am asking you will be

10   under oath.

11        Please administer the oath.

12             (Prospective jury administered oath.)

13        THE DEPUTY CLERK:  Thank you.  You may be seated.

14        THE COURT:  Thank you.

15        Before we begin, I'd ask that anyone who has phones

16   -- and I know you have purses and things with you, please put

17   away all phones.  They should not be used in the court at

18   all.  Thank you.

19        What I should say -- what I am saying now should not

20   be construed as an invitation to any of you to capriciously

21   or without good cause seek to be excused merely to avoid

22   discharging the legal and civil duty which you have to serve

23   as jurors.  But if any of you, honestly and conscientiously

24   believe that you would be subjected to serious hardship or be

25   otherwise serious inconvenienced or affected if you are

1  selected as a juror in this trial and, again, a trial that is

2  expected to be concluded by the end of this week.  I request

3  that you one by one raise your hand and then step up to the

4  bench and we'll discuss at the bench with the counsel your

5  reason.

6        Let me give you an example of a serious inconvenience

7  which would be, for example, your son or daughter's wedding

8  would be a serious reason, a surgical procedure that could

9  not or should not be postponed.

10       Let me give you another example of what would not be

11 a serious reason:  Participation in Halloween activities

12 would not normally be considered a serious reason for not

13 serving.

14       Having said that, let me advise you that all the

15 counsel has asked that I make sure to advise you that they

16 have agreed that you will be discharged on Thursday on

17 Halloween well before evening.  So at 5:00 at the latest and

18 probably earlier than that so that if you do have activities

19 on Halloween whether with your family or on your own, you

20 will be free to engage in those.

21       Again, please raise your hand if you feel you would

22 be subjected to serious hardship or be otherwise seriously

23 inconvenienced or affected if you were selected as a juror in

24 this trial.

25       I'm going to go to in order.  I see everybody sitting

1    there and I'm going to go in order.  So that Juror No. 8.

2    Would you like to please approach the bench.

3             (WHEREUPON, the following proceedings were held at

4    the bench:)

5             THE COURT:  Juror No. 8, what's going on?

6             JUROR:  So my father is a hostage in Venezuela.  It's

7    an honor to be here because the legal doesn't work there.  He

8    doesn't have a trial or anything, but I can serve.  I just --

9    I sometimes have phone calls or things that state department

10   people call us about things that might be happening and have

11   to make certain decisions.

12            THE COURT:  And this is your father you're talking

13   about?

14            JUROR:  Yes.

15            THE COURT:  And how long has he been a hostage?

16            JUROR:  He'll be two years this November 21st.  And

17   so yeah.  That's the only -- it's kind of obviously a strange

18   situation.

19            THE COURT:  So let me ask you, first, you won't be

20   able to have your phone --

21            JUROR:  Right.

22            THE COURT:  -- while you're serving --

23            JUROR:  That's the only -- yeah.

24            THE COURT:  -- as a juror.

25            Would you be able to concentrate and give your full

1    attention to this matter or would your mind be on something

2    else happening or checking your phone?

3            JUROR:  No, I should be able to concentrate.  My only

4    concern is I obviously sometimes may have to step out because

5    I do get a little -- having anxious issues because of this or

6    if I could have water to take my meds and things to kind

7    of -- that's the only thing.

8            THE COURT:  And we can certainly do that.  And I'm

9    going to instruct all the jurors that if you need a break,

10   raise your hand and if you need water and if you want to

11   bring water here you can.

12           JUROR:  Yeah, just to step out or something like

13   that.  Sometimes, you know, things happen but that's the only

14   thing.

15           THE COURT:  And I'm very sorry to hear --

16           JUROR:  Thank you.

17           THE COURT:  -- about your father and I'm sure I speak

18   for everybody here.

19           Is there anything going on right now in his case that

20   is different than what's been going on?

21           JUROR:  The only thing is, he'll be two years this

22   November and so we're building -- working on some stuff for

23   --next week I'll be going to DC, certain things might be

24   happening down there with the case hopefully that we can get

25   it resolved before the two-year mark.  That's kind of like

1   our goal.  But -- and if you want to look online, we are on

2   there.  Yeah.  So whatever you decide.

3          THE COURT:  But if you're chosen, if you're chosen,

4   you feel you can sit and pay attention --

5          JUROR:  Yeah.

6          THE COURT:  -- and your mind will be on this case?

7          JUROR:  Yeah, I believe so.  I can do it.  I just

8   wanted to make sure I can step out or, you know, have water

9   or whatever if I need it.

10          THE COURT:  Any questions, Mr. Kopfler?  Mr. Miller?

11          MR. KOPFLER:  No questions, Your Honor.

12          THE COURT:  Thank you for bringing that to our

13   attention.  Please go take a seat.

14          JUROR:  Thank you.

15          THE COURT:  Why don't y'all stay here?

16          Mr. Kopfler.

17          Okay.  Juror No. 16.

18                    (Juror approaches bench.)

19          This is Juror No. 16, Mr. Lacombe.  Tell us what's

20   going on.

21          JUROR:  I'm not sure what the duration of the trial.

22   I do have travel arrangements for work set for Friday

23   morning.  We may be out of here, but I do have travel

24   arrangements out of state.

25          THE COURT:  We may be.  And you're flying somewhere

```
 1   Friday?

 2          JUROR:  Yes, ma'am, to Houston.

 3          THE COURT:  And when are you needed there?

 4          JUROR:  Friday afternoon.

 5          THE COURT:  Can it be, you know, rescheduled?  Can it

 6   be pushed back a little bit?

 7          JUROR:  It is a set meeting.  It is a disaster

 8   program I do disaster recovery for work and it is a mandatory

 9   pre-bid meeting.

10          THE COURT:  Are you the leader of the meeting?

11          JUROR:  Yes -- I'm not the leader of the meeting.

12   I'm representing my company in the meeting.

13          THE COURT:  Is somebody else from your company also

14   going?

15          JUROR:  No, I am the only individual going at the

16   current time.  That is something I could potentially arrange,

17   but I am usually the only person that attends those meetings.

18          THE COURT:  So if you are selected, do you think you

19   would be able to either get somebody else from your company

20   to go and take that meeting or push the meeting to --

21          JUROR:  I should be able to.  I mean, I don't think

22   it would be a problem.  But I did want to at least bring it

23   to the attention --

24          THE COURT:  So if you are selected without having

25   that opportunity but you'll then have the opportunity to make
```

1   those arrangements, would you be able to give this trial your

2   full attention?

3        JUROR:  Yes, ma'am.

4        THE COURT:  And put that aside that somebody else is

5   going to take it or it's going to be pushed back and you'll

6   be able to give this trial your full attention?

7        JUROR:  Yes, ma'am.

8        THE COURT:  Any questions, Mr. Miller, Mr. Kopfler?

9        MR. KOPFLER:  No, ma'am.

10       THE COURT:  Thank you for bringing that to our

11   attention.

12                    (Juror returns to jury box.)

13       Stay here for a moment.

14                    (Juror approaches bench.)

15       Juror Number 17.  Good morning, Mr. Balfer.

16       JUROR:  Yes.  So I work in publishing.  I'm a

17   one-person department, so I do fear that five days away would

18   cause an extreme emotional psychological distress, definitely

19   impair my ability to concentrate.  It's my busiest time of

20   the year in the winter season, and I do have many projects

21   closing on top of each other.  So to be away for that long

22   would not mean that the doesn't gets done by someone else.

23   It would simply accumulate.  That's my concern.

24       THE COURT:  Mr. Balfer, you understand that our

25   justice system requires jurors.  It's an essential part of

1    having a fair and impartial trier of fact.

2         JUROR:  Yes.

3         THE COURT:  And we need jurors to hear cases.

4         JUROR:  Yes.

5         THE COURT:  If you were selected as a juror in this

6    case, would you be able to sit and give your 100 percent

7    attention to the facts of this case?

8         JUROR:  I don't think I could say 100 percent.

9         THE COURT:  Have you ever served as a juror?

10        JUROR:  No.

11        THE COURT:  Have you ever been called as a juror?

12        JUROR:  No.

13        THE COURT:  Do you have anyone else who works with

14   you?

15        JUROR:  Not in my department, no.  Singular

16   department.

17        THE COURT:  What's the company you work for in?

18        JUROR:  I work for Renaissance Publishing.  I'm the

19   leader of the custom department.  So I'm the only editor.  I

20   do have art directors for the production of the magazines,

21   but I'm the only editor for that department.

22        THE COURT:  Are there deadlines taking place this

23   week?

24        JUROR:  Yes, ma'am.

25        THE COURT:  And what happens if that doesn't get

1      done?

2             JUROR:  Magazines get delayed.

3             THE COURT:  And there's nobody else that does it

4      other than you?  Nobody would take that over?

5             JUROR:  (Shakes head.)

6             THE COURT:  If you had the opportunity to make a

7      phone call, could they get somebody else in place to do that?

8             JUROR:  Possibly.  Traditionally there's no one that

9      supports my role.

10            THE COURT:  Mr. Kopfler, any questions?

11            MR. KOPFLER:  The fact that you would be called away

12     from a key position for this company, is that going to cause

13     you stress?

14            JUROR:  Yes.

15            MR. KOPFLER:  That you would have difficulty paying

16     attention to the evidence.

17            JUROR:  I would say so, yes.

18            MR. KOPFLER:  How so?

19            JUROR:  Our magazines are basically paid for by other

20     clients.  So it's not just our company who, you know, would

21     be inconvenienced by it.  It would be who all of our clients

22     who are waiting for me to produce their publications.  So

23     that's my concern.  It's not just myself and my company

24     affected.  It's also all of our clients.

25            MR. KOPFLER:  What happens when you get sick or have

1    the flu?  Does the company shut down or does someone take

2    your place?

3             JUROR:  No.  I continue working.

4             THE COURT:  Do you have vacation time?

5             JUROR:  I do.  I haven't used any this year.  I had

6    surgery earlier this year, and I did have to work from home

7    while I recovered.

8             THE COURT:  Mr. Miller, any questions?

9             MR. MILLER:  No questions.

10            THE COURT:  Thank you.  Please be seated.

11                    (Juror returns to jury box.)

12            Yes.  Juror No. 18.

13                    (Juror approaches bench.)

14            This is Juror 18, Ms. Ricard.

15            Ms. Ricard, good morning.  What's going on?

16            JUROR:  I was in a car accident in August and I have

17   a herniated disc in my neck and a bulging disc in my neck and

18   I have injections scheduled for Friday and I go to physical

19   therapy twice a week.  And I can't sit down for a long time

20   because it puts pressure on my back and my neck.

21            THE COURT:  Sounds as though you have some

22   significant newly diagnosed medical issues.  Are you in pain

23   right now?

24            JUROR:  Yes.

25            THE COURT:  Yes.  Okay.  If you were selected as a

1    juror, you would have to sit for -- and you could stand.

2    You're certainly more than welcome to stand.  Would that help

3    alleviate it?

4         JUROR:  I have to sit down for a minute, then stand

5    up and sit down.

6         THE COURT:  And you could certainly do that sit down

7    and stand up.  If you are selected, we would be for probably

8    four days of being a juror.  Would your medical issues cause

9    you not to give your full and complete attention to this

10   matter?

11        JUROR:  Yes.

12        THE COURT:  Mr. Kopfler, any questions?

13        MR. KOPFLER:  Yes, ma'am.

14        Are you taking any narcotic medication that would

15   impair your ability to --

16        JUROR:  I take Flexeril, I take gabapentin,

17   1200 milligrams.

18        MR. KOPFLER:  You take any narcotics?

19        JUROR:  I don't think it's -- tramadol, that's a

20   narcotic.

21        MR. KOPFLER:  Tramadol, gabapentin, and Flexeril?

22        JUROR:  Yes.

23        MR. KOPFLER:  You're scheduled for a procedure

24   Friday?

25        JUROR:  6:30 in the morning.

1          MR. KOPFLER:  Where is that?

2          JUROR:  Metairie LA Solutions.

3          MR. KOPFLER:  No further questions.

4          THE COURT:  Mr. Miller, anything?

5          MR. MILLER:  No questions.

6          THE COURT:  And this procedure, have you had this

7    procedure before?

8          JUROR:  I had it in my neck already.  But I'm getting

9    it in my back this time.

10          THE COURT:  Thank you, Ms. Ricard.  Please have a

11   seat.

12                    (Juror returns to jury box.)

13          Juror No. 19.

14                    (Juror approaches bench.)

15          THE COURT:  Ms. Sam.

16          JUROR:  This is very -- we have a leadership meeting

17   on Wednesday.

18          THE COURT:  A leadership meeting.

19          JUROR:  Yeah, on Wednesday.  So all the leaders will

20   be out and it will be in Raceland.  I'm the only one open up

21   on Wednesday.  If there's any way I am serving to call them

22   and let them know.  I need to let them know ASAP if I'm to

23   serve because they need to find someone to open and on

24   Wednesday.

25          THE COURT:  Ms. Sam, I understand you have an

1    obligation.  What time is that that you have to be there to

2    open?

3              JUROR:  8:00.

4              THE COURT:  8:00 in the morning?

5              JUROR:  Uh-huh.

6              THE COURT:  But if you were selected and if I gave

7    you time today to make a call --

8              JUROR:  Yes.

9              THE COURT:  -- you think somebody will be able to

10   take your place and do that?

11             JUROR:  I think so.  I'm hopeful they will be.

12             THE COURT:  You know for a fact they would be able

13   to?

14             JUROR:  I don't know for a fact, but I'm pretty

15   certain we would have to figure something out.

16             THE COURT:  So if you were selected and you were able

17   to make that call and know that somebody is in place, would

18   you be able to give this matter your full attention?

19             JUROR:  Yes.

20             THE COURT:  Thank you.

21             Any questions, I'm sorry, Mr. Kopfler?  Mr. Miller?

22             MR. KOPFLER:  No.

23             THE COURT:  Thank you.

24                  (Juror returns to jury box.)

25             Juror No. 21.

1              (Juror approaches bench.)

2          Ms. Ruli.  It's R-u-l-i.

3          MR. MILLER:  21?

4          THE COURT:  Correct.

5          MR. MILLER:  21 is Love.

6          THE COURT:  I'm sorry.

7          JUROR:  I work as an evaluator in St. Tammany Parish

8   School Board and we would work on -- we're completing the

9   student evaluations to see if they could qualify for special

10  education services.  So missing the five days would be a

11  hardship for me because I have students that is in timeline

12  right now and that would negatively impact me completing

13  their evaluations within that time frame.  Like I had one

14  that I was trying to get out on Thursday.

15         THE COURT:  And so these evaluations, does somebody

16  else work on them with you?

17         JUROR:  Yeah, it's a team.

18         THE COURT:  You're one member of this team?

19         JUROR:  Uh-huh.

20         THE COURT:  And did you say they're due this week?

21         JUROR:  Well, I had one that I was trying to prepare

22  for.  I'm the actual coordinator, so I have all the pieces

23  the teams do need to review.  I have to meet with the parents

24  to go over their results and then we can put it out.

25         THE COURT:  And knowing that this trial could go

1    through Friday, hopefully, it won't, but could go through

2    Friday, could this be pushed to Monday where you could get

3    this done?

4         JUROR:  It'll still be a stretch because on top of

5    doing the evaluations, I still have to go out and do like

6    educational testing for my teammates who have like their

7    evaluation.  So it could be done but it will just be a

8    stretch.  I just wanted to voice it.

9         THE COURT:  I appreciate it.  And you do have other

10   members of your team.  Could some of them do this?

11        JUROR:  I'm the only person to do, like, the

12   education.  Like they each work in their discipline, like the

13   psychologists do the psychology tests, the speech do the

14   speech test.  I do education and I'm on every case as the

15   education evaluator.

16        THE COURT:  Let me ask you, Ms. Love.  If you're

17   selected as a juror, with you knowing your work that is going

18   on, would you be able to give this matter your full

19   attention?

20        JUROR:  I would try my best.  Everything I do I try

21   to give my best.  I will try my best.

22        THE COURT:  If you were the attorneys here, would you

23   want you in your current frame of mind to serve as a juror in

24   this matter here?

25        JUROR:  To be honest, no, because on top of work, I

1  do have some stuff personally at home with my husband that

2  I'm experiencing too that's kind of like affecting me.  Like

3  even today, like I'm here.  I'm not here, like I'm having

4  difficulty focusing.

5        THE COURT:  And, again, we don't want to embarrass

6  you.  So whatever is going on either professionally or

7  personally, do you feel as though you can give this matter

8  your undivided attention and be a fair and impartial juror?

9        JUROR:  Yes.

10       THE COURT:  Yes.

11       JUROR:  As long as it -- it's not starting today,

12  right?  This is just the jury selection.

13       THE COURT:  It is starting today.  After we pick the

14  jury, we're going to start immediately.  Is there something

15  going on?

16       JUROR:  Yeah.  If it's today, yeah.

17       THE COURT:  You have something today?

18       JUROR:  No, I'm saying like just with the focus like

19  if we could -- this is my first time being in this

20  environment or experience, so I would like to, like, try to

21  get under myself so I can focus because right now --

22       THE COURT:  Let me say, when we pick the jury,

23  everybody will have a break to make whatever phone calls,

24  take care of any professional obligations or personal, so you

25  will have a break during that time.  And, of course, during

1   the day and at lunch, you will have breaks also where you can

2   be on your phone.  You will have access to speak to other

3   people.  Knowing that, would you be able to be a juror and

4   give your attention to this matter?

5        JUROR:  Yes, with a break.  Yes, with a break.

6        THE COURT:  Mr. Kopfler, any questions?

7        MR. KOPFLER:  No questions, Your Honor.

8        THE COURT:  Mr. Miller.

9        MR. MILLER:  No questions.

10        THE COURT:  Thank you, Ms. Love.

11             (Juror returns to jury box.)

12        Anybody else?

13        Yes, please come forward.

14             (Juror approaches bench.)

15        JUROR:  Good morning.  My name is Heidi.

16        THE COURT:  You're Ms. Conley?

17        JUROR:  Yes, ma'am.  Despite the panic attack I had

18   getting on the elevator, I didn't expect that.

19        THE COURT:  Is it scary?

20        JUROR:  It's one of those things that triggers my

21   anxiety panic attacks, but I'm sorry.  I'm sorry for that.

22   But my sister drove me this morning and my husband's off

23   tomorrow but that's the only rides I have.  I don't drive out

24   of my neighborhood.  You know, I don't drive the interstate

25   and I'm the only employee of where I work.  So my boss will

1    be here today and tomorrow, but the main thing is that, what

2    happens to me, I suffer from insomnia.  And I didn't sleep

3    last night, and I don't know what would happen to me today,

4    I'm not going to sleep tonight either.  So that plays a role

5    in my ability to, I don't know, be comprehensive or how do

6    you say it?  Or present?  What is the word I'm looking for?

7            THE COURT:  Present is a good word.

8            JUROR:  Yeah.  Impaired, I think that's what I'm

9    looking for.  So I don't drive out of my neighborhood.  Like

10   I said, I don't do that when I have nights I don't sleep.

11           THE COURT:  Ms. Conley, what's your job?

12           JUROR:  I work at the vitamin store.  It's a small

13   business privately with the big guys.  So it's on Veterans.

14   So it's a small privately owned business for natural

15   medicine.

16           THE COURT:  But you're able to work and concentrate

17   during your job?

18           JUROR:  Yes.  We don't open until 10:00.  So

19   sometimes I get sleep from like 2:00 to 4:00 at the most.

20   But like I said, when my anxiety attack happened in the

21   elevator, knowing that every day I might have to get in

22   there, that is -- it's unreasonable.  For most people, I

23   understand that.  That's not something that's normal.

24           THE COURT:  So, Ms. Conley, only you can answer this

25   question.  If you were selected as a juror in this case and

1   knowing that it's going to be the rest of today, could be

2   four days, it might be five, could you give it your undivided

3   attention and be a fair and impartial juror in this case?

4          JUROR:  No.

5          THE COURT:  You said no?

6          JUROR:  No.  Just because I don't think I can just

7   focus only on that.  I believe --

8          THE COURT:  Do you take any medicine?

9          JUROR:  Only natural medicine.  I can't take

10  prescription drugs.  My body responds horrible to it,

11  horrible doctor experiences.  So that's why I do what I do in

12  natural therapies.  So I have things I try to help with that.

13         THE COURT:  Have you ever served as a juror before?

14         JUROR:  No, ma'am.  I have gone three different times

15  but I was just in the room, never called.  Across the river.

16  My husband took me and waited with me.  I don't drive out of

17  the neighborhood.  I don't do bridges and I don't do

18  interstate.

19         THE COURT:  Mr. Kopfler, any questions?

20         MR. KOPFLER:  So where you work, do you drive to

21  work?

22         JUROR:  Literally straight down Veterans Avenue.

23  It's one way, just red lights.  I don't get on the

24  interstate.  I don't -- I have less than 10,000 miles on my

25  2015 Encore.

1        MR. KOPFLER:  I can sympathize with the insomnia.  I

2  have that from time to time.  But the downside is, I get real

3  sleepy in the afternoons, particularly after lunch.  Are you

4  subject to nodding off where you would --

5        JUROR:  Well, I can't focus.  I get where I can't

6  focus.  You know, unfortunately, I wouldn't wish this on

7  anybody and I believe in the system and I believe in this

8  with all my heart.

9        THE COURT:  Mr. Miller, any questions?

10        MR. MILLER:  If I understand, so you don't have a

11  ride Wednesday, Thursday or Friday?

12        JUROR:  No, sir, I do not.  My sister came in from

13  Chalmette to get me and my husband works for the Postal

14  Service.  He's off on Tuesdays, but the rest of the week, I

15  do not.

16        This is so embarrassing.

17        THE COURT:  No, we appreciate you being honest with

18  us and I also appreciate that you understand the importance

19  of the jury system.

20        JUROR:  I do.  I do.

21        THE COURT:  Because we --

22        JUROR:  I respect it.  It's our right.

23        THE COURT:  We need jurors.

24        JUROR:  It's our right.

25        THE COURT:  Our obligation.

1          JUROR:  Yes, ma'am.

2          THE COURT:  So understand that.  Thank you.  I don't

3     think we have any other questions.  Please go have a seat.

4     You okay to sit back down?

5          JUROR:  Yes.

6          THE COURT:  Take your time.

7                    (Juror returns to jury box.)

8          Let me see if there's anybody else.

9                         (In open court.)

10         Would anybody else have a serious hardship that

11    hasn't already spoken?  Juror No. 7.

12                    (Juror approaches bench.)

13         WHEREUPON, the following proceedings were held at the

14    bench:

15         JUROR:  How you doing, Your Honor?

16         THE COURT:  Good morning, Mr. Hotard.

17         JUROR:  The thing is I, don't know how to drive in

18    New Orleans.  My son missed work to bring us today, and after

19    today, I got to depend on my wife to bring me and she's

20    taking care of her dad which he's got cancer.

21         THE COURT:  So do you think if you were chosen as a

22    juror that you could make some plans, whether it's your son

23    or wife or somebody else, to drive you just for these few

24    days?

25         JUROR:  Somebody would have to drive me.  Nine out of

1    ten with me driving, nine out of ten I'm going to get in a

2    wreck before we get here.

3              THE COURT:  We don't want that to happen.  Where are

4    you coming from?

5              JUROR:  Thibodaux.

6              THE COURT:  Do you think you can make those plans --

7              JUROR:  I can try.

8              THE COURT:  -- and find somebody to drive you?

9              JUROR:  I can try.  That's all I can say.

10             THE COURT:  Your wife does drive?

11             JUROR:  Yes.  But she's not great at driving in New

12   Orleans either.

13             THE COURT:  But if she -- I understand she's taking

14   care of a parent with cancer, but if she dropped you off and

15   had the whole day free and could come get you, would that

16   work?

17             JUROR:  Maybe.  Yes.

18             THE COURT:  Mr. Hotard, correct?

19             JUROR:  Yes.

20             THE COURT:  You're the only one who can tell

21   everybody here.  If you were chosen, could you sit and give

22   your 100 percent attention to this case and be a fair and

23   impartial juror?

24             JUROR:  Yes.

25             THE COURT:  Mr. Kopfler, any questions?  One second,

1    sir.

2              MR. KOPFLER:  What kind of cancer does your --

3              JUROR:  He's got lung cancer.

4              MR. KOPFLER:  Is he hospitalized or at home?

5              JUROR:  He's staying at the house right now.  They

6    have to bring him every so often to the hospital get checked.

7              MR. KOPFLER:  Does he have any appointments set up

8    this week?

9              JUROR:  For this month.

10             MR. KOPFLER:  This month, not this week.

11             JUROR:  No.

12             MR. KOPFLER:  This week?

13             JUROR:  Not this month.

14             MR. KOPFLER:  We're almost end of the month, that's

15   why I'm just asking.

16             JUROR:  I understand.

17             MR. KOPFLER:  He's already had his appointments?

18             JUROR:  Well, he's got to go every so often to get

19   checked to see if it's advancing or what.

20             MR. KOPFLER:  How did you get here today?  It wasn't

21   with your wife, was it?

22             JUROR:  No.  My son.  My son took off of work to

23   bring us.

24             MR. KOPFLER:  What kind of work does he do?

25             JUROR:  He's a school teacher.

1          THE COURT:  Mr. Miller, any questions?

2          Thank you, Mr. Hotard.

3                    (In open court.)

4          Anybody else that would have a serious inconvenience

5     or hardship that wants to share anything?

6          Thank you.

7          We'll do these after.

8          MR. MILLER:  The cause after?

9          THE COURT:  Yeah, because I think there will be more,

10    so let's see what happens.

11         MR. KOPFLER:  We may end up getting a jury before we

12    even get to most of these people.  So I was thinking we got

13    16 in the box right now.  We only need eight.

14         THE COURT:  Right.  Right.  So let's just wait and

15    keep going with the questions.

16                    (In open court.)

17         THE COURT:  Thank you.  And let me take a minute and

18    say there will be times in the voir dire process and in the

19    trial where the counsel has to approach the bench and you

20    will have to listen to that music.  During this process -- it

21    could be worse.  During this process, if you want to talk

22    amongst yourselves quietly you may.  If you need to stand up

23    and stretch your back and just stand up you may.  I apologize

24    we need to do that.  But it will actually make things move

25    faster if we can do that.

1          For all of you, if you answer no to the following

2     questions, please raise your hand, if your answer is no to

3     the following:

4          Can each of you read, write, speak, and understand

5     the English language?

6          Is there anybody no?  Nobody has raised their hand.

7          Can everybody hear and see well?  Anybody who has an

8     issue with that?

9          Nobody has raised their hand.

10         Now, for the remaining questions, if your answer is

11    yes, please raise your hand.  I'll remind you what I just

12    said, that you may approach the bench and discuss any answers

13    with myself and counsel if need be.  We don't want to

14    embarrass anybody with your answers.  The purpose of these

15    questions is simply to get a fair and impartial jury.

16         From the brief overview I gave you earlier, do you

17    think that you know anything about this case?

18         Have you read anything about it or have you heard any

19    discussions concerning it?

20         Has anyone spoken to you about it or communicated to

21    you in any way about this case?

22         Anybody raising their hand?

23         No.

24         The plaintiffs in this case are Keith Babin, Kevin

25    Burge, Joshua Dismukes, and Barbara Tate.  And I don't think

1    any of us got to meet Ms. Tate earlier and I think this is

2    Ms. Tate that came in.

3           Ms. Tate, the rest of the plaintiffs were introduced.

4    This is Ms. Tate.  Thank you, ma'am.

5           The defendant in this case is Plaquemines Parish.

6    Does anyone here know anybody I just named?  Anybody?

7           The attorneys introduced themselves earlier.  And,

8    again, I'm going to provide their names and law firms.

9    Representing the plaintiffs are Charles Stiegler of the

10   Stiegler Law Firm and Kopfler of Kopfler & Hermann Law Firm.

11   Representing the defendant, Plaquemines Parish, is Eric

12   Miller and Geoffrey Mitchell.

13           MR. MILLER:  Alex Landin.

14           THE COURT:  Oh, I'm sorry.  Alexander Landin.

15           MR. MILLER:  Alexander Landin.

16           THE COURT:  I'm sorry.

17           Do you know any of the attorneys in the matter?

18   Anybody?

19           Has anybody had any dealings with any of the law

20   firms mentioned, the Kullman Law Firm, the Kopfler & Hermann

21   Law Firm or the Stiegler Law Firm?  Anybody had any dealings

22   or any family member had any dealings with those law firms?

23           Does anyone know any of the court staff that I

24   introduced earlier?

25           Yes.  One juror's raised her hand, Juror No. 13.

1          JUROR:  Yes, I think so.

2          THE COURT:  Who do you know?

3          Are you married to Chad?

4          THE DEPUTY CLERK:  Yeah.

5          THE COURT:  So you know one of the case managers?

6          JUROR:  Know of.  Sister-in-law and brother-in-law.

7          THE COURT:  So the fact that you know someone on the

8  court staff, would that influence you being a fair and

9  impartial in this case?

10         JUROR:  (Shakes head.)

11         THE COURT:  Could you put aside any personal feelings

12 you have through your brother and sister-in-law and whatever

13 you know about the court staff, listen to the facts of the

14 case and the evidence presented, and base your decisions

15 solely on the evidence presented in the case?

16         JUROR:  Yes, ma'am.

17         THE COURT:  All right.  Thank you.

18         I'm going to read a list of witnesses who may testify

19 in this matter.  Please raise your hand if you know any of

20 the people on this witness list.  I've already introduced the

21 plaintiffs in this case, Mr. Babin, Mr. Burge, Mr. Dismukes

22 and Ms. Tate.  Also, possibly testifying in this case, Mr.

23 Patrick Harvey, Mr. Jonathan Butcher, Ms. Emily Sylve, that's

24 S-y-l-v-e, Mr. Roy Robichaux, and Ms. Gina Meyer.

25         Does anyone know any of the witnesses who may testify

1   in this matter?

2        Has anyone here ever worked in the legal field,

3   whether as a lawyer, paralegal or in any capacity whatsoever

4   in a law office?

5        Okay.  Couple people have raised their hand.

6        Juror No. 9.

7        JUROR:  I'm an attorney.

8        THE COURT:  You are an attorney.  And, ma'am, may I

9   ask where you work?

10        JUROR:  Lugenbuhl, Wheaton, Peck, Rankin & Hubbard.

11        THE COURT:  And I already asked this question.  You

12   don't seem to know any of the attorneys here?

13        JUROR:  I do not.

14        THE COURT:  And do you do any work with employment

15   law?

16        JUROR:  Not in the recent past, no.

17        THE COURT:  Have you ever worked on a case involving

18   the Fair Labor Standards Act?

19        JUROR:  I have worked on an employment dispute

20   involving payroll, but it was not under federal law.

21        THE COURT:  And is there anything in your work that

22   would prevent you from being a fair juror in this case?

23        JUROR:  No.

24        THE COURT:  And you know that I will instruct you on

25   the law and the evidence comes from the witness stand.  Could

1    you put aside any of your expertise and what you already know

2    and base your decision solely on the law as I give it to you?

3            JUROR:  Yes.

4            THE COURT:  Juror in the back.

5            JUROR:  I'm an attorney, self-employed.

6            THE COURT:  Sir, I'm sorry.  I can't see your juror

7    number.  Can you tell me?

8            JUROR:  22.

9            THE COURT:  And that is Mr. Ruli?

10           JUROR:  Correct.

11           THE COURT:  And you're self-employed.  Sir?

12           JUROR:  Yes, solo practitioner.

13           THE COURT:  I'm sorry?

14           JUROR:  Solo practitioner.

15           THE COURT:  Solo practitioner.  And what kind of law

16   do you do?

17           JUROR:  Plaintiff.

18           THE COURT:  And same questions I just asked this

19   juror, sir, could you put aside your expertise and what you

20   know about the law and if you were chosen as a juror, base

21   your decision solely on the evidence presented and the law as

22   I give it to you?

23           JUROR:  Yes.

24           THE COURT:  Is there any other reason why you could

25   not be a fair and impartial juror in this case?

1          JUROR:  No reason.

2          THE COURT:  Thank you.

3          Anybody here -- else work in any capacity in a law

4   firm or as a paralegal in any way?

5          Has anyone here ever worked for Plaquemines Parish?

6   Or do you have any close friends or relatives who are

7   currently or have in the past worked for Plaquemines Parish

8   government?

9          Nobody?

10         Has anybody here ever applied for a job in

11  Plaquemines Parish?

12         No.

13         Has anybody here ever lived in Plaquemines Parish?

14         Would any of you hold an individual to a lesser

15  burden simply because he or she is suing a governmental

16  entity?  Would anybody say because you're suing a

17  governmental entity you shouldn't have to show much in a

18  burden of proof?  Does anybody feel that way?

19         Let me ask the flip side.  Would any of you require

20  an individual suing the government to a higher burden?  And

21  I'll let you know the burden here is a preponderance of the

22  evidence.  Would anyone require a person to how -- to prove a

23  higher burden than what I'm going to tell you is the burden

24  of proof because they're suing a governmental entity?  Does

25  anyone feel that way?

1          Have any of you ever been employed by any

2    governmental department or agency whether federal, state, or

3    local?

4          Yes.  Yes, ma'am.  Okay.  Wait.  Juror No. 12, first

5    and then I'll come to you.

6          JUROR:  I was a teacher but that was 30 years ago,

7    for St. Bernard Parish.

8          THE COURT:  All right.  Thank you, sir.

9          And Juror No. 14.

10         JUROR:  Yes.  I currently work for federal government

11   and I've been working for the government for the past

12   30 years.

13         THE COURT:  And, ma'am, in what capacity do you work

14   for the federal government?

15         JUROR:  Right now I'm a claims examiner for USDA.

16         THE COURT:  Claims examiner and investigator?

17         JUROR:  US -- it's a claims examiner for USDA

18   concerning bills, national finance.

19         THE COURT:  For the USDA?

20         JUROR:  Yes.

21         THE COURT:  And is it Ms. Fanguy or is it -- no.  Oh,

22   I'm sorry.  It's Ms. Pryor.

23         JUROR:  Pryor.

24         THE COURT:  And, ma'am, would that work -- would

25   any -- would that influence your ability to be a fair and

1   impartial juror in this case, your working with the federal

2   government?

3          JUROR:  No, it wouldn't.

4          THE COURT:  Anybody else employed by the federal

5   government?  Yes, ma'am.

6          JUROR:  Not the federal government but with the

7   state.

8          COURT REPORTER:  Can you speak up, ma'am?

9          JUROR:  With the state, with St. Tammany Parish

10  School Board as an educational guidance counselor.

11         THE COURT:  And that's Juror No. 21, Ms. Love?  And

12  you work for St. Tammany --

13         JUROR:  Parish School Board.

14         THE COURT:  And the same questions I asked the other

15  jurors, Ms. Love.  Would that affect your ability to be a

16  fair and impartial juror in this case?

17         JUROR:  No.

18         THE COURT:  Would you -- any of the people who have

19  worked for either the federal government or state government

20  or previously worked for the government, would you be more

21  sympathetic to the defendant, to Plaquemines Parish

22  government?

23         Everybody saying no?

24         The fact that a parish government is a party in this

25  case must not influence your thoughts about this lawsuit or

1    your verdict.  Under the law and in the interest of fairness,

2    you must not distinguish between a parish government and an

3    individual.  All are persons in the eye of the law and both

4    are entitled to be judged fairly and by the same standards.

5    Do any of you have any belief or feeling against parish

6    governments that might prevent you from being fair and

7    impartial in deciding this case?  Does anyone have any

8    negative feelings towards parish governments?

9            Does anyone have any negative feelings towards

10   Plaquemines Parish or Plaquemines Parish government

11   specifically?

12           Nobody raising their hand?

13           Have you or any close friend or family member worked

14   as a first responder, whether with the fire or police

15   department or as an emergency medical technician or

16   paramedic?

17           Anybody?

18           We got a few people.  I'm just going to start in

19   order.  That's Juror No. 6?

20           Yes, sir, Mr. Hayes.

21           JUROR:  Yes.

22           THE COURT:  Do you currently work as a first

23   responder.

24           JUROR:  Family member.

25           THE COURT:  Family member.  And who is that, sir?

1     What relationship?

2           JUROR:  He's my nephew.

3           THE COURT:  A nephew?

4           JUROR:  Yeah.

5           THE COURT:  And in what capacity does that nephew

6     work?

7           JUROR:  Fire department.

8           THE COURT:  And where?

9           JUROR:  I don't remember what parish it was for.

10          THE COURT:  In Louisiana?

11          JUROR:  Louisiana.

12          THE COURT:  Are you close to this nephew?

13          JUROR:  Not really.  I mean, we talk -- holidays and

14    things, but we're not really "close" close.

15          THE COURT:  Do you discuss his work with the fire

16    department?

17          JUROR:  No.

18          THE COURT:  I'm going to have some follow-up

19    questions to everybody, but I'm going to through everyone

20    else first.

21          Who else, family member?  Yes, Juror No. 8 first.

22          JUROR:  My cousin, but it's out of state.

23          THE COURT:  And what does your cousin do, ma'am?

24          JUROR:  He's a fireman.

25          THE COURT:  What state?

```
 1            JUROR:  New York City.

 2            THE COURT:  And do you discuss with your cousin his

 3   or her duties with the fire department?

 4            JUROR:  No.

 5            THE COURT:  Thank you.

 6            Who else down on the bottom -- oh, I'm sorry.  Juror

 7   No. 2.

 8            JUROR:  My sister, she's a police officer for

 9   Plaquemines.

10            THE COURT:  Your sister is -- I'm sorry --

11            JUROR:  Police.

12            THE COURT:  Police officer.  Where?

13            JUROR:  Plaquemines Parish.

14            THE COURT:  In Plaquemines Parish.

15            JUROR:  (Nods head.)

16            THE COURT:  And that's Ms. Johnson?

17            JUROR:  Yes.

18            THE COURT:  And do you discuss with your sister her

19   job as a police officer?

20            JUROR:  No.

21            THE COURT:  Are you close to your sister?

22            JUROR:  No.

23            THE COURT:  Thank you for your honesty.

24            First row, do I have anybody?  Yes.  Yes, ma'am.

25            JUROR:  My father was a police officer for my whole
```

1    life, chief of police.  He was in the national guard.  He was

2    military police.

3           THE COURT:  And that's Juror No. 13?

4           JUROR:  Uh-huh.

5           THE COURT:  And where was your father a police

6    officer?

7           JUROR:  Hattiesburg, Mississippi.

8           THE COURT:  In Hattiesburg.

9           Is your father still working?

10          JUROR:  He just retired last year.

11          THE COURT:  I'm assuming since he did it his entire

12   life you often spoke with him about his activities as a

13   police officer?

14          JUROR:  Oh, yes.

15          THE COURT:  Any other family member?

16          JUROR:  No.

17          THE COURT:  And I'm going to ask some follow-up

18   questions of everybody.

19          Yes, ma'am.

20          JUROR:  My aunt was chief of police her entire career

21   as well.  She retired last year, Saint Mary Parish.

22          THE COURT:  I'm sorry, what parish?

23          JUROR:  Saint Mary Parish.

24          THE COURT:  Your aunt, chief of police.  And were you

25   close to your aunt?

1           JUROR:  Yes.

2           THE COURT:  Did you speak with her about her duties

3    as chief of police?

4           JUROR:  Yes.

5           THE COURT:  Thank you.  I'm going to get back to you.

6           Yes, ma'am.

7           JUROR:  My nephew is a first responder in Terrebonne

8    Parish, Acadian Ambulance.

9           THE COURT:  Your nephew --

10          JUROR:  My nephew is a first responder with Acadian

11   Ambulance, EMT.

12          THE COURT:  Do you know how long your nephew has been

13   working for Acadian ambulance?

14          JUROR:  Been a few years, maybe 7 to 10 years.

15          THE COURT:  Are you close to this nephew?

16          JUROR:  Not really.

17          THE COURT:  Is this your sister's son?

18          JUROR:  My brother's son.

19          THE COURT:  Your brother's son.  Do you speak with

20   your nephew about his duties as a first responder?

21          JUROR:  No.

22          THE COURT:  And in the back row, yes, ma'am.  Yes.

23          JUROR:  My father is a retired New Orleans

24   firefighter and I have two brothers who are police officers,

25   one in New Orleans and one in Houston.

1          THE COURT:  Can tell us your juror number.  I'm

2   sorry.

3          JUROR:  I'm 24.

4          THE COURT:  24.  And your father is retired.

5          JUROR:  Retired New Orleans fire.

6          THE COURT:  New Orleans fire.  And two brothers who

7   are police officers.  Where are your brothers police

8   officers?

9          JUROR:  One here in New Orleans and one in Houston.

10         THE COURT:  And do you speak with them about their

11  job and what they do?

12         JUROR:  I have.

13         THE COURT:  Did anyone else have anybody who's a

14  first responder, police and firefighter?

15         Yes, Juror No. 4.

16         JUROR:  My nephew.

17         THE COURT:  What does your nephew do, ma'am?

18         JUROR:  Police.

19         THE COURT:  Where?

20         JUROR:  Orleans Parish.

21         THE COURT:  I'm sorry?

22         JUROR:  Orleans Parish.

23         THE COURT:  Orleans Parish.

24         JUROR:  Orleans Parish.

25         THE COURT:  NOPD or somewhere else?

1            JUROR:  (Nods head.)

2            THE COURT:  And are you close to this nephew?

3            JUROR:  Yes.

4            THE COURT:  And do you speak to him about his job?

5            JUROR:  Yes.

6            THE COURT:  Okay.  Yes.

7            JUROR:  I do have a nephew who is a fireman in St.

8    Bernard Parish.

9            THE COURT:  He's currently a fireman in St. Bernard?

10           JUROR:  Yes.

11           THE COURT:  Do you speak with him about his job as a

12   fireman?

13           JUROR:  Very superficial.

14           THE COURT:  The usual at family holidays?

15           JUROR:  Yeah.

16           THE COURT:  And I appreciate that you thought of it

17   and I suggest anybody, if you think as other people answer or

18   well, wait a minute, I do have somebody I haven't thought

19   about this relative, please raise your hand.

20           Yes, ma'am.

21           JUROR:  For a short term, my daughter did work for

22   Acadian in Arizona and I think in Texas for a while, but now

23   she's not doing that.  But I don't know the length of time.

24           THE COURT:  Ms. Pryor, your daughter worked for

25   Acadian Ambulance.

1          JUROR:  Yes.

2          THE COURT:  Do you know how long?  You said a short

3     time.

4          JUROR:  I'm not really sure.  Yeah.

5          THE COURT:  And were you all living in the same place

6     when she worked for Acadian?

7          JUROR:  No, she was out of town.

8          THE COURT:  Do you remember talking to her about her

9     job duties?

10          JUROR:  Not specific duties.  Things like CPR,

11     general stuff.

12          THE COURT:  Did anybody else have anything else they

13     wanted to add?

14          Now this is to everybody but especially to those

15     people who have a family member, whether your father, your

16     brothers, your nieces or nephews, the fact that you have

17     family members who have worked as first responders or

18     currently working as first responders, you understand from

19     this case we're going to be talking about emergency medical

20     technicians and first responders.  Would the fact that that

21     is what this case is about influence you to be possibly more

22     sympathetic to the plaintiffs in this case?  Does anyone feel

23     that way?

24          I think everybody can say their heart is with first

25     responders, but I want to be clear that the evidence in any

1    case has to come from the witness stand and the exhibits and

2    I will give you the laws.  From the people who said they have

3    family members who worked as first responders, can you follow

4    that, listen to the evidence and only base your decision

5    based on the evidence and what I tell you?  Does everyone

6    agree with that?

7            Yes, ma'am.

8            JUROR:  My dad, he was a juvenile detention center --

9            COURT REPORTER:  Can you speak up?

10           JUROR:  I'm sorry.  My dad who is a juvenile

11   detention center counselor for 30-plus years in Jefferson

12   Parish.  We didn't speak about his work.  He wasn't first

13   responders.  He was dealing with juvenile criminals.

14           THE COURT:  And that's Ms. Sam?

15           JUROR:  Yes.

16           THE COURT:  So that was your father.  So juvenile

17   detention center, Jefferson Parish?

18           JUROR:  Yes.

19           THE COURT:  So same questions I asked everyone else.

20   Would the fact that you have that in your background and

21   obviously would have discussed that with your father, would

22   that make you more sympathetic to people who are emergency

23   medical technicians or first responders?

24           JUROR:  No, ma'am.

25           THE COURT:  Does anyone feel that way?

1        Knowing a little bit you know about this case, does

2   everyone feel they can be a fair and impartial juror knowing

3   the facts of this case?

4        JUROR:  Yes, ma'am.

5        THE COURT:  Does anyone here have close friends or

6   family that have a job where they are on standby or on-call?

7        Have you or anyone close to you ever sued or made a

8   claim against an employer for unfair treatment, including any

9   reason concerning overtime pay or for any wage dispute?

10        Anybody ever made a claim against an employer for

11   unfair wage dispute?

12        Have you ever had to call for the assistance of an

13   emergency medical technician or paramedic?

14        We're going to get to you all.  We're going to get in

15   order.

16        Yes, sir.

17        JUROR:  No. 5.  Several times.  I couldn't give you

18   the exact specifics of it.

19        THE COURT:  You've had to call for emergency medical

20   help?

21        JUROR:  Yes.

22        THE COURT:  All right.  And was that experience --

23   I'm sure at the time it was not a good experience.  But was

24   your experience with those professionals a positive

25   experience?

1              JUROR:  Yes, ma'am.

2              THE COURT:  Would -- I'll ask everybody the same

3      question afterwards.

4              Who else in the back who has had to call -- Juror

5      No. 8.

6              JUROR:  Yes, I had to call.

7              THE COURT:  And if anything is personal or

8      embarrassing, please know you can approach the bench.

9              Was the experience and the professionalism of those

10     people a good experience?

11             JUROR:  Yes.

12             THE COURT:  All right.  Anybody else?

13             Yes, ma'am, Juror No. 18.

14             JUROR:  (Juror soft spoken.)

15             THE COURT:  You've had to call?

16             JUROR:  She said she had to call quite a few times.

17                 (Ms. Ricard, No. 19 spoke for Juror 18.)

18             THE COURT:  Okay.  We may have some follow-up

19     questions.  Thank you, Ms. Ricard.

20             Who else?  Yes.  Juror --

21             JUROR:  I have.  In my profession I had to call for

22     someone passing out in the waiting room.

23             THE COURT:  The same questions I asked the others,

24     was your experience an overall positive one with how the EMTs

25     handled the matter?

1          JUROR:  Yes.

2          THE COURT:  Anybody else?

3          JUROR:  I have for my husband.

4          To everybody who has had to call and rely on the

5     services of emergency medical technicians, would that make

6     you feel more sympathetic to the plaintiffs in this case

7     because they are emergency medical technicians?  Does anyone

8     feel that way, that that would influence them?  Nobody?

9     Was -- and I know I keep asking this, but this is what this

10    entire matter is about.

11         Could you put that out of your mind and judge this

12    case based on the evidence and the exhibits and the law I

13    give you?

14         Everyone agree with that?

15         If you're selected as a juror in this case, you'll be

16    required to put aside any personal feelings or feelings of

17    passion or prejudice or sympathy and decide the case solely

18    on the evidence introduced during the trial and the

19    instructions I will give you.  I think everybody has agreed

20    that.  Can you all do that?

21         Thank you.  Do any of you know of any reason that I

22    may not have raised that you could not sit in this case from

23    the information that you know so far and render a just, fair,

24    honest, and impartial verdict?

25         Is there anything that I haven't said that you

1    sitting there think maybe the judge or the attorneys would

2    need to know this about me?  Anybody feel that way?

3          Yes, ma'am, Ms. Sam?  You want to approach?

4                    (Juror approaches bench.)

5          (WHEREUPON, the following proceedings were held at

6    the bench:)

7          JUROR:  When you were asking about a class action, I

8    didn't hear the whole question.

9          THE COURT:  I didn't ask anything about a class

10   action.

11         JUROR:  No, no, about claims or wages or something.

12         THE COURT:  Have you ever made a claim against an

13   employer?

14         JUROR:  When I was formerly employed at Walgreens

15   they had a judgment or something about placement of certain

16   pharmacists in certain demographics and we did receive

17   payment, but it was just based upon where we were assigned or

18   something like that.

19         THE COURT:  Were you part of that decision-making

20   process in how employees were classified?

21         JUROR:  No.  No.  No.  It was -- I was actually a

22   recipient of the judgment of like the payment.  It was

23   something about where pharmacists were placed as far as

24   location.  And I don't even remember -- I mean, it was a

25   million years ago.  I don't remember the logistics of it or,

1    like, the details.

2          THE COURT:  Did you ever have to go to court and

3    testify about it?

4          JUROR:  No.  No.  It was done corporately.  It was

5    just payment corporately for Walgreens.

6          THE COURT:  It wasn't a lawsuit that you were

7    involved?

8          JUROR:  Not directly.  I know like -- I guess it was

9    a class.  I don't know how I was part of it.  I guess I just

10   met the criteria.

11         THE COURT:  So it sounds from what you said it had

12   something to do with a wage dispute and that everybody got

13   something afterwards.  It was in that category.

14         JUROR:  Right.  Because it was based upon where we

15   were assigned.

16         THE COURT:  Knowing that this case is a wage dispute,

17   dispute about overtime pay, would that affect your ability to

18   sit in this case?

19         JUROR:  It would not.

20         THE COURT:  It would not.

21         JUROR:  No.

22         THE COURT:  Anybody have any questions?

23         Thank you for bringing that to our attention, Ms.

24   Sam.

25                    (Juror returns to jury box.)

1          While you're up here.  Can you get one of the cards

2    so I can give each one?  One for each.

3          I'm going to give this to the jurors and have them

4    stand up one at a time and give this information, and then

5    I'm going to follow up because we didn't put it on here about

6    prior jury service.  That'll be the last question.  So you

7    can be thinking if there's anything you think needs follow-up

8    after I've left off after they each do that.  I intend on

9    concluding the voir dire.

10         MR. KOPFLER:  We get questions or no questions?  Do

11   we get to ask any questions?

12         THE COURT:  After they do this, after I follow up, if

13   you feel like you need something, I'm going to ask you to

14   approach the bench.  If you feel like you need a couple of

15   minutes --

16         MR. KOPFLER:  I'll show you what I got.

17         THE COURT:  I'm completely open to that.

18                        (In open court.)

19         Do you believe that just because someone sues his or

20   her employer or files a lawsuit that the employer must have

21   done something wrong?

22         Anyone believe that?  Just because somebody sues you

23   where there's smoke there's fire?  They must have done

24   something wrong?

25         No?

1          Is there anything in your background that would

2     affect your ability to judge this type of case, fairly to

3     both sides in this matter?

4          Okay.  I'm going to have the case manager hand out

5     some cards.  I'm going to start with Juror No. 1, hate to put

6     you on the spot.  But I'm going to ask that you stand and

7     give the information on the cards.  It's name, where you

8     live, just geographical region, what your employment is,

9     whether anyone else resides in the household with you and

10    what their employment is.

11         Yes, sir.

12         JUROR:  I had to go back one question.  Yes, of

13    course.

14         Is it okay if I --

15         THE COURT:  Approach?  Of course.

16                   (Juror approaches bench.)

17         That will give everybody an opportunity to look at

18    their card and get their answers.  We're getting to the end

19    here.

20         (WHEREUPON, the following proceedings were held at

21    the bench:)

22         JUROR:  I worked at a plant in New Orleans at a union

23    for almost 30 years.  We just finished up real tough union

24    negotiation.  I and know some of the topics was overtime and

25    call-in pay where the -- there is only two positions in the

1   whole plant that gets that, but there are a lot of other

2   people that are call-in pay but it's not really official.  So

3   I don't know how much that would affect my decision or when

4   we're talking about overtime or call-in pay and stuff like

5   that.

6         THE COURT:  So you're a member of the union.  Are you

7   on the board?  Are you the one making the decision?

8         JUROR:  I'm not a trustee.  I'm not an officer.  I'm

9   a member.

10        THE COURT:  And is your pay affected by these

11  decisions?

12        JUROR:  Well, they're routed through me.  We may have

13  to call you in, Dan -- you see, I work in a very small

14  department.  There's only four of us and we work a four-shift

15  operation.  And someone had gone out on DB and -- in working

16  management, they told me I was -- told me my leader saying we

17  may need you Saturday.  And, I mean, I told them, yes,

18  because it's my job, but when I told the wife, she wasn't

19  happy about it and I wasn't very happy about it.  So whether

20  it will affect my decision, I would like to think it wouldn't

21  but it all depends on the facts.

22        THE COURT:  Well, and everything depends on the

23  facts.  We can't get into your mind, but these attorneys need

24  to hear from you.  And you're the only one who can answer

25  this.  If they were picking a jury, would you want them to

1  pick you in your current frame of mind with whatever is going

2  on in your business to hear a case about a wage dispute?

3       JUROR:  I want to be honest.

4       THE COURT:  Please.

5       JUROR:  Especially in court.  I do lean one way.

6       THE COURT:  I appreciate that.  We all have our

7  feelings about things, and that's what this is about.

8       So do you feel like you're already leaning in favor

9  of one side or the other without hearing anything?

10       JUROR:  Yes.

11       THE COURT:  If I told you that, sir, you have to put

12  that out of your mind, because everyone has feelings like

13  that, and base your decision solely on what you're going to

14  hear and the law and you have to take that and you have to

15  give me an oath that you can put that out of your mind, would

16  you be able to do that?

17       JUROR:  I would -- I would try the best I could.  I

18  would like to believe that I could set that aside.

19       THE COURT:  Mr. Kopfler, any questions?

20       MR. KOPFLER:  Have you -- Mr. Munch, have you been on

21  any juries before?

22       JUROR:  No, this would be my first.

23       MR. KOPFLER:  So we all start off with evidence that

24  concludes at the case, the judge gives the instruction on the

25  law.  Would the fact that you have been a union member make

1    it difficult for you to make a decision on an overtime

2    dispute involving emergency medical people that work for the

3    Parish of Plaquemines?

4         JUROR:  Not if it's spelled out exactly, what is

5    accepted and what's not accepted.

6         THE COURT:  Well, it's going to be a -- jurors have

7    to decide facts.  So you're going to have to listen to the

8    testimony and make a decision of what you think the facts

9    are.  I'll give you the law, but you're going to have to

10   decide the facts.

11        JUROR:  I'd like to believe I could, but I just want

12   to let both lawyers understand, you know.

13        THE COURT:  I think that's what we can all ask.

14        MR. MILLER:  Were you part of the negotiations for

15   the --

16        JUROR:  I was not part of the negotiations.  I was

17   not involved in the negotiation.  I was just a member.  We

18   did vote.  We just voted I think in September.

19        THE COURT:  Any other questions?

20        JUROR:  Maybe that's why it's on my mind right now.

21        THE COURT:  Any other questions?

22        MR. KOPFLER:  No, Your Honor.

23        THE COURT:  Thank you, sir.

24                    (In open court.)

25        THE COURT:  Is it Mr. Steib?

1          JUROR:  Yes, ma'am.

2          THE COURT:  You're up.

3          JUROR:  My name is Seth Joseph Steib.  I presently

4     reside at 215 Church Street in Destrahan, Louisiana 70047.  I

5     am married.  My spouse's name is Shane Michael Jordan

6     (phonetic), Senior.  My present occupation is I work for

7     Entergy, the utility.  The name, city, business of your

8     employer -- they're at 639 Loyola Avenue here in New Orleans,

9     70113.  My present -- occupation of my spouse is manager of

10    process improvement at LSU Health Sciences and we do have one

11    child.  He is eight years old and he is living in the home

12    with us.

13         THE COURT:  Thank you, Mr. Steib.

14         One follow-up, I'm going to ask everybody that I

15    didn't include on the card.  Have you ever sat on any jury?

16         JUROR:  No, ma'am.

17         THE COURT:  Federal, state, anywhere so everyone can

18    be thinking of that too, if you had any prior jury service.

19         Thank you, Mr. Steib.

20         Ms. Johnson?

21         JUROR:  My name is Keoshi Johnson.  I live at 1327

22    Franklin Avenue in Gretna, Louisiana.  I'm single.  I work at

23    Ochsner Medical Center.  And address is -- as a financial

24    counselor.

25         THE COURT:  And for everybody, your employer's

1    address, you don't need to know their address, maybe city and

2    so if you worked at Ochsner right on Jefferson?

3           JUROR:  Yes.

4           THE COURT:  Okay.  That's fine.

5           JUROR:  No children.

6           THE COURT:  Any prior jury service?

7           JUROR:  Yes.  Federal.

8           THE COURT:  How long ago?

9           JUROR:  About five years ago.

10          THE COURT:  And do you recall whether it was a

11   criminal case or a civil case?

12          JUROR:  I think criminal.

13          THE COURT:  Criminal case.  And without telling us

14   what your verdict was, do you remember the verdict of the

15   jury?

16          JUROR:  Yes.  It was not guilty.

17          THE COURT:  Do you remember what the charge was?

18          JUROR:  It was a drug charge.

19          THE COURT:  Any other jury service other than that

20   federal court five years ago?

21          JUROR:  No.

22          THE COURT:  Thank you, Ms. Johnson.

23          Mr. Armand?

24          JUROR:  My name is Kenny Armand.  I live at 124 West

25   46th Street, Cut Off, Louisiana.  I'm married.  My wife's

1    name is Genie.  I'm a facility maintenance guy.  I work for

2    PHI out of Lafayette and I have no children.

3            THE COURT:  Any prior jury service?

4            JUROR:  No.  No, ma'am.

5            THE COURT:  Thank you.

6            Ms. Mackey.

7            JUROR:  My name is Bertha Mackey.  My address is 1810

8    Avenue Street, New Orleans, 70117.  I work for the City for

9    the NOR department --

10           COURT REPORTER:  I'm sorry you work for --

11           JUROR:  NOR.  And I have two kids --

12           THE COURT:  Are those --

13           JUROR:  -- in the home.

14           THE COURT:  They do live in the residence --

15           JUROR:  They do not.

16           THE COURT:  They do not.  And have you ever served on

17   a jury, federal, state, anywhere?

18           JUROR:  Yes.

19           THE COURT:  Do you remember where it was whether --

20           JUROR:  Orleans Parish.

21           THE COURT:  I'm sorry?

22           JUROR:  Orleans Parish.

23           THE COURT:  How long ago?

24           JUROR:  It's been a while.

25           THE COURT:  Do you remember if it as a criminal case

1    or a civil case?

2         JUROR:  Not exactly.  It's been a while ago.

3         THE COURT:  And do you remember the result of the

4    case?

5         JUROR:  It was a not guilty.

6         THE COURT:  Not guilty.  Do you remember what the

7    charge was?

8         JUROR:  No.

9         THE COURT:  And that's the only time you served in a

10   jury service?

11        JUROR:  Uh-huh.

12        JUROR:  My name is Gene Young.  I go by my middle

13   name which is Lewis.  I live at 6204 Blank Street in

14   Metairie.  I'm married to Anjel Villarubia Young (phonetic).

15   Current occupation is a compliance officer for Equifax based

16   out of Atlanta.  My wife is an administrative assistant for

17   Enterprise Rental Car.  I have two children.  One lives at

18   home.  One's a freshman in college.  And I have been on two

19   juries.  I was on a federal grand jury approximately 20 years

20   ago and I was on a civil jury in Jefferson Parish

21   approximately four to five years ago.

22        THE COURT:  On a civil jury, do you recall if the

23   jury found in favor of the plaintiff or the defendant?

24        JUROR:  They found for the plaintiff.

25        THE COURT:  Do you remember what the dispute was

1    about?

2           JUROR:  It was a homeowner's association paying for

3    repairs on a condo building in Metairie.

4           THE COURT:  And one follow-up question, as a

5    compliance officer, do you have -- as part of your role

6    having to do with payroll at all?

7           JUROR:  No, ma'am, it does not.

8           THE COURT:  Thank you.  And I am going to go back to

9    Mr. Steib and ask that question.  You're an HR

10   representative.

11          JUROR:  Yes, ma'am.

12          THE COURT:  Do you have anything to do with payroll

13   at your company?

14          JUROR:  No, ma'am.

15          THE COURT:  All right.  Thank you.

16          Mr. Hayes.

17          JUROR:  I'm Jason Hayes.  I'm at 1431 Sycamore Place

18   in Mandeville.  I'm married, spouse name Nicole Hayes.  I am

19   an automation controls consultant for an oil and gas company

20   in Worley and they're out of Metairie.  I have three

21   children, two at home.

22          THE COURT:  Have you ever served on a jury?

23          JUROR:  No.

24          THE COURT:  Never been called for jury service?

25          JUROR:  Yes.

1         THE COURT:  You have been called?

2         JUROR:  Called but never sat on a panel.

3         THE COURT:  Where were you called, in state court or

4    federal court?

5         JUROR:  It was always the local parish, state, yes.

6         THE COURT:  But never served.

7         JUROR:  Never served.

8         THE COURT:  Thank you.  Mr. Hotard.

9         JUROR:  My name is Ashton Hotard.  My address is 2235

10   Shotgun Road, Thibodaux, Louisiana.  Yes, I'm married.  My

11   spouse's name is Monica Hotard.  I'm an insulator and

12   electrical work, the name of my business and employee are in

13   Baton Rouge, Louisiana.  My wife doesn't work.  I have two

14   children.  One of them live at the house.

15        THE COURT:  And, sir, have you ever served on a jury?

16        JUROR:  No.  About 30 years ago, I came over here but

17   I wasn't picked.

18        THE COURT:  Thank you.

19        JUROR:  My name is Veronica Adele Weggeman.  I

20   recently moved to 4616 Willow Street, New Orleans, Louisiana.

21   I'm married.  My husband is Hayes Weggeman.  I am a speech

22   language pathologist.  I work at New Orleans Speech and

23   Hearing Center in the city, part-time and then I'm contract

24   work part-time, another company, doing home health with small

25   children.  My husband works at Chevron in Belle Chasse as an

1    engineer and we have no children.

2         THE COURT:  Have you ever served on a jury, federal

3    or state?

4         JUROR:  No, this is my first time.

5         THE COURT:  Thank you.

6         JUROR:  My name is Chase Lacombe.  I just recently

7    moved to 224 Diane Avenue in River Ridge, Louisiana.  I am

8    single.  I work for two companies, Lamar Contractors and LGS

9    Logistics, both focused on the disaster recovery and

10   emergency response located out of Luling, Louisiana.  We have

11   satellite offices in multiple states and territories in the

12   United States, and I do not have any children.

13        THE COURT:  Any prior jury service at all?

14        JUROR:  No, ma'am.

15        THE COURT:  Thank you.

16        JUROR:  My name is Myra Fanguy.  My address is 350

17   Windward Drive, Houma, Louisiana.  I am married to Kenneth

18   Fanguy, Senior.  I do not have a job.  My husband works at

19   Federal Express in Houma.  We have three children, none live

20   at home and I have never been selected for jury.

21        THE COURT:  Thank you.

22        JUROR:  My name is Deborah Pryor and my address is

23   3500 Division Street, Apartment 387, in Metairie, 70002.  I'm

24   divorced and then my husband re-married and he passed away

25   later.  And so now I work for USDA National Finance Center

1    out of Michoud in the NASA building and that's New Orleans,

2    Louisiana.  I did -- oh, claims examiner is my occupation.

3    And I had four children, I have three adult children living.

4    One has come back to live with me recently.  And I have

5    served on a criminal case in Orleans Parish, at Tulane and

6    Broad and the result was a not guilty case.  It was a rape

7    case.

8         THE COURT:  Rape case?

9         JUROR:  Yes.

10        THE COURT:  And about how long ago was that, ma'am?

11        JUROR:  It's been some years, I think more than 10

12   years before Katrina.

13        THE COURT:  Thank you.  And I should have asked this

14   earlier, with your employment with USDA as being a claims

15   examiner, do you have anything to do with payroll?

16        JUROR:  No.  That's not the payroll department.  It

17   kind of -- like, with bills, delinquent bills.  It can affect

18   their payroll, but it's not the payroll section.

19        THE COURT:  Thank you.

20        JUROR:  My name is Leigh Anne Schenck.  My address is

21   9 Shill Avenue in Kenner, Louisiana 70065.  I'm married.  My

22   spouse's name is Brian.  My occupation is administrative

23   assistant for The Hand Center of Louisiana and I do payroll.

24   We're in Metairie right next to EJ Hospital.  My spouse's

25   occupation is sales at Imperial Trading.  I have two

1   children, 9 and 5, and they are living at home.  And I have

2   not served on a jury.

3        THE COURT:  And, Ms. Schenck, with your payroll, do

4   you have any specials training in payroll?

5        JUROR:  No, not other than what my boss taught me.

6        THE COURT:  Do you have to make decisions regarding

7   overtime pay?

8        JUROR:  Not decisions, but I have to tell the

9   employees they're not allowed to get overtime.

10       THE COURT:  And knowing the brief facts that you

11  know, that this case involves claims for overtime pay, would

12  that affect your ability to sit as a juror on this case?

13       JUROR:  I don't believe so.

14       THE COURT:  If I told you that you need to put aside

15  anything of your work experience and listen to the evidence

16  and the law as I give it to you, can you do that?

17       JUROR:  Uh-huh.  Yes, ma'am.

18       THE COURT:  Thank you.

19       Mr. Munch.

20       JUROR:  My name is Daniel Munch.  My present address

21  is 207 Chalmette Avenue, that's in Chalmette.  My marital

22  status is I'm divorced; however, I'm dating my ex-wife.  So

23  her name is Kim Carreras (phonetic).  My present occupation,

24  I work in a quality lab for Folgers coffee on Old Gentilly

25  Road.  I don't have a spouse, but she -- she is currently

1  unemployed.  She's on disability and I do have one child.  He

2  has returned to home, but very complicated.  But he has

3  returned home.  He's living at home.

4        THE COURT:  Understood.  And, Mr. Munch, any prior

5  jury service?

6        JUROR:  I haven't served.  I haven't served.  I've

7  been called.

8        THE COURT:  Yes, ma'am.

9        JUROR:  I'm Valerie Goertzen.  I live at 331

10  Driftwood Circle in Slidell, Louisiana.  I'm married and my

11  husband's name is Chris Goertzen.  I'm a full professor of

12  music history at Loyola University here in the city across

13  from Audubon Park.  My husband is also.  We have the same

14  degree.  He teaches music history as a full professor at the

15  University of Southern Mississippi in Hattiesburg.  We have

16  two children, but they are grown and living on the east

17  coast.

18        I was called once for St. Tammany Parish, but I was

19  released because we just had a hurricane, and we had missed

20  classes and so I went back to work.

21        THE COURT:  So you didn't serve?

22        JUROR:  I did not serve.

23        THE COURT:  Thank you.

24        JUROR:  My name is Lanesha West.  I live at 24413 Old

25  Columbia Road in Franklinton, Louisiana.  I am single.  I am

1    currently a manager for Wendy's, which is in Covington,

2    Louisiana.  And I have no children, and I have never served

3    on a jury.

4          THE COURT:  And, Ms. West, do you, as the manager,

5    are you responsible for payroll?

6          JUROR:  Absolutely not.

7          THE COURT:  I thought you were going to say

8    absolutely you are.  Okay.  That's a corporate -- they handle

9    it corporately?

10          JUROR:  Yes, ma'am.

11          THE COURT:  Thank you.

12          JUROR:  Good morning.  Shaun Schudmak.  I live at

13    4921 Jasper Street in Metairie.  I'm married.  My husband's

14    name is Jesse Schudmak.  I'm an attorney at Lugenbuhl,

15    Wheaton, Peck, Rankin & Hubbard in New Orleans.  My husband

16    is an attorney for Jefferson Parish.  He's a Parish attorney

17    in Gretna.  We have one child.  He is two years old living at

18    home.

19          THE COURT:  Any prior jury service?

20          JUROR:  I've been summons but never selected.

21          THE COURT:  Thank you.

22                (Juror passes microphone.)

23          Oh, we can get that.

24          Thank you for doing that.

25          JUROR:  My name is Christopher Balfer.  I live at

1    3710 Bauvais Street in Metairie.  I'm not married, in

2    long-term domestic partnership.  Spouse's name is Reed

3    Willis.  I work in publishing in Metairie.  My employer is

4    Renaissance Publishing on Veterans Boulevard.  My partner is

5    a composer in film and television, no children, never been

6    called or served.

7         THE COURT:  Thank you, Mr. Balfer.

8         JUROR:  My name is Taini Ricard.  I live with one son

9    at 3200 Ru Parc Fontaine.  I'm divorced.  I'm disabled.  I

10   have four children.  One is incarcerated and two in college.

11        THE COURT:  And have you ever served on a jury

12   before?

13        JUROR:  No.

14        THE COURT:  Thank you.

15        JUROR:  My name is Kendra Sam.  I presently live at

16   3715 Mimosa Court.  That's in Algiers, Louisiana.  I am

17   divorced.  My current occupation, I'm a pharmacist with

18   Ochsner.  I primarily work only at two locations which is

19   Main Campus and also in Raceland.  I have two children, two

20   sons in high school.

21        And, yes, I have served on a jury.  It was Orleans

22   Parish criminal court.  The judgment was guilty.

23        THE COURT:  Do you remember what the charge was?

24        JUROR:  Murder.

25        THE COURT:  How long ago?

1          JUROR:  Over five years ago.

2          THE COURT:  That's the only time you've served?

3          JUROR:  Yes.

4          THE COURT:  Thank you.

5          JUROR:  I'm Robert Cooksey.  I live at One Cypress

6     Meadow Loop, Slidell, Louisiana; not married any longer.  I'm

7     a quality assurance inspector for Lockheed Martin in Stennis

8     Mississippi, no children at home, never served on a jury.

9          THE COURT:  Thank you, Mr. Cooksey.

10         JUROR:  My name is Lawanda Love.  I reside at 20367

11    Clemson Way in Ponchatoula, Louisiana.  I'm married.  His

12    name is Avery Love.  I'm currently an education diagnostician

13    at St. Tammany Parish School Board and I work out of our

14    Covington office and he's a drafter and we do not have any

15    children.

16         THE COURT:  Anybody else in the home with you?

17         JUROR:  No.  And I have no prior jury duty service.

18         THE COURT:  Thank you.

19         JUROR:  Good morning.  My name is Heidi Conley.  I

20    live at 4201 Newton Street in Metairie, Louisiana.  I am

21    married to Michael Conley.  Present occupation I work for the

22    Vitamin Store on Veterans Boulevard as a salesperson.  Let's

23    see.  My employer's name is Mr. Robert Plaquey (phonetic).  I

24    have no children living at home, and I have not served on a

25    jury.

1          THE COURT:  Not served on a jury.

2          JUROR:  No, ma'am, I have not.

3          THE COURT:  Thank you, Ms. Conley.

4          JUROR:  Good morning.  I'm Susan Lasalle.  I live at

5    2120 Franklin Avenue in Metairie, Louisiana.  I'm in a

6    long-term domestic partnership with Julie Flower.  My

7    occupation is a clergy person.  I serve as pastor of Little

8    Farms United Church of Christ in River Ridge.  My partner is

9    retired and she has two children but neither living at home.

10   And I have served on a jury in East Baton Rouge Parish.  It

11   was a civil case.

12         THE COURT:  Do you remember how long that was?

13         JUROR:  Before Katrina.

14         THE COURT:  We all measure things pretty close to

15   Katrina.

16         JUROR:  Before Katrina.

17         THE COURT:  Do you remember what the dispute was in

18   that civil case?

19         JUROR:  Yes, ma'am.

20         THE COURT:  Can you give us broadly?

21         JUROR:  Someone had gotten injured in a doctor's

22   office or physical therapy kind of office and they were suing

23   the doctor's office for damages on that.

24         THE COURT:  And did the jury find in favor of the

25   plaintiff or the defendant?

1        JUROR:  Remind me which is which.

2        THE COURT:  The one who was suing is the plaintiff

3   and the doctor would have been the defendant?

4        JUROR:  The defendant.

5        THE COURT:  Thank you.  Any other jury service?

6        JUROR:  No, ma'am.

7        THE COURT:  Thank you.

8        JUROR:  My name is Araven Jones.  My address is 6165

9   Adam Drive.  That's in Marrero.  I'm married.  My spouse's

10  name is Dwayne.  I work as a school bus driver in Harvey for

11  First Student.  My husband is a self-employed.  He's a

12  mechanic.  And we have three children and they all live at

13  home.  And I have not served on any juries.

14       THE COURT:  Thank you, Ms. Jones.

15       JUROR:  Jack Ruli, 949 Rue Chantilly.  Married.  My

16  wife's name is Holly.  I'm a self-employed attorney in

17  Metairie.  My wife works as a dispatch manager, sales manager

18  and I served on a jury about 2009 in a criminal matter, St.

19  Tammany Parish, sexual molestation, guilty.  Two grown

20  children out of the house.

21       THE COURT:  Mr. Ruli, your wife, you said she's a

22  dispatch.  I missed what she does.

23       JUROR:  Dispatch manager, sales manager for Been

24  There Dump That.

25       THE COURT:  And the dispatch manager, what does that

1    mean exactly?

2         JUROR:  She directs trucks to go different job sites.

3         THE COURT:  And I'm sorry.  I was trying to take

4    notes.  Jury, St. Tammany Parish.  You said it was a sexual

5    assault?

6         JUROR:  Correct.

7         THE COURT:  All right.  Thank you, sir.

8         We're getting to the end of the voir dire.  I

9    appreciate your patience and attention.  I will consult with

10   the attorneys for a moment.  Please feel free to stand up.

11   We are getting near the end.  Counsel, approach please.

12        (WHEREUPON, the following proceedings were held at

13   the bench:)

14        THE COURT:  You have some follow-up you want to ask?

15        MR. KOPFLER:  Not really.  From the answers to the

16   questions, I don't.  I got some other questions that I wanted

17   to ask if that's okay.

18        THE COURT:  Can you tell me briefly what they are?

19        MR. KOPFLER:  Number one, have you ever heard the

20   phrase Johnny on the spot?  What does that mean to you?

21        THE COURT:  What does that have to do with anything?

22        MR. KOPFLER:  Standby, common phrase.

23        MR. MILLER:  I've heard it, it never come up in this

24   case.

25        THE COURT:  I asked if anybody worked on standby or

1    any family member on-call.

2         Okay.  What else?

3         MR. KOPFLER:  It's what I call either or questions.

4    You can just read over them if you want to read them or you

5    want me to read through them.

6         THE COURT:  Is there a reason why you didn't submit

7    these?

8         MR. KOPFLER:  Hum.  I can't -- I have no excuse, Your

9    Honor.  I kind of -- I think maybe I misunderstood.  I

10   thought we were going to get five minutes of oral voir dire.

11   I didn't realize we had given them to you in writing for you

12   to read them.

13        THE COURT:  You said follow-up ones.  But the fact

14   that you had gave them prepared raises the question of why

15   you didn't give them earlier.

16        MR. KOPFLER:  Misunderstanding.

17        THE COURT:  What I don't want and the reason that I

18   wanted to ask the questions is this is not argument.  If you

19   have a question, I told you you can have that time and I'm

20   still open to that.  I don't want statements first and then a

21   question.  Just ask a question.

22        Have you provided those to Mr. Miller?

23        MR. KOPFLER:  No.

24        MR. MILLER:  No.

25        THE COURT:  May I share these with Mr. Miller?

1          MR. KOPFLER:  Sure.

2          THE COURT:  I have a concern with the second

3    question.  Because I really think it's -- could be read the

4    way I'm reading it as arguing your case or making a position

5    that's not in evidence.

6          MR. MILLER:  I mean, they're not follow-up questions.

7    They're all questions about varying statements in the case.

8          THE COURT:  They're new cases -- I mean, they are not

9    follow-up questions.

10          MR. KOPFLER:  No, they're not follow-up questions

11    that you asked, Your Honor.  That's true.

12          THE COURT:  I'm fine with this one.  Do you have any

13    objection to this last one?

14          MR. MILLER:  Again, it goes to the merits of the

15    case.  I mean, that's our good faith defense is to whether or

16    not they were aware of the policy and the fact that they

17    continued working, continued getting paid.  I mean, that's

18    our argument.  They knew how they were getting paid.

19          THE COURT:  Which is more the reason to ask it and I

20    think the question would be, do you believe that if an

21    employee tolerates a pay grievance and never complains he is

22    agreeing with the employer?  It's do you believe that or not.

23    Let's find out.

24          MR. KOPFLER:  Okay.

25          THE COURT:  I don't have a question -- I don't have

1   an issue with have any of you heard the phrase Johnny on the

2   spot and what does it mean to you?  If it has something to do

3   with overtime, let's find out.

4        Again, if I get the feeling that you're arguing the

5   case, then I might step in and I might do the follow-up.

6        The second question about some people believe that

7   employees who are required to live in company facilities on

8   standby ready to respond to an emergency are entitled to

9   overtime for the standby time over 40 hours.  Other people

10  believe employees required to live in company facilities on

11  standby ready to respond should not receive overtime for the

12  standby time over 40 when they are not actually working.

13  Which way do you lean?

14        Very confusing question.  I've already told them the

15  evidence is going to come from the stand.  I'm going to give

16  them the law.  I think that is confusing and I think it gets

17  into something that's obviously not in facts and -- or not in

18  evidence and could be disputed as part of the law.  I'm not

19  going to allow that.  You want to suggest another way to ask

20  it?  What are you trying to get at with this one?

21        MR. KOPFLER:  Just to get their feelings --

22        THE COURT:  The fact that they live --

23        MR. KOPFLER:  They're required to live in the

24  stations.

25        THE COURT:  Would the fact that a person is required

1    by his employer to live on premises effect -- do you think

2    that should have an effect on their pay?

3            MR. KOPFLER:  Okay.

4            THE COURT:  That's -- I think that's a reasonable

5    question.  Then Mr. Miller may have some follow-up to that.

6            MR. KOPFLER:  Sure.

7            THE COURT:  But that's the question, a factual

8    question is the sole fact that they're required to live on

9    the premises.  Do you think that should weigh on whether they

10   get overtime or not.

11           MR. KOPFLER:  Okay.

12           THE COURT:  But you may need to follow-up, understand

13   the judge is going to give you the law on what the law is.

14           MR. MILLER:  Am I permitted to ask the fact that

15   they're not required to live on premises, would that affect

16   your --

17           MR. KOPFLER:  That's an undisputed fact.

18           THE COURT:  Yes.  You may but we're not going back

19   and forth.  Yes.  If he asks some, you can ask some.  But

20   let's not keep going.  They've sat through a lot and answered

21   this.  They know what the case is about.  And they are --

22   but, of course, you may have some follow-up.

23           Mr. Miller, I would suggest you leave it since you

24   haven't proposed any to follow-up to his.

25           MR. MILLER:  Well, I just had a few to your actual

1    follow-ups.  You asked if they were more sympathetic to the

2    plaintiff and you asked similar questions, but it would be

3    would you treat the Parish more harshly because they're --

4    that's a different term that you used, but it mirrors the

5    terminology --

6              THE COURT:  That's fine.  That's fine.  I also just

7    for the record I did ask them if they would --

8              MR. MILLER:  A higher standard.

9              THE COURT:  Correct, which I adopted from you all.

10             MR. MILLER:  And then the two others have any of them

11   had a dispute about wages with their employer.  We asked if

12   they had sued, but I don't think we asked --

13             THE COURT:  I did.  I asked any wage dispute, but you

14   may ask it again.

15             MR. MILLER:  And does anyone have any special

16   knowledge about payroll.  Somebody touched on HR person, the

17   other individual, but I don't know that we've done it across

18   the board.

19             THE COURT:  I'm fine with those.

20             Do you have any objection to his follow-up?

21             MR. KOPFLER:  No.  No.

22             THE COURT:  I missed a couple.  I'm sorry I need to

23   go back to No. 3.  Some people believe a working agreement

24   between parties should be signed or exchanged between the

25   parties.  Others believe there can be a working agreement

1    between parties even though not in writing or exchanged.

2    Which way do you lean?

3        I'm not sure that that's an appropriate question for

4    the jury.

5        MR. KOPFLER:  Judge, you make the rules here.  I'm

6    going to go with what you say.  This is the way I would

7    handle it.  Okay?

8        THE COURT:  We're not -- I'm not even giving any

9    charge on written agreements versus verbal agreements because

10   nobody asked for any.  I think that's very confusing.  That

11   might be something you need to talk about because there is no

12   charge.  That's not part of what I understand the case to be

13   about.

14       MR. MILLER:  Right.  Because the agreement can be

15   implicit or explicit.

16       THE COURT:  Correct.  Again, that's not even in the

17   charge.  So we may need to talk about that in charging

18   conference.  I don't think that one's appropriate for this

19   case.

20       And your fourth one, some people believe that if the

21   employer does the right thing does the worker -- does the

22   employer have to do the right thing and pay correctly even if

23   there was no complaint.  Is there a -- oh.

24       MR. KOPFLER:  I think you had fixed that one.

25       THE COURT:  You already have that one.

1          MR. KOPFLER:  Let me borrow your ink pen.

2          THE COURT:  Of course.

3          MR. KOPFLER:  So I don't do anything.  So one is

4     okay.  Two I think is somewhat modified, that was about

5     living in company facilities.

6          THE COURT:  Do you believe the fact that an employee

7     provides a living facility should affect how the person is

8     paid.  If the judge tells you that that does not have any

9     effect, can you follow that?  That's the bottom line here.

10          MR. KOPFLER:  Nothing here.

11          THE COURT:  Or the sole reason, or the sole fact that

12     they live in employer-provided housing, because that's what

13     you're trying to get.  The sole reason that they live in

14     employer provided housing, should that affect their pay?

15          MR. KOPFLER:  Okay.  I just understand that there is

16     an undisputed that they're required to live in company

17     facilities.

18          MR. MILLER:  It's not an undisputed fact.

19          MR. KOPFLER:  It is in your trial order.

20          MR. MILLER:  It's disputed.

21          MR. KOPFLER:  I've got it -- you want me to pull it

22     up right quick?

23          THE COURT:  He can ask the question and we can talk

24     about this after whether it's disputed or not.

25          MR. MILLER:  I mean, he can't say it's undisputed

1  fact.

2          THE COURT:  He's not going to say that.

3          MR. KOPFLER:  It's in my opening statement because I

4  took it out of your undisputed facts by the Parish of

5  Plaquemines.

6          MR. MILLER:  They're not required to stay.  The memo,

7  the February 2019 --

8          THE COURT:  Look, let's discuss this afterwards.

9  Let's pick the jury.  They need a break because they need to

10  make their calls and we can go through all the challenges and

11  then we'll go in the back and discuss this.  I would rather

12  get the jury picked.

13          Okay?

14          MR. KOPFLER:  Okay.

15                          (In open court.)

16          THE COURT:  Thank you again for your attention and

17  the attorneys have a few follow-up.  I promise you they will

18  not be as longwinded as I have been.  Less than five minutes

19  each, they're going to ask a few questions.  Please continue

20  to give your same undivided attention.

21          Mr. Kopfler?

22          MR. KOPFLER:  Okay.  Joe Kopfler again.  I'm

23  representing the EMTs and paramedics in this wage dispute.

24  I've got a question for all of you.  Have any of you ever

25  heard the phrase Johnny on the spot?  If you have, raise your

1    hand.

2          Okay.  We got quite a few people.  The Loyola music

3    professor.  Juror No. 11, what does that mean to you?

4          JUROR:  Johnny on the spot?

5          MR. KOPFLER:  Yes.

6          THE COURT:  Means you have to be the right person in

7    the right plan.

8          How about you, Mr. Munch?  Do you agree with that or

9    do you have a different definition?

10         JUROR:  Johnny on the spot is always there.  No

11   matter the problem, he's always there.  He's Johnny on the

12   spot.

13         MR. KOPFLER:  Okay.  Juror -- Mr. Steib.

14         JUROR:  Yes, sir.  Johnny on the spot to me would

15   mean someone is prepared to address the problem and they're

16   punctual.

17         MR. KOPFLER:  Mr. Armand.

18         JUROR:  Johnny on the spot, there at all times.  I

19   agree with what he said.

20         MR. KOPFLER:  Some of you raised your hands, not

21   sitting in the box also.

22         THE COURT:  Mr. Cooksey?

23         MR. KOPFLER:  Yes, Mr. Cooksey.

24         JUROR:  Yes.

25         MR. KOPFLER:  What does Johnny on the spot mean to

1   you?

2        JUROR:  Right there for the right time.

3        MR. KOPFLER:  You've heard your fellow jurors,

4   prospective jurors, give their definitions of Johnny on the

5   spot.  Does anybody have any different meaning to -- it means

6   to them?

7        If so, raise your hand.

8        Of those that did raise your hand that said you knew

9   what Johnny on the spot means, have the jurors that we've

10  talked to, they explained it to your satisfaction, if so

11  raise your hand.

12       Do you believe if the plaintiffs in this case working

13  for the Parish of Plaquemines were required to live in Parish

14  of Plaquemines facilities while on standby, do you think that

15  will affect your belief as to whether they should get

16  overtime pay or not?

17       JUROR:  Can you explain that again?

18       MR. KOPFLER:  The fact that in this case, the

19  plaintiffs were living in company or parish-provided

20  facilities, does anybody feel that that makes a difference in

21  their determination of whether or not they should get

22  overtime or not?

23       JUROR:  In a parish --

24       JUROR:  Were they're charged to live there?

25       MR. KOPFLER:  No, they were required to live there.

1          JUROR:  I believe it could affect it, but I don't

2     have enough information to make that decision.

3          MR. KOPFLER:  The evidence will come out during the

4     trial and at the close of the case, Judge Vitter will tell

5     you what the law is so you can make a decision.

6          Mr. Munch, you have any comment?

7          JUROR:  They're required to live -- no.  No.

8          THE COURT:  Mr. Young, you hit the nail on the head.

9     Mr. Kopfler, if I may.

10         You don't have the evidence yet to understand what

11    was required and what somebody did.  If I told you that you

12    are going to have to make a determination as to some facts

13    but you will make that determination solely up to you, based

14    on the evidence and the exhibits, and that may be one of the

15    things you hear about.  Can you wait and hear about that

16    before making any determination?

17         JUROR:  I guess.

18         THE COURT:  Thank you.

19         MR. KOPFLER:  One last question, if an employee

20    tolerates a pay grievance and never complains, does anybody

21    believe that means he's agreeing with the employer?

22         JUROR:  Can you elaborate?

23         MR. KOPFLER:  If an employee were to tolerate a pay

24    grievance and never complain, is he agreeing with the

25    employer?

1        JUROR:  What is a pay grievance?  What is that?

2        MR. KOPFLER:  A dispute between the employer and

3   employee over how much they're paid?

4        JUROR:  So if I have a problem with how much I'm

5   getting paid, does that have a problem with what?  What's the

6   last part of your question?

7        MR. KOPFLER:  Do you believe that if someone has a

8   pay grievance and never complains, are they, in fact,

9   agreeing with the employer?

10        JUROR:  No.

11        MR. KOPFLER:  Anybody have any different answers?

12   Anybody want to add anything?

13        JUROR:  I don't know enough about the situation of

14   the pay agreement.  No, sir.

15        JUROR:  I think somebody can disagree and not say

16   anything for various reasons.  Whether or not -- whether or

17   not you agree there would be other circumstances to keep you

18   from saying something.

19        JUROR:  Silence doesn't necessarily equal acceptance.

20        MR. KOPFLER:  Doesn't necessarily -- I'm sorry.  What

21   did you say?

22        JUROR:  Equal acceptance.

23        MR. KOPFLER:  Ms. Love, I saw you nodding your head.

24   Did you have any comment?

25        JUROR:  I agree it didn't mean they necessarily agree

1    with it just because they didn't say anything.

2         MR. KOPFLER:  Okay.  No more questions.

3         Lady in the back there.

4         JUROR:  I do kind of agree it would be an acceptance.

5         MR. KOPFLER:  Okay.  All right.

6         Mr. Miller may have some questions.

7         THE COURT:  Thank you, Mr. Kopfler.

8         Mr. Miller?

9         MR. MILLER:  Thank you, Your Honor.

10         Good morning again.  I have just a few real quick

11    questions.

12         Has anyone had any disputes over their wages with

13    their employers?

14         JUROR:  Yes.

15         MR. MILLER:  Could you elaborate?

16         JUROR:  I was working for my company for five years

17    and I felt like I needed a pay raise, so I argued with them

18    for a long time before they finally gave it to me.  But it

19    was a give and take situation.  I still had to do something

20    in order to get what I wanted.

21         MR. MILLER:  But you were able to work it out with

22    the employer?

23         JUROR:  Yes.  I was satisfied.

24         MR. MILLER:  Anyone else?

25         Yes, sir.

1          JUROR:  Employer shut the doors without any notice.

2          MR. MILLER:  And no one got paid?

3          JUROR:  No one got paid.

4          MR. MILLER:  Anyone else?

5          Does anybody have any specialized knowledge about

6    payroll rules, overtime laws?

7          JUROR:  I have to go back -- I have to go back a

8    question.  When I was in education, we had blue flu day where

9    70 percent of the teachers were sick, where we didn't show up

10   for work.

11         MR. MILLER:  Okay.

12         JUROR:  It wasn't a paid dispute.  We felt we weren't

13   being paid enough.  We wanted to bring it to their attention,

14   so about 70 percent of the parish teachers -- now this was in

15   the mid '80s.

16         MR. MILLER:  And what was the dispute about?  Wages.

17         JUROR:  Wages.  Teacher salary.  My pay at the time

18   was about 16,000 a year.

19         MR. MILLER:  So it was more of an increase issue?

20         JUROR:  Yes.

21         MR. MILLER:  My last question was, you were asked

22   would you be more sympathetic to the plaintiffs.  My question

23   would be, because I represent the Parish of Plaquemines,

24   would you treat Plaquemines Parish more harshly because it is

25   a governmental entity?  Anyone?

1          All right.  Thank you.

2          Your Honor, that's all the questions I have.

3          THE COURT:  Thank you.  You're going to be treated to

4     some more music right now, but we're getting to the end.  So

5     I'm going to give the attorneys a couple of minutes to decide

6     who they think would be best to hear this case and we're

7     going to pick the juries -- jurors and then we'll excuse the

8     rest of you.

9               (Peremptory challenges exercised.)

10         THE COURT:  I'm going to give you a few more minutes,

11    but I thought if we did cause because you really can't make

12    your peremptories until we do the cause.

13         Do you all have any challenges?

14         MR. KOPFLER:  The people in the box or the whole

15    courtroom?

16         THE COURT:  The whole court.

17         MR. KOPFLER:  Okay.  You know, Ms. Weggeman, pretty

18    heart wrenching story of her father, hostage in Columbia

19    that.  She can't keep our mind on the case, if she didn't

20    have a phone for that call to be coming.  I think we ought to

21    excuse her by consent.

22         THE COURT:  Mr. Miller?

23         MR. MILLER:  You know, I too have concerns.  I think

24    she wants to serve.  I think she would do a good job if she

25    were on the jury.

1          THE COURT:  You think she would not?

2          MR. MILLER:  I think she would.  I think she wants to

3    serve and we have the alternates in case something happens.

4    Now, the travel next week to DC, I don't know if she has any

5    preparations for that that she's going to need to do or be

6    preoccupied with.

7          THE COURT:  So you're not consenting to her removal?

8          MR. MILLER:  No.  No.

9          THE COURT:  And, Mr. Kopfler, I think she came back

10   around and said as long as she could occasionally go check

11   her phone and get up and have water, she could be fair and

12   give 100 percent of her time.  So I'm not going to allow a

13   challenge for cause on her and that was to Juror No. 8, Ms.

14   Weggeman.

15         MR. KOPFLER:  In that second panel, two of them, one

16   them was Mr. Balfer looked like he was about to have a

17   breakdown here being on the jury and I think he's a key

18   employee.  Maybe he's fearful for his job.  I don't know the

19   answer there, but just to -- seems like he's not emotionally

20   set to act as a juror on this case for the number of days

21   involved.  There's a hardship to his employer.

22         MR. MILLER:  I agree.  He's very preoccupied with his

23   work and very concerned about his publishing side to get it

24   off timely for the clients, and I don't think he would serve

25   as well as a juror.  So I agree.

1          THE COURT:  Juror No. 17 is going to be excused for

2    cause.  That's Juror No. 17.

3          If we're going in order, we talked about Juror No.

4    18.  She's the one with the automobile accident.

5          MR. MILLER:  I think she would be for cause.

6          MR. KOPFLER:  She was on three different medications,

7    getting an injection on Friday.  She could barely talk to us.

8          THE COURT:  Mr. Miller?

9          MR. MILLER:  I agree.

10          THE COURT:  I agree.  The court is excusing Juror

11    No. 18, Ms. Ricard.

12          MR. KOPFLER:  Ms. Heidi Conley.

13          MR. MILLER:  I agree.

14          THE COURT:  The court concurs.  Juror No. 25 will be

15    excused for cause.

16          Any others in the first few you want to discuss,

17    Mr. Kopfler?

18          MR. KOPFLER:  I don't recall.  I think that's it.

19          THE COURT:  All right.  So I'll give you a few

20    minutes right now and then we'll start -- Melissa and Cheri.

21    We'll start with you, going back and forth.  Remember you

22    have three peremptories for the first six and one additional

23    for one of the two.

24          MR. KOPFLER:  You're going numerical order across the

25    back row?

1        THE COURT:  Correct.

2        Gentlemen, I mentioned this in the pretrial order.

3   Remember back strikes are allowed.  Less than five minutes.

4             (Peremptory challenges exercised.)

5                  (In open court.)

6        THE COURT:  We're going to take a couple of minutes

7   and we're going to select the jurors.  Before we do that, I

8   just want to say to everybody thank you very much for being

9   here.  You have been most attentive and it's greatly

10  appreciated.

11       I thought I lost my court reporter.

12       It is greatly appreciated.  We're going to select six

13  jurors and two alternates, so eight people will be able to

14  stay with us for the next few days.  Everyone, when you are

15  picked of those eight people, we will almost immediately take

16  a break so that you can make whatever phone calls and I'll

17  give you further instructions regarding that.

18       So we are most appreciative of you being here and of

19  the eight people who are about to be picked and for everyone

20  who came here and answered quite honestly, thank you for

21  that.

22       As I said in the beginning, some cases are best to be

23  heard by a judge and there are others that this is what a

24  jury is made for and this is one of those cases.  So we

25  greatly appreciate it.  I know everybody here does.

1        I think I have a juror that has their hand up that

2   may need a little break for a couple of minutes.  This is

3   going to take a couple minutes.  Most of you are going to be

4   excused if you can wait.  Can you wait a couple of minutes?

5        JUROR:  (Nods head.)

6        Just for the record, I know that music may not be to

7   your liking, but some of the judges do just white noise,

8   static the whole time instead of music.  So I am thinking the

9   music is a little better than having static in your ears.

10  Almost done.

11       All right.  Okay.  I'm going to call eight jurors'

12  numbers.  I would ask those eight jurors, please remain in

13  the courtroom.  Everyone else, again, is sincerely thanked

14  for being here and for your service.  I am going to ask for

15  all the remaining jurors, those whose numbers are not called

16  please return to the jury room and don't just leave without

17  going and checking in there.  I don't think you're going to

18  be needed anywhere else, but I can't tell you to go home from

19  here.  But please go back down there.  And they will

20  officially discharge you.  Again, we thank you for being

21  here.

22       The following jurors should stay in the courtroom

23  room, Juror No. 1, Juror No. 2, Juror No. 5, Juror No. 7,

24  Juror No. 10, Juror No. 12, Juror No. 14, and Juror No. 15.

25       Those eight jurors should remain in the courtroom.

1    Everyone else should please be excused now.

2         All rise as the rest of the jury departs.  Thank you

3    again.  Those eight remain.

4         Again that's Juror No. 1, 2, 5, 7, 10, 12, 14, and

5    15.

6              (Nonselected jurors exits courtroom.)

7         Juror No. 1 and No. 2, why don't you all come right

8    down to the front.  We have everyone sit right along the

9    front row so you have front row seats to see everything.  So

10   sit right in order.  Perfect.

11        Thank you for doing that.

12        Okay.  Let's be seated.  We're going to sit in this

13   order during the entire trial.  I want to make sure we have

14   it correct.  Juror No. 1, Juror No. 2, Juror No. 5.

15        Where is Juror No. 7?  Juror No. 7, sir, you should

16   be right here.

17        And then just push down and then Juror No. 10,

18   perfect; Juror No. 12, perfect; 14 and 15.

19        Jurors 14 and 15, you have each been selected as an

20   alternate juror.  As an alternate juror, you'll sit with the

21   jury.  You'll have the same duties and obligations as the

22   jurors and, of course, are expected to give the case the same

23   undivided attention that the other jurors are required to

24   give.  An alternate juror who does not replace a juror prior

25   to the jury's retiring to deliberate will be discharged and

1    may not participate in the deliberations.

2         If you don't mind, I'm going to have the courtroom

3    deputy swear you in as jurors.  I would like to give some

4    preliminary instructions.  I promise you they are very short

5    and then we can take a break for lunch so you will have time

6    to make whatever calls you need to make for work and

7    otherwise and you'll go and have lunch.  The court does not

8    provide lunch, but they can give you some assistance on where

9    to go around here.  And then I'll give you some more

10   instructions.

11        THE DEPUTY CLERK:  Can you please stand and raise

12   your right hand.

13             (Selected jury administered oath.)

14                      JURY INSTRUCTIONS

15        THE COURT:  Thank you.  Now welcome as our jurors.

16        Members of the jury, you've now been sworn in as the

17   jury to try this case.  As the judge, I'll decide all

18   questions of law and procedure.  As the jury, you are the

19   judge of the facts.  At the end of the trial, I will instruct

20   you on the rules of law that you must apply to the facts as

21   you find them.  You may take notes during this trial.  Do not

22   allow your note-taking to distract you from listening to the

23   testimony.  Your notes are an aid to your memory.

24        If your memory should later be different than your

25   notes, you should rely on your memory.  Do not be unduly

1    influenced by the notes of other jurors.  A juror's notes are

2    not entitled to any greater weight than each of your juror's

3    recollection of the testimony.

4         Until this trial is over, do not discuss this case

5    with anyone and do not permit anyone to discuss the case in

6    your presence.  This includes your spouse, children,

7    relatives, friends, coworkers and people with whom you

8    commute to court each day.  You should warn them not to ask

9    you anything about your jury service or this case until the

10   trial is over and I have accepted the jury's verdict and

11   discharged you as a juror.

12        During your jury service, you must not communicate

13   any information about this case by any means, by conversation

14   or with the tools of technology.  For example, do not talk

15   face to face or use any electronic device or media such as

16   the telephone, a cell or a smartphone, camera, recording

17   device, Blackberry, PDA, computer, the Internet, any internet

18   service, any text or instant messaging service, blog or

19   website, Facebook, MySpace, YouTube or Twitter or any way to

20   communicate to anyone any information about this case until I

21   accept your verdict or excuse you as a juror.  Do not even

22   discuss this case with the other jurors until the end of this

23   case when you retire to deliberate.  It is unfair to discuss

24   the case before all the evidence is in because you may become

25   an advocate for one side or another.

1          The parties, the witnesses, the attorneys, and

2     persons associated with the case are not allowed to

3     communicate with you, and you may not speak with anyone else

4     in or around the courthouse other than your fellow jurors or

5     court personnel.  This is a friendly city and I don't want

6     you to think either the court staff or the attorneys or their

7     clients are being unfriendly, but all have been advised not

8     to communicate with any jurors while this trial is pending.

9          Do not make any independent investigation of this

10    case.  You must rely solely on what you see and hear in the

11    courtroom.  Do not try to learn anything about the case from

12    any other source.  In particular, you may not use any

13    electronic device or media such as a telephone, cell phone,

14    smartphone, or computer to research any issue touching on

15    this case.

16         Do not go online or read any newspaper account of

17    this trial or listen to any radio or television newscast

18    about it.  Do not visit or view any place discussed in this

19    case and do not use Internet programs or other devices to

20    search for or to view any place discussed in the testimony.

21         In sum, you may not research any information about

22    this case, the law, or the people involved, including the

23    parties, the witnesses, the lawyers or the judge until after

24    you've been excused as a juror.

25         There are some issues of law or procedure that I must

1    decide with the attorneys and I must discuss.  These issues

2    are not part of what you decide and they're not properly

3    discussed in your presence.  To avoid having you leave the

4    courtroom and to save time, I may discuss these issues with

5    the attorneys at the bench out of your hearing as you saw

6    this morning.

7           When I confer with the attorneys at the bench, please

8    do not listen to what we are discussing.  If the discussions

9    require more time, I may have you leave the courtroom until

10   the lawyers and I resolve the issues.  I will sincerely try

11   to keep those interruptions as few and brief as possible.

12          The trial will soon begin.  Lawyers for each side

13   will make an opening statement.  Opening statements are

14   intended to assist you in understanding the significance of

15   the evidence that will be presented.  The opening statements

16   are not evidence.  After the opening statements, the

17   plaintiffs will present their case through witness testimony

18   and documentary or other evidence.

19          Next, the defendants will have an opportunity to

20   present its case.  The plaintiff then may present rebuttal

21   evidence.  After all of the evidence is introduced, the

22   lawyers will then make closing arguments.  Closing arguments

23   too are not evidence but rather the attorneys'

24   interpretations of what the evidence has shown or not shown.

25   I will then instruct you on the law that applies to this

1   case.

2           Finally, you will go to the jury room to deliberate

3   to reach a verdict.  Keep an open mind during the entire

4   trial.  Do not decide the case until you have heard all the

5   evidence, the closing arguments and my instructions.

6           Again, remember, we're about to take a break now.

7   Let's see.  It is 11:30.  So we're going to take a break now.

8   I'm sorry.  I was thinking whether we should do opening

9   statements, but I think we should take a break now and for

10  lunch.  You're going to the be escorted at all times by the

11  CSO into the jury room.  You are more than welcome to get

12  food and bring it there.  And in subsequent days, you may

13  bring food or you may go out during the lunch break.

14          One of the first things I would ask when you go back

15  into the jury room today is to discuss a start time for the

16  rest of the days.  I am going to leave it to you as the jury

17  to decide whether you would like to begin at 8:30 or at 9:00.

18  I don't know how far each of you are traveling and what will

19  be best.  That will be your first decision as a jury.  You

20  will inform the CSO, the court security officer, and he will

21  inform the court, and the attorneys have agreed that whatever

22  time is best for the jury as jurors, that's what time we will

23  start on subsequent days.

24          For now, it is 11:30 when we take a break.  We will

25  be back at 12:45 to begin with opening statements.

1          All rise.

2          The court security officer is going to escort you to

3     the jury room.

4                    (Jury exits courtroom.)

5          All right.  Please be seated.

6          Counsel, why don't we go in the back to a conference

7     room to discuss a few things before opening statements and

8     then we can put anything on the record afterwards.

9          Court is adjourned until 12:45.

10                   (Recess taken.)

11         THE COURT:  Before the jury comes back, I just want

12    to put on the record a few things that we discussed in the

13    back.

14         We had a pending motion *in limine* which was R Doc

15    101, Motion *in Limine* to Exclude Certain Exhibits and,

16    Mr. Kopfler, you had been listed A, Dispatch Logs; B, a

17    Summary Sheet; C, a spreadsheet; D, Plaquemines Parish

18    ordinances, and, E, legal opinion letters.  As regarding E,

19    the legal opinion letters, a subsequent order R Doc 117 has

20    already resolved that issue, so that's moot.

21         My understanding -- and, Mr. Miller, please correct

22    me if I'm wrong -- B, the summary sheet, C the spreadsheet,

23    and D, the ordinances are all moot because you're now going

24    to withdraw those as exhibits.  Is that accurate?

25         MR. MILLER:  Yes, Your Honor.

1        THE COURT:  So B, C, and D are withdrawn.  And we do

2   not have to decide on.  And A may still be produced depending

3   on authentication.

4        MR. MILLER:  Correct.

5        THE COURT:  Perfect.  I wanted to put that on the

6   record.

7        And the other thing we discussed, there will be some

8   stipulations that will be entered into, but we don't need to

9   get those right now, and you will agree on them sometime

10  today or tomorrow and we'll have those entered into the

11  record.

12       MR. STIEGLER:  Yes, Your Honor.  Do you want us to

13  file those into PACER or --

14       THE COURT:  File them in PACER once you agree.

15       Anything else before we bring the jury back?

16       And remember, Counsel.  You have 20 minutes for

17  opening statements.  You don't get paid by the minute.

18       MR. KOPFLER:  Chop my legs off.

19       THE COURT:  You don't have to use all 20.

20       Thank you.

21       Anytime you're ready.

22       THE DEPUTY CLERK:  All rise.

23                 (Jury enters courtroom.)

24       THE COURT:  Jurors, please sit.  We stand for you.

25       Before we begin opening statements, which Mr. Kopfler

1   will begin in just a moment, I hope you were comfortable.

2   Please know that throughout these days, if you're cold or

3   warm, the temperature will probably be the same on subsequent

4   days, so dress accordingly.

5        And one other thing I understand that you have agreed

6   that we will begin at 9:00 a.m. for the remaining days.  So

7   tomorrow we will begin at 9:00 a.m.

8        With that, as I discussed, we are going to begin with

9   opening statements of the case.

10        And, Mr. Kopfler, you will begin with opening

11   statement.  Thank you, sir.

12                 OPENING STATEMENTS

13        MR. KOPFLER:  Good afternoon, ladies and gentlemen of

14   the jury.

15        A parish government must pay its emergency workers

16   who work over 40 hours time and a half pay or overtime when

17   the workers are required at all times to be in a state of

18   readiness.

19        Now let me tell you the story of the case.  We

20   represent three paramedics; Keith Babin, Joshua Dismukes, and

21   Barbara Tate, and one emergency medical technician, Kevin

22   Burge, all of whom have been employed by the Parish of

23   Plaquemines for years.  Ms. Tate resigned in the last month

24   or so and is working for Acadian Ambulance in Baton Rouge.

25        Each plaintiff, each paramedic, each EMT, is trained,

1    qualified, and licensed for their position.  The pertinent

2    claim here today is for the time frame of August 3rd, '15,

3    through today.  Each claim for each party is an individual

4    claim.

5         Barbara Tate, when she worked for the Parish of

6    Plaquemines, lived in Baton Rouge where she still resides.

7    Kevin Burge lives in Norco.  Joshua Dismukes lives in Golden

8    Meadow.  Kevin Burge lives in Schriever or what we may call

9    locally Bayou Blue.  Each one of these individuals lives

10   hundreds of miles from their place of employment with the

11   Parish of Plaquemines.  Each person, each employee, leaves

12   their home and family every other week and travels to

13   Plaquemines Parish where they're required to live either in a

14   firehouse in Pointe a la Hache or a trailer facility in

15   Boothville-Venice.

16        Each one of these employees of Plaquemines Parish

17   works 168 hours, 7 days a week, during their hitch.  Each one

18   of these workers are provided a pager and a radio.  They have

19   to keep them with them at all times, and they're on standby

20   in a state of readiness for callouts for emergency medical

21   calls 24 hours a day during those 168 hours.

22        Okay.  I don't remember whether any of you had been

23   to Plaquemines Parish before.  It's below New Orleans.  It

24   wraps around the side of the Mississippi River.  It's a long

25   narrow parish.  The end of the road is right here in Venice

1    and you come up that road a little bit to Boothville into

2    this area up to Empire.  That's the area down at the lower

3    end of Terrebonne -- of Plaquemines Parish where Keith Burge

4    (sic), Joshua Dismukes, and Kevin Burge did their work for

5    the Parish of Plaquemines.  Ms. Tate, she was a little bit

6    further up the river.  She worked from Pointe a la Hache to

7    the end of the road.

8         Each territory is about 35 or 40 miles.  There are

9    other EMS stations throughout Plaquemines Parish, one in

10   Belle Chasse on the Westbank, one in Port Sulfur on the

11   Westbank, and north of where Ms. Tate worked in an area

12   called Woodlawn.

13        Upon receipt of a pager -- a page and a radio call

14   from EMS dispatch in Belle Chasse, each one of these

15   employees is required to be in their ambulance within five to

16   six minutes en route to the call.  Typical calls, each one of

17   these employees receive are heart attacks, shortness of

18   breath, broken bones, car wrecks, and any other kind of

19   emergency situation you can imagine.  Their duty is to be in

20   uniform and respond with an ambulance to the scene as soon as

21   possible.  If a patient or a resident is incapacitated and

22   requires hospitalization, they must transport that patient to

23   the nearest facility that could provide the services

24   necessary for that patient.

25        And, again, it's a long narrow parish.  From Venice

1    to Belle Chasse I think is 70 miles.  If you're on the

2    Westbank and you're in the Venice-Boothville area like Burge

3    and Dismukes and Babin, there is a facility in Port Sulfur if

4    a patient requires hospitalization for any type of life

5    threatening situation, they must be transported to either

6    Westbank Ochsner facility -- it's the old Meadow Crest -- or

7    they must be transferred further to West Jefferson Hospital

8    in Marrero.  Some of the emergency calls for prisoners from

9    the prison in Pointe a la Hache, they're required to go to

10   University Medical Center over here on Canal Street.

11        Sometimes by request they're brought to further, more

12   distant hospital such as East Jefferson.

13        Barbara Tate, the only individual earlier who was

14   working on the east bank of the river would transport

15   patients through the Pointe a la Hache ferry to Belle Chasse

16   and then to Westbank Ochsner in Jefferson Parish or she may

17   drive up the east side of the river and take the ferry at

18   Belle Chasse.

19        If we had a situation as you know might happen, if

20   ferries are out, she may either have to bring the patient to

21   Chalmette Hospital in St. Bernard Parish or on through New

22   Orleans to Childrens Hospital or any of the hospitals in New

23   Orleans like University Medical Center or East Jefferson.

24        The average runtime back and forth for a hospital

25   admit for either Babin, Burge, Dismukes, or Tate is about

1    four hours.  And for those of you not familiar with lower

2    Plaquemines Parish, there are no movie theaters, there are no

3    Walmarts, no shopping centers, or amenities in Venice or

4    Pointe a la Hache.

5         The frequency of calls is unpredictable.  It depends

6    upon the emergency.  These EMTs and paramedics may go a day

7    without a call, and then they may have them four to five per

8    day.  As in any standby or on-call work, there is idle time

9    when the employees are waiting to respond to a call.  During

10   that time, these emergency personnel may watch TV, surf the

11   Internet, read books, cook, sleep, but all times, they're

12   required to remain at the station or the firehouse unless

13   they're authorized.

14        The following are uncontested facts:  Plaintiffs, all

15   of these plaintiffs, were or are required to live in housing

16   provided by the Parish of Plaquemines during their seven-day

17   shifts.  Plaintiffs' family, friends or acquaintances are not

18   allowed to live or stay at the station where they would stay

19   during their seven-day shift.  Plaintiffs are restricted when

20   not on emergency call from leaving their station unless they

21   take the emergency vehicle and their partner and are in

22   uniform.

23        Depending on their experience and qualification, each

24   individual is paid a different hourly rate but for the

25   168-hour workweek where they were on standby ready to respond

1    to an emergency.  There's no pay over 40 hours, time and a

2    half, which we commonly call overtime.

3         Each individual's paycheck is paid strictly on

4    straight time at their hourly rate.  The Parish of

5    Plaquemines also deducts six hours of downtime from each

6    employee's paycheck for sleep, meals, and other activities

7    even though each individual is subject to respond within five

8    to six minutes to an emergency call in their uniform and in

9    the ambulance whether they're sleeping, eating, showering,

10   cooking or any activity.  You'll hear the story they're

11   regularly awakened by calls during the night.

12        Before we came to court, we had to find out a few

13   things.  Was there an agreement between these individuals and

14   the Parish of Plaquemines, that the Parish of Plaquemines

15   would only be required to pay straight time and no overtime?

16   We issued what are called written interrogatories to the

17   Parish of Plaquemines.  We schedule and took a deposition of

18   the Parish of Plaquemines where we questioned the Parish of

19   Plaquemines through its designated representatives, Emily

20   Sylve and Jonathan Butcher.

21        What we found out is there was no written agreement

22   between Babin, Burge, Dismukes, and Tate in the Parish of

23   Plaquemines.  There was no signed agreement between the

24   paramedics and EMTs in the Parish of Plaquemines.  Any

25   written pay rules for EMS, any ordinance for EMS pay that

1   would spell out anything regarding pay was never provided to

2   the EMT or the paramedics.  Any daily log sheets that the

3   Parish of Plaquemines might have required to be completed by

4   the EMTs and paramedics was never provided to them.  They

5   just didn't pay overtime.  Burge, Babin, Dismukes and Tate

6   will tell you they never received nor had seen any written

7   EMS pay rules.

8        What about complaints?  We found that each one of the

9   paramedics and the EMT complained to their supervisor which

10  at the time was Gina Meyer and Robin Brewer and then Roy

11  Robichaux, the fire chief for Plaquemines Parish who took

12  over for Gina Meyer and Robin Brewer.  Some of them even

13  complained to the civil director and parish councilman for

14  the Parish of Plaquemines.  The response they received was,

15  that's the way it is, that's the way it's been, that's the

16  way it's going to be.  No overtime work for EMS workers

17  during their downtime on standby.

18       This downtime deduction takes from each employee's

19  paycheck is not a bona fide regularly scheduled sleeping

20  period because there's no regular schedule.  Burge, Dismukes,

21  Tate, Babin had no scheduled downtime; for example, midnight

22  to seven o'clock.  They're simply told that some unspecified

23  six-hour period will be assigned to the title of downtime

24  solely for the purpose of nonpayment of wages.  Nothing

25  differentiates the downtime from any other six-hour period of

1    the day.

2         These EMT and paramedics responsibilities remain the

3    same and they're equally on-call and ready to respond.  When

4    one of the plaintiffs here -- here we are, the plaintiffs.

5    We're bringing the claim.  The defendants, the Parish of

6    Plaquemines.  When one of the plaintiffs complained to his

7    supervisor asked for payment of downtime when it was

8    interrupted, it was denied.  The supervisor responded sleep

9    on the way back from calls.

10        Another question we had to determine was whether the

11   standby was necessarily and primarily for the benefit of the

12   Parish of Plaquemines.  Babin, Burge, and Dismukes were

13   required to stay in a Plaquemines Parish provided trail --

14   trailer in Boothville, again, hundreds of miles from home.

15        These photos show the conditions of the trailer they

16   stayed in from 2015 until about 2018 when it was condemned,

17   these photos showing mold --

18        THE DEPUTY CLERK:  Five minutes.

19        MR. KOPFLER:  -- sheetrock falling out of the walls,

20   holes in the floor, air conditioning clogged up with mold.

21   Some of the problems they were required to live with and

22   living in those conditions is not a benefit to those workers.

23   You will learn that there were no other ambulance services in

24   Plaquemines if the people of Parish of Plaquemines had an

25   emergency.  There's no doctor on Eastbank where Babin Tate

1    was stationed and where Kevin Burge is stationed now.

2          These plaintiffs were and are the sole-trained

3    medical personnel in their assigned area and able to respond

4    to everyone's calls.  Their quick response is for the people

5    of lower Plaquemines a matter of life and death.  Whether

6    Babin, Burge, Dismukes, and Tate were free to engage in

7    personal activities during periods of idleness has to balance

8    against, one, they weren't allowed a second job, two, they

9    weren't allowed to be at home, three, no family allowed.

10   They weren't allowed to venture out of the area.  They had to

11   be en route in an ambulance in five to six minutes after a

12   call.  They were required to live in government housing.  So

13   you can watch TV.  You can talk on the phone.  You can listen

14   to music, read a book, but any extended activities were

15   subject to interruption.

16         After the calls, the ambulance had to be cleaned with

17   blood removed, disinfectant, reports prepared, and medication

18   supplies restocked.  There's really no question that these

19   employees were engaged by the Parish of Plaquemines to wait

20   for an emergency.  In the period of time that they were

21   awaiting, they're entitled to be paid.

22         The Parish paid all time at straight time, less six

23   hours for their -- for a total of 132 hours, but they did not

24   pay overtime.  They did not pay time and a half, overtime for

25   work over 40 hours.

1            You will decide separately whether the time for which

2   these individuals were on standby, required to be at the

3   Parish facilities, stations or fire stations is compensable

4   under the Fair Labor Standard Act for overtime hours.  The

5   simple truth is these individuals were hundreds of miles away

6   from home, required to live in these facilities for 168 hours

7   a week.  If you remember one thing about this case is that

8   each individual was in a constant state of readiness,

9   activating to provide services for the benefit of the people

10  of the Parish of Plaquemines, ready Johnny on the spot to

11  render services.

12           There's a right way to handle overtime claims and

13  there's a wrong way.  In this case, the Parish of Plaquemines

14  has decided to not pay overtime on a policy they establish

15  that they did not hand out to its employees, that was

16  objected to, and complained to by its employees, that the

17  most can be said was tolerated by these employees.

18           After I'm finished here, the defendants will give you

19  their story and we'll get to work.  After we listen to the

20  evidence, you will decide whether overtime pay is owed,

21  whether the Parish should pay time and a half for hours over

22  40 including downtime, whether the work performed on standby

23  was for the benefit of the Parish.  And then you'll make a

24  decision whether the business was carried on as usual or

25  whether overtime pay and downtime should be lawfully paid.

1          Thank you.

2          MR. LANDIN:  Good afternoon.  I know we've already

3    been introduced, but I just want to take a moment to

4    reintroduce myself.  My name is Alex Landin and I represent

5    the defendant, Plaquemines Parish, in this matter.  Seated at

6    our table is Eric Miller, another attorney who is

7    representing Plaquemines Parish in this matter.  Also seated

8    at our table is Jonathan Butcher, the superintendent of the

9    Parish of Plaquemines Fire Department.  Mr. Butcher will

10   serve as a corporate representative for the Parish during

11   this trial.

12          As you just heard, at the time of filing their

13   lawsuit in 2018, the plaintiffs all worked for Plaquemines

14   Parish as paramedics or EMTs.  The plaintiffs worked 7-day,

15   24-hour shifts.  Throughout trial you may here these 7-day,

16   24-hour shifts referred to as time on-call or hitches.

17          Because the plaintiffs responded to emergency calls

18   in a specific territory, they were required to stay in this

19   territory during their seven-day shifts so they could quickly

20   respond to these emergency calls.  The evidence will show

21   that pursuant to Parish policy, for each 24-hour shift, the

22   plaintiffs were compensated for 18 of those 24 hours, as the

23   6 hours that they weren't compensated for constituted sleep

24   or downtime.  The evidence will also show pursuant to Parish

25   policy the plaintiffs would receive overtime pay when their

1    actual work time exceeded 40 hours in a workweek.

2          The Parish policy defines actual work time as the

3    time spent responding to and returning from an emergency

4    dispatch call or time spent on related activities, such as

5    restocking the ambulance.  So if the plaintiffs spent more

6    than 40 hours in a workweek responding to and returning from

7    emergency calls or doing other related activity, they would

8    receive overtime pay.

9          While most employers don't provide free living

10   arrangements for their employees, the testimony will show

11   that the Parish provided places for the plaintiffs to stay

12   free of charge as the plaintiffs did not have to pay rent or

13   utilities.   Plaintiffs Babin, Burge and Dismukes were

14   provided with a three-bedroom, two-bath mobile home free of

15   charge.  The mobile home had electricity, air conditioning,

16   indoor heating, hot and cold water.  It also had a living

17   area with furniture, kitchen, stove, oven, microwave,

18   washer/dryer, TV, and Internet.  The testimony will show the

19   plaintiffs were responsible for its upkeep and they failed to

20   do so.  In fact, the testimony will show that a small fire

21   started in the mobile home on one occasion because the

22   plaintiff let his children come in and cook breakfast.

23         Plaintiff Barbara Tate was allowed to stay in the

24   firehouse free of charge.  The firehouse had a living room

25   with bedroom, private bath, kitchen, washer/dryer, TV, and

1  Internet.  Most importantly, the testimony will show the

2  plaintiffs did not have to stay in this freely provided

3  Parish housing.  They all made a decision to stay there

4  because not a single one of them lived within the territory

5  and because it was free.

6      Keep in mind, the plaintiffs made a conscious decision to

7  work for the Parish despite not living within their assigned

8  territory.

9          In fact, up until February of this past year, when

10  they were provided with a freshly remodeled trailer with new

11  appliances, the plaintiffs could have stayed anywhere of

12  their choosing in their assigned territory.  They could have

13  rented an apartment.  They could have stayed with friends or

14  any number of other options.  In fact, the testimony will

15  show that in 2018 one of the plaintiffs even stayed at a

16  hotel with his family during one of his seven-day shifts.

17          While the plaintiffs were required to stay within

18  their assigned territory during their shifts, they would

19  frequently leave this territory to take patients to various

20  hospitals outside their territory.  These various hospitals

21  were Kenner Regional, Childrens Hospital and Ochsner Westbank

22  and they had no real time constraints on returning back to

23  their territory upon leaving these hospitals.

24          So now the important question, why are we here?  We

25  are here because the plaintiffs, who are paid approximately

1   $60,000 per year, to respond to an average of between two and

2   three dispatch calls per week believe that they should have

3   been paid over $100,000 per year on account of the time that

4   they spent sleeping, eating, and watching TV during their

5   seven-day shifts.  The evidence will show the Parish's pay

6   policy is clear.  The plaintiffs will not be paid for six

7   hours of sleep time and only actual work time -- that is,

8   time responding to and returning from an emergency call would

9   count towards their overtime.  Plaintiffs are going to claim

10  that they were unaware of this policy or that they did not

11  know how they were being paid but the evidence will show

12  otherwise.

13         The evidence will show that all of the plaintiffs

14  have worked for the Parish since at least 2014, with three of

15  the plaintiffs working for the Parish for over 10 years.

16  They all regularly received their paychecks, which did not

17  receive overtime, and they all knew that their 7-day, 24-hour

18  shift amounted to a total of 168 hours.  Despite being fully

19  aware that the total hours of their 7-day shifts amounted to

20  over 40 hours and despite receiving countless paychecks that

21  didn't include overtime, the plaintiffs will say that they

22  did not know that they only would receive overtime when their

23  actual work time exceeded 40 hours in a workweek.

24         But the testimony will show that clearly the

25  plaintiffs knew how they were being paid because they

1    complained about it, particularly the fact they weren't

2    receiving overtime, yet they all continued to work under this

3    pay plan after complaining about it.  In fact, the evidence

4    will show the plaintiffs completed their own time sheets and

5    only wrote in 18 hours for their 24-hour shifts so they

6    clearly knew what the pay plan provided.

7        Plaintiffs will also try to claim that during the

8    time they were not responding to calls, they were restricted

9    in engaging in personal pursuits and were just nervously

10   awaiting the next incoming call.  Don't buy it.

11       The testimony, particularly the plaintiff's own

12   testimony, will show however that when the plaintiffs were

13   not responding to emergency calls, they were watching TV or

14   movies, visiting friends, visiting with family, playing

15   musical instruments, browsing the Internet, hunting, fishing,

16   going to the grocery, eating at restaurants like Popeye's and

17   Taco Bell, and even shopping at places like Walmart and

18   Academy Sports.

19       The evidence will show, and it's important to note,

20   that the plaintiffs were all left to their own devices when

21   not responding to an emergency call.  There was no one

22   supervising or monitoring them as to what they did or did not

23   do.  As long as the plaintiffs promptly responded to an

24   emergency call, the Parish was not concerned with what they

25   did during this downtime.

1          The plaintiffs will likely point to a memorandum

2     that stated that they had to stay at the firehouse or mobile

3     home and could not leave during their seven-day shifts unless

4     they went along with another individual.  This is the

5     plaintiffs' way of attempting to downplay this actual freedom

6     that we just spoke about.  Do not let this memo fool you.

7          When you see this memo I want you to notice first

8     that it was just issued this past February.  So as I stated

9     earlier, prior to this time, plaintiffs could have stayed

10    anywhere of their choosing in the assigned territory; hotel,

11    friend's apartment or whatnot.  You will also hear testimony

12    that the memo did not prevent the plaintiffs from stopping at

13    places like Walmart or Popeye's on the way back from the

14    hospital, nor did the memo prevent them from watching TV,

15    visiting friends, sleeping, hunting or fishing, or leaving

16    their quarters as long as they stayed within their assigned

17    territory.  Also, all four plaintiffs already lived in this

18    freely provided housing, so the February memo did not affect

19    them.

20         The plaintiffs also don't want to tell you the known

21    purpose behind this memo, which was to shorten response times

22    because it had been taking too long for paramedics to respond

23    to an emergency call because one paramedic was having to go

24    pick up his or her buddy at places like Taco Bell or Academy

25    Sports before heading to a potential emergency.

1        At the end of this trial in deciding whether the

2   plaintiffs are entitled to additional compensation, you, the

3   jury, will essentially have two main questions to answer.

4   The first question is this:  During the time that plaintiffs

5   were waiting to receive a call, were they completely relieved

6   of duty so that they could use it for their own purposes,

7   such as for eating, sleeping, watching television, or

8   engaging in recreational activity?

9        And here's the second question:  Were the plaintiffs

10  able to get six total hours of noncontinuous uninterrupted

11  sleep time during their 24-hour shifts.  If your answer is

12  yes to both of these questions the plaintiffs are not

13  entitled to any additional compensation.

14       There is an important piece of evidence that will

15  fairly and objectively help you answer these two questions.

16  This important piece of evidence are the dispatch logs for

17  the plaintiffs.  These dispatch logs track the time from when

18  the plaintiffs are first paged for an emergency until the

19  time that they radio back into dispatch to let dispatch know

20  that they are returning to their territory.  In other words,

21  these dispatch logs track the plaintiff's actual work time.

22  Again, this is the time spent responding to and returning

23  from an emergency call and this is the time that counts

24  towards overtime.

25       When you look at these dispatch logs, I want you to

1  notice a couple of things.  First, they will show that the

2  plaintiffs were not frequently interrupted by calls.  More

3  often than not, the plaintiffs went hours, even days without

4  receiving a call.  In fact, in the two years prior to filing

5  this lawsuit, plaintiff Keith Babin responded to an average

6  of 2.6 calls per every week that he worked.  Plaintiff Kevin

7  Burge responded to an average of 2.8 calls for every week

8  that he worked.  Plaintiff Joshua Dismukes responded to an

9  average of 2.5 calls for every week that he worked, and

10  plaintiff Barbara Tate responded to an average of 1.6 calls

11  for every week that she worked.

12      Second, these dispatch logs will show you that

13  plaintiffs generally only spent between 10 to 15 hours per

14  week responding to and returning to these limited number of

15  emergency calls, so they did not perform more than 40 hours

16  of actual work in a workweek.  So if you want the simple

17  truth, just look at these dispatch logs.  This crucial piece

18  of evidence will show you how little actual work time the

19  plaintiffs spent during their 7-day shifts and by the same

20  token these dispatch logs will also show how much free time

21  the plaintiffs had to sleep, watch, TV and movies, eat, visit

22  friends and go hunting or fishing.

23      I want to thank you all for your time, attention, and

24  service this week, but before I turn it over, I want you to

25  ask yourself this one question at the end of this trial:

1    Does the evidence show that the plaintiffs, who all earn

2    $60,000 per year to respond to an average of less than three

3    calls per week, are entitled to receive an additional

4    $100,000 for the time that they spent sleeping, eating,

5    watching TV and movies, visiting with friends, hunting and

6    fishing?

7            Thank you.

8            THE COURT:  Thank you, Mr. Landin.

9            Counsel approach for one moment.

10           (WHEREUPON, the following proceedings were held at

11   the bench:)

12           MR. KOPFLER:  We go through a detailed pretrial

13   procedure in which everybody participated and they prepared

14   their uncontested facts and now they want to change the story

15   when we get to trial.  And it's just not right.

16           THE COURT:  You've got the same depositions and

17   information they have.  We'll see what they're able to prove.

18           MR. KOPFLER:  What does a pretrial order do but set

19   forth what the contested facts and uncontested facts are.

20   And you know here we've got the Parish of Plaquemines.  They

21   put down their position in the pretrial order and then the

22   day of order, they want to tell a different story.  I think

23   the jury should be advised of that.

24           THE COURT:  Let's see what the facts, what they're

25   able to prove and what your facts will likely.

1          I called you up here for a different reason.  Please

2    advise your clients not to show any emotion if they can.

3    They will have their time to testify and I'll specifically

4    point out during defendants opening statement Ms. Tate was

5    just shaking her head to the jury.  I know this is personal

6    to her.  But they need not to communicate those kind of

7    things to the jury.

8          MR. KOPFLER:  Okay.  We'll take care of that.

9          THE COURT:  And I didn't see her looking directly at

10   the jury but just for the record she was certainly shaking

11   her head.

12         Okay.  Call your first witness.

13                    (In open court.)

14         MR. KOPFLER:  Call Keith Babin.

15         We would move for sequestration of the witnesses,

16   particularly those for Parish of Plaquemines.

17         THE COURT:  All right.  If there are any witnesses in

18   the courtroom other than the corporate representative or

19   Plaquemines representative, any witnesses?

20         I would ask counsel if you see witnesses come in,

21   please advise them as to the sequestration.

22         MR. MILLER:  Yes, Your Honor.

23         THE COURT:  Stand right here.  We'll get you sworn

24   in.

25                   (Witness administered oath.)

1        THE DEPUTY CLERK:  Please have a seat.

2        Please state and spell your name for the record once

3   you're seated.

4        THE WITNESS:  Keith Babin, K-e-i-t-h, B-a-b-i-n.

5                         KEITH BABIN,

6   called as a witness, being first duly sworn, was examined and

7   testified as follows:

8                      DIRECT EXAMINATION

9   BY MR. KOPFLER:

10       Q.  Keith, what's your address?

11       A.  312 Bayou Blue Bypass Road, Monterey, Louisiana.

12       Q.  How long have you been living there?

13       A.  Oh, since 2007.

14       Q.  And are you married?  Do you have children?

15       A.  Yes.

16       Q.  Tell us about that.

17       A.  My wife, Crystal, the pretty blonde back yonder.  And

18   I have four children, two boys, two girls.

19       Q.  Can you tell us about your education?

20       A.  High school, had some college when I was in the

21   military and the Army in Texas, stationed in Fort Hood,

22   Texas.  After that, kind of worked around in the oil field a

23   little bit and that declined, so I decided to do this.

24       Q.  Let me ask you about that.  How long were you in the

25   military?

1    A.   Three years.

2    Q.   What was your rank on discharge?

3    A.   E4.

4    Q.   What was your discharge?

5    A.   Honorable.

6    Q.   And what kind of work did you do once you got out of

7    the military?

8    A.   Went straight into oil field.  I was a purchasing

9    agent at a fabrication yard in New Iberia.

10   Q.   And then you decided to get into emergency work?

11   A.   After a couple other jobs with the oil field and it

12   kind of slowed down and declined and my mother had leukemia

13   at the end of the '80s and I used to ride in the ambulance

14   with her to get her platelets and everything and she was

15   like, Keith, this would be a good job for you.  So took me a

16   few years but here I am.

17   Q.   What was the first step to getting into emergency

18   work?

19   A.   You have to get your EMT basic certification and

20   that's usually about six -- anywhere from six months to

21   twelve months.

22   Q.   And where did you get your certification?

23   A.   Thibodaux Technical Institute.

24   Q.   That's in LaFourche Parish?

25   A.   Yes.

1      Q.   And did you begin work following your training?

2      A.   Yes.  I started a company called Priority Mobile

3   Health in Gretna.  They generally service the St. Bernard

4   area, Chalmette area, and did some transfer stuff in New

5   Orleans area.

6      Q.   And how long did you work for priority?

7      A.   Six years.

8      Q.   And did you take further training?

9      A.   Yes.  I -- they offered what's called an in-house

10  paramedic course that was sponsored by Delgado University, so

11  I got into paramedic training at that time, got my paramedic

12  certification in '97.

13     Q.   What's involved with the training?

14     A.   Paramedic's a little bit more intense because you're

15  basically learning how to save somebody's life, okay.  And

16  that course is usually about 18 months long.  You have to

17  take an ACLS, which is advanced cardiac life support.  Same

18  class as doctors and nurses take, you're right there with

19  them.  UBLS, CPR, of course, PALS, which is pediatric

20  advanced life support, you also have to take.  And then you

21  have to do so many hours clinical time in a hospital setting

22  and on an ambulance before you can go for your natural --

23  national.

24     Q.   When did you get your paramedic license?

25     A.   '97.

1    Q.  And since then, do you have to have continuing
2  education?
3    A.  Yes.  Every two years we have to recertify at our
4  level.  Paramedic you have to go through a 48-hour refresher
5  class.  You have to update your ACLS every two years, your
6  PALS every two years, CPR every two years.  So it's a
7  never-ending learning experience you can say.
8    Q.  Once you got your paramedic certification or license
9  -- by the way, is that national, state, or both?
10   A.  It's both.
11   Q.  And you had to be recertified how often?
12   A.  Every two years.
13   Q.  At the time you got your license, were you still with
14  Priority?
15   A.  Yes.  My paramedic certification yes.
16   Q.  And who else did you work for?
17   A.  Acadian Ambulance.
18   Q.  Tell the jury what a paramedic actually does.
19   A.  Everything that a doctor does in an emergency room
20  except we do it in a six by eight setting going 70 miles an
21  hour.  So everything that a doctor learns about advanced
22  cardiac life support, like I said, we're side by side in the
23  same class taking the same thing.  It's an American Heart
24  Association-sponsored class.  So we all have to take it.  So
25  I'm not saying I'm a doctor, but, you know.  I've helped a

1    lot of people.  So has Josh.  So has Kevin.  And Barbara

2    also.  It's --

3        Q.  When did you come to work for the Parish of

4    Plaquemines?

5        A.  September of 2008.

6        Q.  And what was the schedule that you worked for them?

7        A.  Seven on/seven off.  I didn't find out until a couple

8    weeks after I was actually employed that we were getting only

9    paid for 132 of those hours though.  So what you going to do?

10       Q.  So were you required to live in the facilities that

11   the Parish of Plaquemines provided you?

12       A.  Yes.

13       Q.  Has that been the whole time that you've worked for

14   them?

15       A.  Yes.

16       Q.  And what purpose does that serve?

17       A.  What do you mean what purpose does it serve?

18       Q.  Let me ask you this:  Sometimes --

19       A.  Ideally you're supposed to have both crew members

20   there, that way you're both responding from the same point at

21   the same time instead of having one guy here and having one

22   guy down the road somewhere and having to meet up.  So it's a

23   time issue, you know, getting to the patients.

24       Q.  So if someone lives in the Parish of Plaquemines and

25   they have an emergency, they can call 911 and you and your

1  team member would respond; is that right?

2      **A.**   Yes.

3      **Q.**   But if you were not living at the station, what do

4  the people do that want to come directly to you?

5      **A.**   What do you mean?  Like --

6          MR. MILLER:  Objection, Your Honor; calls for

7  speculation.

8          MR. KOPFLER:  I'll rephrase the question.

9  BY MR. KOPFLER:

10     **Q.**   Do you have walkups to the station?

11     **A.**   Yes.

12     **Q.**   Can you explain to the jury what that means?

13     **A.**   It's usually a lot of local people come up and knock

14  on our door because they know where we're at and ask for

15  service.

16     **Q.**   What kind of services?

17     **A.**   Anything from chest pains to I got a hook in my

18  finger.

19     **Q.**   Your hours, has that changed since you've worked for

20  the Parish of Plaquemines?

21     **A.**   No.

22     **Q.**   How are you paid?

23     **A.**   For 132 hours straight.

24     **Q.**   Are you paid any overtime?

25     **A.**   Not at all.

1      Q.   What area of Plaquemines have you worked?

2      A.   Lower part, Venice -- well our area, there used to be

3   a truck in Buras but they decommissioned that truck so our

4   service area has actually grown from the -- I don't know if

5   y'all familiar with it, Empire Bridge south to the end of the

6   road which is roughly 35, 40 miles.

7      Q.   Any calls from that area you would respond to?

8      A.   Correct.

9      Q.   And tell us about the pager system and the radio

10   system.

11      A.   Well, we have a little two-inch-by-three-inch black

12   pager that's on the charger on our nightstand and we have the

13   radios also.  Usually the pager will go off.  It will tone

14   first and then it will say 1896 respond to such and such

15   address or such and such blank.  Then you acknowledge the

16   call on your radio.

17         And you can ask everybody that works there.  A lot of

18   times the paging system doesn't work.  So your backup is your

19   radio.  So you don't want to sleep with your radio off.  You

20   keep your radio on the whole time you're there.  Sometimes

21   the radio don't work, and that's when our personal cell

22   phones come into play because dispatch has our numbers and

23   that's the third way they get in touch with us.

24         You want me to keep going?

25         MR. KOPFLER:  Just a second.  I wanted to pull up my

1    map here.

2          Do you have that map handy?  Will you put it right?

3          THE WITNESS:  That's not Venice.

4          MR. KOPFLER:  It's not coming up.

5    BY MR. KOPFLER:

6      Q.  So tell us about the distances involved in your work.

7    How far is Venice from, say, Belle Chasse?

8      A.  Roughly about 70 miles.

9      Q.  How far is it from Venice to West Jefferson?

10     A.  About 75.

11     Q.  And these pager calls you receive, how often do you

12   receive a pager call?  Have you heard this -- the lawyer for

13   the Parish saying that for two years before I think this

14   claim was filed in '18 that you would have very few calls per

15   week.  What do you say about that?

16     A.  It varies.  I mean, you can go from one extreme to

17   the other down there.  Josh, just the other day, said he

18   worked 19 hours straight.  When you're on an ambulance

19   responding from Venice, it's 180-mile roundtrip, so it kind

20   of wears you out.  Kevin and I, I think our best was 15 hours

21   straight, and like I said that's four or five calls.  You got

22   to figure the average call will last you four hours.  By the

23   time you get dispatch, gets hands on the patient, get them

24   loaded in the bus, get them to the hospital, and then if

25   you're lucky, you got a bed available.  If not, you may have

1    to wait two to three hours at the hospital for a bed.  Then

2    you transfer your patient over.  Then you clean your rig and

3    get down the road, refuel, restock, and then you're back at

4    your station.  That's on average four hours.

5        Q.  Does that include cleaning the ambulance?

6        A.  Yeah.

7        Q.  And what goes on with cleaning the ambulance and why

8    is that important?

9        A.  Well, it depends on the call.  I mean, if you have a

10   messy call, a lot of blood and stuff, you got to disinfect

11   everything.  You don't want to contaminate the next patient

12   or anybody else, your coworkers or anybody.  So that's the

13   importance of it right there.

14       Q.  Can you turn your pager or your radio off?

15       A.  No, not at all.

16       Q.  In August of '15, were you required to stay at Gilly

17   Lane Boothville station?

18       A.  Yes.

19       Q.  That was part of your job?

20       A.  Yes.

21       Q.  And that was the same place that you and Kevin Burge

22   worked?

23       A.  Yes.

24       Q.  Now, that address, you're still at that same address

25   but at a different facility?

1      **A.**   Different trailer, yes.

2      **Q.**   And what kind of problems did you have with this

3    trailer?

4      **A.**   The one before now?

5      **Q.**   Yes.

6      **A.**   We've continually complained -- well, you saw the

7    pictures.  The way the complaints were usually handled once

8    we complained to our supervisors, they contact the

9    maintenance department.  The maintenance department will take

10   a few days to come down there.  They look at it and they flat

11   out tell us, look, this thing is condemned.  We're not going

12   to do anything in it.  So then it gets kicked back to our

13   supervisors until eventually nothing ever got done.  What

14   made us get out of this trailer is we finally got the courage

15   up to go to the health department.  And the minute we

16   complained to the health department and they came inspect us,

17   they condemned the trailer right then and there.  We could

18   not go back in it.  So I'm not even going to get into it.

19     **Q.**   How many years were you in that trailer with those

20   kind of problems?

21     **A.**   10 years.  9 years.

22     **Q.**   And when the health department condemned the trailer,

23   where were you moved to?

24     **A.**   The firehouse.  They emptied out the weight room and

25   put two beds in there and said, okay, y'all gonna stay here

1   until we get you something else.  There were times we didn't

2   have heat.  There was times we didn't have cool air.  There

3   was times we didn't have hot water.  And I think we stayed

4   there a total of three or four months.

5       Q.  Can you tell the jury what this photograph shows?

6       A.  Now, bear in mind, all these pictures that you're

7   going to see, this is after they repaired it already.  They

8   came in there and changed out the wood on the floor, and even

9   while they were changing it, we were telling them, look, you

10  need to put a moisture barrier down or a year later you're

11  going to be back here to do the same thing.  And this is the

12  results.

13      This particular picture right here, if I'm not

14  mistaken, was underneath the floor, underneath the head of my

15  bed.

16  BY MR. KOPFLER:

17      Q.  Is that an accurate depiction of the conditions that

18  existed when that photograph was taken?

19      A.  Yeah, same shot.  You can see the trailer through

20  the -- at the bottom of the photo.  That's exactly how it was

21  covered before.

22      Q.  And where was that hole in the floor?

23      A.  That was separating my bedroom to the little hall

24  where the air conditioning unit was.

25      Q.  Do you recognize that photograph?

1    A.   Yeah.

2    Q.   Is that in the station at Boothville?

3    A.   Uh-huh.

4    Q.   And what does that photo depict?

5    A.   That looks like where the air conditioning unit was

6  because they took the bottom section out.

7    Q.   Is that an accurate depiction of the conditions that

8  you lived in?

9    A.   Yes.

10    Q.   What does this photograph depict?

11    A.   That's where the sheetrock fell off the wall because

12  it was soaked with water from the outside rain.

13    Q.   Did you have a leak in the roof?

14    A.   Several.

15    Q.   Is that an accurate depiction of the condition as it

16  existed when you lived there?

17    A.   Yes.

18    Q.   Again, is that a similar photograph?

19    A.   Yep.

20    Q.   And this one looks a little similar, but a little

21  different because it's dark.  Is this the same Sheetrock

22  problem?

23    A.   Yeah, I think that's in the air conditioning, hole

24  where the vent is.

25    Q.   And so what is the black stuff that we see in this

1   picture as compared to the other one?

2       A.  That's mold.

3       Q.  Is that what you were talking about, the complaint

4   was made to the health department?

5       A.  Yes.

6       Q.  What does this photograph depict?

7       A.  That is the flooring with the carpet removed, base

8   molding and the sheetrock where it was all wet.  That would

9   have been in the living room.

10      Q.  And what does this photograph depict?

11      A.  That would be in the ceiling in the, I think,

12  bedroom.  Yeah, smoke alarm.

13      Q.  And what's the black there?

14      A.  Mold.

15      Q.  Does it accurately show the conditions when you were

16  living there?

17      A.  Yes.

18      Q.  How about this photograph?

19      A.  Same bedroom, same ceiling.

20      Q.  And this is from leaks in the roof?

21      A.  Yes.  I'm sorry.  That's the bathroom.

22      Q.  What is this?  I think this has Mr. Burge in the

23  picture.  What is that a picture depicting?

24      A.  That's the wall.

25      Q.  Did this trailer you lived in in Boothville that was

1    provided to you by the Parish, did it have mold throughout

2    the trailer?

3        A.   Yes.   That actually is the second trailer.   The first

4    one was even worse than this.

5        Q.   Again, does that depict mold?

6        A.   Yes.

7        Q.   And what -- and how often would you make complaints

8    to your supervisors?

9        A.   Every shift.

10       Q.   And what was the response?

11       A.   Just like it was, they'll contact maintenance,

12   maintenance come down there and said this building needs to

13   be condemned and nothing would ever get done.

14       Q.   So when Mr. Landin told the jury that you could go

15   live where you wanted to for this job in the Parish of

16   Plaquemines, is he talking to you as a stationed employee?

17       A.   No.

18            MR. MILLER:   Objection, Your Honor; leading and calls

19   for speculation.

20            THE COURT:   Sustained.

21   BY MR. KOPFLER:

22       Q.   What do you have to say about Mr. Landin's statement

23   that you could live anywhere you wanted?

24       A.   Well, if that's the case, I would have stayed home,

25   you know.

1     **Q.**   Were you required to live in the Parish of

2    Plaquemines-provided housing?

3     **A.**   Yes, that was our crew quarters.

4     **Q.**   Now, was there a time where you worked or there were

5    EMS, EMT workers, paramedics, that lived at home from the

6    Parish of Plaquemines?

7     **A.**   Yes.

8     **Q.**   Can you explain that to the jury?

9     **A.**   There were a few medics that lived in the area and

10   they got the privilege of working out of their house, which

11   we all didn't really agree with, because the concept of two

12   people responding from the same point didn't exist then.  It

13   was one guy would show up with the ambulance and the other

14   one would have to wait.  And that's not good patient care.

15   Like I said, it was several, three or four of them.

16    **Q.**   So if you resided and were a resident of the Parish

17   of Plaquemines, was there a difference on requirement at some

18   point in time about where you stayed?

19    **A.**   Not until the fire department took us over.

20    **Q.**   And that's something recently?

21    **A.**   Fire department took us over maybe two and a half

22   years ago now, three years maybe.  I'm not sure of the dates.

23   But when they moved that new trailer that we have now, that's

24   really when the memo was put in place as far as, you know,

25   you have to stay here and here and here.

1    **Q.**   And that applied to the people --

2    **A.**   That applied to everybody.  Everybody.  Nobody was

3    allowed to stay at their homes anymore.

4    **Q.**   Now, what about visitors and family?  Was there a

5    requirement from the Parish concerning them and this station?

6    **A.**   You can have visitors during the day but no

7    stay-overs or nothing like that.  There weren't extra

8    facilities for visitors.  So it wasn't allowed.

9    **Q.**   How many -- how did you spend your time when you were

10   not on calls?

11   **A.**   Worrying about the next one.  No, watching TV.  I

12   bring my guitar down there.  I play guitar.  I'm not that

13   good but I play, stuff like that.

14   **Q.**   When you and your partner, Burge, were working

15   together, what was the requirement if you or he left the

16   station?

17   **A.**   We would have to go together in the unit.

18   **Q.**   Was there a requirement of uniforms?

19   **A.**   Well, yeah.

20   **Q.**   And --

21   **A.**   Anytime you're out in public, you have to be in

22   uniform.  I mean, that's a given.

23   **Q.**   So tell the jury about Boothville-Venice.  Not about

24   coming back from Westbank Ochsner's --

25   **A.**   Correct.

1    **Q.**   But --

2    **A.**   Have you ever heard the term end of the world?  This

3    is it.  Like, there's no Taco Bells.  There's no Academy of

4    Sports or anything down there.  There's barely a convenience

5    store.  There's one or two restaurants that are highly priced

6    Venice Marina, Cypress Cove Marina.  We don't get discounts,

7    so we don't go eat there.  There's basically nothing to do

8    but watch the grass grow and wait for the next call.  And

9    that's what we're there for, to wait for the next call.

10   **Q.**   How do you eat from the station?  What was your plan?

11   **A.**   I stop at Walmart on the way to work and get what I

12   need for the week.

13   **Q.**   And you would cook and prepare your food?

14   **A.**   Make quick meals, yeah.

15   **Q.**   Tell us about a life-threatening call, not a scraped

16   knee, but something along that lines, how it works, what

17   you're required to do?

18   **A.**   Cardiac arrest, just happened last week, 53-year-old

19   guy drops dead in his yard.  Neighbors are doing CPR on him.

20   We get him in the truck, hook him up to the monitor, shocked

21   him a couple times couldn't get an IV in his arm so we have

22   to do what's called an IO drill in his leg.  It's drilling a

23   needle into the bone so we can add IV access to give him

24   medications.  Gave him a few rounds of what's called an

25   epinephrine and we got a pulse back.

1          If you ever want to know what it's like to have

2   somebody's life in your hand for 70 miles to go to the

3   hospital, come take a ride with us.  You're sitting here

4   squeezing the bag and you're literally talking to this guy to

5   come back to life.  He lasted two days in the hospital and

6   family pulled the plug.

7      Q.   What is your required response time?

8      A.   We have six minutes to go to get 10-8.

9      Q.   Can you tell the jury what 10-8 means?

10     A.   En route, to get in the unit, be physically on the

11  way.

12     Q.   And that's whether you're sleeping, eating --

13     A.   That's all times.

14     Q.   So since August of '15, you worked pretty much with

15  Kevin Burge on your hitch; is that right?

16     A.   Yes.

17     Q.   And who are you working with now?

18     A.   A new girl, her name is Kelsea Dayton.

19     Q.   What is the EMT's job as compared to the paramedic's

20  job?

21     A.   There's really no -- EMTs are trained in BLS.  They

22  can give some medications, assist with medications such as

23  nitro, aspirin, stuff like that with the patient, but when

24  you're working with an EMT basic, you work as a team.  Okay.

25  And when if you work with somebody long enough like Kevin and

1    I worked, everything kind of comes natural, you know, what I

2    mean?  He knows what I want when I need it and it's there.

3    So that's the kind of work relationship you build with your

4    partner.

5        Q.  What happens if you receive a call when you're

6    sleeping?

7        A.  Wake up and go handle your call.

8        Q.  Cooking?  Showering?

9        A.  Same thing.  All that stuff is second nature.  The

10   primary reason you're there is emergencies for the people of

11   Plaquemines Parish.  That's what you're there for.  Rain,

12   shine, snow, sleet, whatever.

13       Q.  What about the fact that you didn't receive overtime?

14   Did you make complaints?

15       A.  Sometimes, yes.

16       Q.  And what was the response?

17       A.  You get different responses from different people,

18   but the general response was that's how it is and that's how

19   it's going to stay.  And that's how it's been since I've been

20   there.  Before I got there, they used to pay overtime.  I

21   don't know the specifics on that, but they did pay overtime.

22   What I've heard was is that the people that were living --

23           MR. MILLER:  Objection, Your Honor; calls for

24   speculation and he's guessing as to what transpired prior to

25   his employment.

1          THE COURT:  Sustained.  You can't say what other

2     people have told you, but you can say what you know.

3          THE WITNESS:  Yes, ma'am.

4     BY MR. KOPFLER:

5     Q.  Were you ever paid overtime when you worked for the

6     Parish of Plaquemines, time and a half working over 40 hours?

7     A.  No.

8     Q.  Were you ever provided an agreement to review, go

9     over and sign, setting forth the pay policy for EMS with the

10    Parish of Plaquemines?

11    A.  No.

12    Q.  Were you ever given a copy of any EMS pay plan from

13    any supervisor that you worked for?

14    A.  No.

15    Q.  Were you ever given a copy of any ordinance from any

16    supervisor you worked for with Plaquemines Parish?

17    A.  No.

18    Q.  But if you looked at your check, you saw you weren't

19    getting overtime, correct?

20    A.  Right.

21    Q.  So why did you continue working for the Parish of

22    Plaquemines until this suit was filed?

23    A.  Plaquemines Parish is civil service.  Well, we were

24    anyway until the fire department took over.  But we're under

25    a parochial retirement system which is a good retirement

1   system.  Health benefits aren't that great, but they aren't

2   that bad either.  So that's why.  And my age, I'm, you

3   know...

4        Q.  Tell us about your downtime after say one of these

5   life-threatening events that you have to respond to.

6        A.  There's no downtime.  I mean, you restock the unit

7   and however long it takes you to do that, you're pretty much

8   10-8 from that time all the way back.  You don't go back in

9   service until you're officially back in your area.  But

10  there's been times where dispatch will call you and say

11  what's your location because there's an emergency right

12  there.  Other times, last November, it's going to be

13  anniversary this November.  I was working with Samantha and

14  there was a trailer on fire.  People in the yard frantically

15  screaming, my kids are in there, my kids are in there.  The

16  kids died, 7 and 9 years old.  We ended up transporting the

17  grandma, the mother and the grandfather who are all, you

18  know, smoke inhalation and everything else to go with it.

19       So, you know, just because you got to wait until you

20  get back in your area to go back service that don't mean, you

21  know, you're not susceptible to a call anywhere.

22       Q.  So what about -- when you're not making that call?

23  When you're back at the station, what's going on after that

24  kind of call?

25       A.  The wind down I guess you can say, you know, like

1    the, huh, it's over with, you know.

2         **Q.**   What about protocols?

3         **A.**   Yeah, you kind of review everything.  Especially bad

4    calls.  You review it in your mind over and over again,

5    sometimes weeks.  You're thinking, you know, did I do

6    anything wrong, did I do everything right and that's a

7    never-ending thing, you know.  That's a struggle we always

8    have.

9         **Q.**   What about this actual time versus standby time?

10   Does that make a difference?

11        **A.**   That's all actual time.  I go to work at 9:00 a.m.

12   Thursday morning and I get off the following Thursday at

13   9:00 a.m.  That time in between, it's fair game.  I mean,

14   whatever comes up, we handle.  So it's...

15        **Q.**   Have you received any awards for your work in

16   Plaquemines Parish?

17        **A.**   Last October, I got at the little local church -- the

18   Baptist church gave us the Paramedic of the Year award.  I've

19   gotten awards from, you know, VFW in Thibodaux for paramedic

20   of the Year, some letters of commendation.

21        **Q.**   So Paramedic of the Year for Plaquemines Parish?

22        **A.**   Not Plaquemines -- well, from the church.

23        **Q.**   But from the church, but they were giving it to the

24   paramedic of the year for --

25        **A.**   Right.

1    **Q.**  -- for Plaquemines Parish, right?

2    **A.**  Right.  And there was also a policeman, a fireman,

3    coast guard that also got awards the same.

4         THE WITNESS:  May I have some of this water?

5         THE COURT:  Of course.

6         MR. KOPFLER:  I tender the witness -- Your Honor,

7    these were demonstrative exhibits, but I would like to --

8    these paper photographs that we showed on the ELMO, I would

9    like these to be introduced into evidence as plaintiffs' next

10   numbered exhibit *in globo* and ask to be published to the

11   jury.

12        MR. MILLER:  Your Honor, we'll re-urge our objection

13   as to the relevance of the matter.  Wage claim has nothing to

14   do with the manner in which they lived.

15        THE COURT:  I'm going to defer my ruling right now on

16   that since you used it as demonstrative.

17        Are you tendering?

18        MR. KOPFLER:  Yes.

19        THE COURT:  -- Mr. Babin?

20        MR. MILLER:  Thank you, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. MILLER:

23   **Q.**  Mr. Babin, I'm just curious.  When you relieved

24   Mr. Dismukes on shift, where do you suppose all the blood and

25   feathers that he'd left in the refrigerator came from?

1    **A.**  I have no idea.

2    **Q.**  But that did occur on more than one occasion.  In

3    fact, you complained about that, didn't you?

4    **A.**  Yeah.

5         THE COURT:  Excuse me for one moment since you asked

6    for water.

7         Do any jurors need any water or anything?

8         We're going to take a break in probably within half

9    an hour or so.  We'll see how the cross-examination goes, and

10   then we'll take a break.  But if you need anything, let me

11   know.

12        I'm sorry, Mr. Miller.

13        MR. MILLER:  That's quite all right.

14   BY MR. MILLER:

15   **Q.**  Mr. Babin, I'm going to show you what's been admitted

16   as Exhibit 9 which is the EMS Pay Rules regarding the EMS

17   pay.  And you were aware of these policies, right?

18   **A.**  No --

19   **Q.**  You never seen them in writing, but you were aware of

20   them.

21   **A.**  Well, let me read them first.

22        THE COURT:  Excuse me.

23        Mr. Munch, can you tap the juror?  The juror next to

24   you.

25        I want to make sure you're --

1          JUROR:  I'm not sleep.

2          THE COURT:  Understood.

3          JUROR:  I'm not sleep.

4          THE COURT:  Understood.  Just wanted to make sure.

5          JUROR:  I'm listening --

6          THE COURT:  And I sometimes do that too, so make sure

7   -- sorry.

8   BY MR. MILLER:

9      Q.  You were aware of this policy?

10     A.  Which one you want me to read?  Because I actually

11  wanted to read it first.

12     Q.  Well, let me just ask you this.

13     A.  Yeah.  I guess I can say yes.

14     Q.  You were aware of it and you remember you discussed

15  this policy or were told about the policy during your

16  employment, right?

17     A.  The first time I saw of this thing right here is in

18  Mr. Kopfler's office.

19     Q.  Right.  You never seen it, but you had -- you were

20  aware of the policy because you had been told about it by

21  your supervisor?  You were told --

22     A.  Just recently I heard Jonathan Butcher.  We've had

23  several not arguments but disagreements on the phone about it

24  with the having to work 24 hours to get paid for 18.  That's

25  kind of like new stuff I heard too.

1    **Q.**  You had the same conversation with Gina Meyers,

2    didn't you, and you had the same conversation with Roy

3    Robichaux?

4    **A.**  Yeah.

5    **Q.**  They all made you aware you get paid for 18 you're

6    off for 6 and you get overtime for actual work hours?

7    **A.**  Right.

8    **Q.**  And on page 3 --

9    **A.**  Wait.  Back up just one second.

10   **Q.**  -- that's the actual work hours, the actual work

11   time?

12   **A.**  No, I never got told that.

13   **Q.**  You never got told that?

14   **A.**  No.

15   **Q.**  You remember in your deposition answering that, yes,

16   you were told what the policy was, you were aware of it?

17   **A.**  Not the overtime policy.

18   **Q.**  When we were just discussing the exhibit --

19   **A.**  As a matter of fact, didn't he ask me about what some

20   kind of form or something like that they had to fill out for

21   it, a BS form I believe was what it was called.

22   **Q.**  I'll call your attention to your deposition, which

23   was taken on May 28th and refer you to page 13, at line 20

24   when you were asked about this particular exhibit.

25          Mr. Babin, I'm going to hand you what I've marked as

1    Exhibit 1 to your deposition and ask do you recognize

2    it.

3         Never seen it in writing.  I mean, we've been told

4    this verbally.  Do you remember that answer?

5    **A.**  Yes.  Nowhere in there does it state that you get

6    paid overtime after 40 hours of actual work.

7    **Q.**  Now, you indicated that your -- you were paid for

8    18 hours.  You're off for six for downtime.  You're not paid

9    for six hours, right?

10   **A.**  No -- yeah, that's a better...

11   **Q.**  And you understood that you would only receive

12   40 hours overtime over 40 of actual worked hours performed.

13   Those are emergency calls.  If you spend more than 40 hours

14   on emergency, then you would get overtime.

15   **A.**  We just discussed that.  No.  I said, no, I did not

16   know that.

17   **Q.**  Now, your workweek is split between -- your shift

18   week is split between the workweek, correct?

19   **A.**  Half goes on one pay period and the other half goes,

20   yes, to the other.

21   **Q.**  So if we look at your pay and attendance, this is a

22   form that you completed, correct?

23   **A.**  Yes.

24   **Q.**  And that's your handwriting?

25   **A.**  Yes.

1    **Q.**   And so this is actually the top, Week 1 is the latter

2    part of the prior week?

3    **A.**   Right.   End of the shift.

4    **Q.**   So you start on a Thursday and you work -- you have

5    15 hours and then you end on the following Thursday, correct?

6    **A.**   Yes.

7    **Q.**   And so -- if you had any annual leave time, you would

8    take that time off, but still record that in order to get

9    paid, correct?

10   **A.**   Right.

11   **Q.**   Now, you indicated that you never had any downtime.

12   I'm just curious.   In those days where you had no emergency

13   call, that would be considered downtime, right?

14   **A.**   Ever had a pager strapped to your side?

15   **Q.**   I'm just saying, when you --

16   **A.**   No, I wouldn't consider it downtime.

17   **Q.**   Just because you had a pager --

18   **A.**   There's no downtime.   I report --

19   **Q.**   Just because --

20   **A.**   -- I report Thursday morning at 9:00 a.m., put my

21   pager on and it stays on until the following Thursday at 9:00

22   a.m., as does the radio.

23   **Q.**   Well, isn't it true that you are always afforded at

24   least six hours of sleep time?

25   **A.**   No.

1    **Q.**   And isn't it true that you were never on any

2    emergency call for more than 40 hours in a workweek?

3    **A.**   Emergency call or calls?

4    **Q.**   Calls.  You were never on total emergency --

5    **A.**   I'm not going to say that no because I never kept

6    track of it.  And I'm sure there were weeks where -- four

7    hours a call, right?  I'm sure there were plenty weeks where

8    I worked over ten calls a week.

9    **Q.**   And you're sure that those ten calls a week were more

10   than 40 hours.  But you really have no idea.  You haven't

11   looked at it.

12   **A.**   Like I said, I never kept any track of it.

13   **Q.**   Now, when you receive a page from dispatch, you

14   acknowledge the page, correct?

15   **A.**   On the radio, yes.

16   **Q.**   And then you have to acknowledge the page within six

17   minutes?

18   **A.**   Yes.

19   **Q.**   And then you have to radio in that you're en route to

20   the patient, correct?

21   **A.**   Well, you have -- you acknowledge the page and you

22   get en route within the six minutes.  I don't -- I think --

23   **Q.**   Well, isn't it true you don't have to be en route for

24   10 to 15 minutes?  You have to acknowledge the page within

25   six minutes and --

1    A.   No, it's six minutes --

2    Q.   En route 10 to 15 --

3    A.   -- to get en route.

4         COURT REPORTER:  One moment.  Can you let him finish

5    the question before you answer?

6         THE WITNESS:  Yes, I'm sorry.

7         COURT REPORTER:  And can you also, Mr. Miller, do the

8    same?

9         MR. MILLER:  Yes, I'm sorry.

10        THE COURT:  Very difficult for the court reporter to

11   take down two people.  She's good.

12   BY MR. MILLER:

13   Q.   And when you arrive on scene, you radio dispatch?

14   A.   Yes.

15   Q.   And then when you're en route to the hospital, you

16   radio dispatch?

17   A.   Yes.

18   Q.   And then when you arrive at the hospital, you radio

19   dispatch?

20   A.   Yes.

21   Q.   And when you clear the patient, you radio dispatch?

22   A.   When we clear the hospital.

23   Q.   Clear the hospital.

24   A.   Yes.

25   Q.   And then when you're back in area, which could be the

1    Empire Bridge or it could be back at the station, you radio

2    that you're complete?

3        **A.**   Yes.

4        **Q.**   So in addition to going a day without getting an

5    emergency call, you could go a week without getting an

6    emergency call?

7        **A.**   That's rare, but I don't think that's ever happened.

8        **Q.**   And you've never submitted any claim for overtime for

9    more than 40 hours on an emergency call?

10       **A.**   I might have written it on my time sheet once or

11   twice just as a joke, but I've always had to correct it.

12       **Q.**   So my question is, have you ever reported that you've

13   been on an emergency call more than 40 hours in a workweek?

14       **A.**   No.  Didn't know I had to.

15       **Q.**   And on those days, you indicated when you're not on

16   an emergency call you can -- you play the guitar?

17       **A.**   Uh-huh.

18       **Q.**   You watch TV -- is that a yes?

19       **A.**   Yes.

20       **Q.**   You watch TV?

21       **A.**   Yes.

22       **Q.**   You can read a book if you want?

23       **A.**   Yes.

24       **Q.**   You can go out to eat if you want?

25       **A.**   No.

1    Q.   You go down to the bar Pilots Restaurant on occasion?

2    A.   Occasionally, yes.

3    Q.   You go down to Venice Marina on occasions?

4    A.   Not anymore.

5    Q.   You go down to the Cypress Cove on occasion?

6    A.   No.

7    Q.   You can visit with family?  They can come visit you?

8    A.   During daylight hours.

9    Q.   You can visit with friends?

10   A.   Yeah, I guess if they want to come down.

11   Q.   You can talk on the phone?

12   A.   Yes.

13   Q.   You can shop on the Internet?  You can surf the

14   Internet?

15   A.   I believe so.

16   Q.   Can you surf the internet?

17   A.   Yes.

18   Q.   If you wanted to, you could make a garden next to

19   the -- next to the trailer if you wanted to do gardening?

20   A.   Never really asked that.

21   Q.   But you could?

22   A.   No, I don't know the answer to that.

23   Q.   And after you drop the -- finished at the hospital

24   and before you return to the area, sometimes you have to stop

25   to resupply the truck?

1    **A.**   Correct.  Yes.

2    **Q.**   Sometimes you stop and run personal errands at the

3    Walmart or Dollar Tree?

4    **A.**   Never.

5    **Q.**   Sometimes you stop and get something to eat at the

6    Taco Bell or the Popeye's on the way back?

7    **A.**   Occasionally, yes.

8    **Q.**   Now, when you're back at the station, you can sleep

9    any time you want as long as you're not on emergency call

10   obviously?

11   **A.**   No.

12   **Q.**   But no one's ever told you you're not supposed to

13   sleep.  That's just something you feel you're unable to do.

14   **A.**   Since the fire department has took over, it's kind of

15   shunned upon sleep during the day unless you had a real busy

16   night.

17   **Q.**   Well, the firemen are not at your trailer, correct?

18   **A.**   No.

19   **Q.**   In fact, there's no supervision at your trailer?

20   **A.**   No.

21   **Q.**   No one is monitoring you as to what you and your

22   partner are doing?

23   **A.**   No.

24   **Q.**   And you're really free to do whatever you want as

25   long as you timely respond to a page?

1     **A.** No.

2     **Q.** You don't have to be in uniform at the station, just

3 if you leave the station and are in public?

4     **A.** You kind of do, yeah.

5     **Q.** Well, you really don't as long as you leave in a

6 timely --

7          THE WITNESS: Are you telling us -- is that a new

8 rule, Jonathan, we don't have to be in uniform?

9          THE COURT: Sir.

10 BY MR. MILLER:

11    **Q.** Mr. Babin, Mr. Babin, the question is simple. You do

12 not have to be in uniform --

13    **A.** No, I have to be in uniform. Let's put it that way.

14    **Q.** That's a rule you imposed on yourself --

15    **A.** That's a rule I've had ever since I've been in EMS.

16 Do I sleep in my uniform? No.

17    **Q.** Now, before February of 2019, you didn't have to stay

18 at the Plaquemines Parish trailer?

19    **A.** No, because we weren't at the fire department then.

20    **Q.** Prior to going to the fire department -- okay. But

21 you didn't have to be at the fire department either. In

22 other words --

23    **A.** It was either that or go home.

24    **Q.** Prior to -- prior to February of 2015, there was no

25 obligation, no requirement that you stay at either the fire

1    station or the EMT station waiting on a call?

2         A.   Yes, there was a requirement.

3         Q.   I'm just curious then.  When -- aren't there other

4    EMTs that are not from that area who don't stay at the EMT

5    station?

6         A.   I don't know.

7         Q.   Isn't Lori Franovich not from that area and she stays

8    at a place not at the EMT station or firehouse?

9         A.   She's staying at the station.

10        Q.   Prior to February 2000 --

11        A.   I don't know where Lori -- I don't work with Lori.

12   She's on an opposite shift so I have no idea what Lori does.

13        Q.   Well, isn't it true you could also go wherever you

14   want as long as you stay within your area?

15        A.   If you're in the ambulance with your partner, you can

16   go wherever you want inside that little 30-mile window.

17        Q.   I'm curious then.  On April 5th of this year, you

18   were paged and responded to a call, but your partner was not

19   with you and you said his pager didn't work.  So that would

20   mean you and your partner were not together, correct?

21        A.   Who was my partner?

22        Q.   Mr. Burge.

23        A.   I don't know.  If Kevin was with me, he was at the

24   trailer.  That might have meant he was taken a little longer

25   to come out so we can get 10-8 because he didn't get the

1    page.

2    Q.  No.  It indicated you left without him.  You don't

3    recall that?

4    A.  No, I don't.

5    Q.  In fact, you can leave the area as long as you notify

6    dispatch?

7    A.  If you notify dispatch, correct.  And we do that if

8    we need to get supplies, oil change, tire change, stuff like

9    that.

10   Q.  You can also go run an errand if you want, if you

11   need to run an errand and notify dispatch that you have to

12   leave the area?

13   A.  Personal errand?

14   Q.  Yes.

15   A.  No.

16   Q.  Now, you make about $63,000 a year?

17   A.  Give or take.

18   Q.  And with benefits loaded, that's about $88,000 a

19   year?

20   A.  I haven't figured that part of it.

21   Q.  You don't have any reason to dispute that, do you?

22   A.  No, sounds about right.  Yeah.

23   MR. MILLER:  Those are all the questions I have.

24   THE COURT:  At this -- Mr. Kopfler, any redirect?

25   MR. KOPFLER:  Sure.

<u>REDIRECT EXAMINATION</u>

BY MR. KOPFLER:

    **Q.**  Just so the jury understands, the document that counsel requested you to review and asked you questions about, EMS Pay Rules --

    **A.**  Okay.

    **Q.**  -- until this lawsuit began, had you ever seen that before?

    **A.**  First time I saw it was in your office and I think you acquired it from them.

    **Q.**  What about downtime for sleep?

    **A.**  Sleep when you get tired.

    **Q.**  There's no set time?

    **A.**  No set times.  I go to bed at four o'clock in the morning, wake up at 7:30.

    **Q.**  And where the exhibit indicated that you were to keep track on some form of actual, I guess that's on emergency calls, had that ever been explained to you?

    **A.**  Keep track of?  What do you mean?

    **Q.**  Like keep an itemization of time for your calls.

    **A.**  No.  The only call-related thing that we fill out is the patient care run log.  You turn in with your run reports at the end of the shift and it just lists the date, patient name and item number.

        Now, had I known we get paid over 40 hours if we turn

1    in a work sheet, you seen the work that needs to be done to

2    those trailers.  I would have been making some hours.

3        Q.  In the whole time that you worked for the Parish of

4    Plaquemines, whether at Gilly Lane or in a fire station, that

5    was part of your job that you were required to live there?

6        A.  Yes.

7        Q.  Did you ever receive anything in writing or anything

8    verbally from any of your supervisors otherwise?

9        A.  No.

10           MR. KOPFLER:  Thank you.

11           THE COURT:  Thank you, Mr. Babin.

12           I think this might be an appropriate time for a quick

13   jury break.  So we're going to break for -- it's 2:23 --

14   until 2:35, just a very quick break so we can get more done.

15           All rise.

16           To the jury, I'm sorry, please leave your notebooks

17   on your seats.  You will be allowed to take your notebooks in

18   for deliberation, but in between during these breaks, you're

19   not allowed to take your notebooks and overnight you're not

20   allowed to take your notebooks.  Your notebooks will be taken

21   by the courtroom deputy and locked up overnight.  Again, you

22   will get them in deliberation.  But do not take them right

23   now.

24           And let me also remind you.  I apologize.  I should

25   remind you.  This is a break.  You have heard one iota of

1    evidence.  Nobody has rested.  It is not time for you to

2    discuss the case and you should not discuss it with each

3    other.  Please do not do so.  If anyone approaches you and

4    tries to talk to you about the case, please advise me about

5    it immediately.  Remember, your job is to keep an open mind

6    until all the evidence has been received.

7         Yes, sir.

8         JUROR:  Yes, ma'am.  What if we have questions?

9         THE COURT:  I will give you a jury instruction at the

10   end and advise you on that.

11        JUROR:  I'm parked until four o'clock.  Are we going

12   to go past 4:00 because I need to go run and add some --

13        THE COURT:  Why don't you speak to the CSO in the

14   back and they can talk to you about it.  Thank you.

15                    (Jury exits courtroom.)

16                    (Recess taken.)

17                    (Jury enters courtroom.)

18        THE COURT:  Please be seated.

19        Jurors, it's my intention to continue until about

20   4:30 or 5:00 today and then recess for the day, which will

21   mean not another break.  It's already a quarter to 3:00.  But

22   if you need something in between that time, please raise your

23   hand and let me know.

24        Okay.  Mr. Kopfler?  Mr. Stiegler?

25        MR. STIEGLER:  Plaintiffs call Kevin Burge.

1          THE DEPUTY CLERK:  Please raise your right hand.

2                    (Witness administered oath.)

3          Please have a seat and please state and spell your

4    name for the record.

5          THE WITNESS:  Kevin Burge, K-e-v-i-n, B-u-r-g-e.

6                         KEVIN BURGE,

7    called as a witness, being first duly sworn, was examined and

8    testified as follows:

9                       DIRECT EXAMINATION

10   BY MR. STIEGLER:

11       Q.  Good afternoon, Mr. Burge.  Could you tell us your

12   home address, please?

13       A.  It's 555 Apple Street, Norco, Louisiana 70079.

14       Q.  And what parish is that in?

15       A.  St. Charles.

16       Q.  How long have you lived there?

17       A.  18 years.

18       Q.  Does anyone live with you?

19       A.  Yes, my wife, Linda.

20       Q.  Do you have any children who live with you?

21       A.  No, sir.

22       Q.  You are an emergency medical technician; is that

23   right?

24       A.  That's correct.

25       Q.  Can you tell us the difference between an EMT and a

1   paramedic, which is what Mr. Babin was?

2       A.  Yes.  A paramedic is more advanced.  Paramedic can

3   start IVs, can intubate a patient who is not breathing as to

4   where a basic -- pretty much does basic life support where a

5   paramedic does advanced life support.  Advanced life support

6   requires more training.

7       Q.  And are you paired up with Mr. Babin as a partner?

8       A.  I was for approximately a little over 11 years.

9       Q.  Until recently?

10      A.  Yes, sir.

11      Q.  And who is your current partner?

12      A.  My current partner right now is paramedic Jimmy

13  Wigstrom (phonetic).

14      Q.  And is it always the case that one paramedic be

15  partnered up with one EMT?

16      A.  Not always.  But they -- that's the ultimate goal is

17  to have a paramedic and EMT, to have a paramedic on every

18  unit.  That way, one paramedic is not overburdened having to

19  run ALS calls in his area and having to cover another area if

20  they don't have a paramedic in that area.

21      Q.  So are there certain calls that are required to have

22  a paramedic --

23      A.  Yes, sir.

24      Q.  -- responding?

25      A.  Yes, sir.  Any calls that transfers out of a

1  hospital, of the medical center in Port Sulfur, any calls

2  that require a paramedic would be patients that would have --

3  that would IVs in their arms with medications flowing through

4  them or have some type of medication where the paramedics can

5  treat the patient and monitor the patient, such as if they

6  have nitroglycerin on them, nitro paste, the paramedic would

7  monitor the blood pressure while the nitro paste is on the

8  chest.  If the patient is not breathing, then they have them

9  intubated.  The paramedic would have to take -- would be the

10  one to take that call.

11      Q.  Are there any emergency calls that the EMT can

12  respond to alone?

13      A.  The emergency medical technician can respond to any

14  call alone with another basic.  Now, once they get there and

15  you assess the patient, it's their duty to decide can I

16  handle this call or is it better for my patient to have a

17  paramedic that can do furthermore for this patient.  And if

18  it's something that I feel that it would benefit the patient

19  to have a paramedic, then I would call for an ALS unit.  If

20  it's something basic just like a cut, it's going to need

21  stitches, to all it's going to require is a bandage, to me

22  holding pressure on it until I get them to the hospital to

23  get stitches, then that's something I would handle.

24      Q.  I'd like to talk a little bit about the training that

25  goes into becoming an EMT.  When did you graduate high

1    school?

2        A.   I graduated high school in 1980, May of 1980.

3        Q.   And did you attend any college?

4        A.   Yes, sir.  I went to Delgado Community College and

5    that's where I got my emergency medical technician, my basic.

6        Q.   So when you say "basic," are there different levels

7    of certifications for EMT?

8        A.   There's three different levels.  You have your basic.

9    You have your advanced.  And then you have your paramedic,

10   paramedic being the highest.

11       Q.   And your certification was basic.

12       A.   My certification is basic, yes, sir.

13       Q.   What prerequisites, what requirements are there to

14   get a basic certification?

15       A.   There's no prerequisite.  Well, it's changed from

16   20 -- 21 years ago.  I think now you have to have a biology

17   class.  I'm not sure.  I got my certification 21 years ago

18   and I know it's changed.

19       Q.   At the time you were certified, what were the

20   requirements, what courses did you have to go through in

21   order to get your --

22       A.   I just took an EMT basic.  Before I did that, I

23   took -- in school, I took prerequisites, math classes.  I

24   took biology.  I took medical terminology.  Those are the

25   classes that I took.  And then after that I took my EMT.  And

1   during that class, there were times I spent hours in the

2   classroom and then there were days of spending a few hours in

3   the hospital doing my clinicals in the hospital getting

4   training.

5       Q.   So when did you first obtain your certification?

6   What year?

7       A.   1998.

8       Q.   And have you been continually certified since then?

9       A.   Yes, sir.

10      Q.   Are you certified by the state of Louisiana or by

11  some agency?

12      A.   Both, national and state.

13      Q.   And are there classes you have to take on a yearly

14  basis or an ongoing basis to maintain your certification?

15      A.   Yes.  We take classes to get our continuing education

16  hours.  We have to recertify every two years.  And each class

17  you take you get credited so many hours.  It could be one

18  hour.  It could be two hours.  It could be three hours

19  depending on how long of a class you take.  The longer the

20  class is the more credit hours you get.

21      Q.   How long in terms of months or years does that course

22  take in order to become fully certified?

23      A.   Approximately one year.

24      Q.   When you became certified in 1998, where did you

25  begin working?

1      A.   I first started in a private ambulance service A-MED

2    that's in Gretna, Louisiana, and I stayed with them for eight

3    years.   I worked at West Jeff for two years.   When I left

4    A-MED I went to West Jeff after six years, but I still stayed

5    at A-MED part-time.   And after I made eight years with A-MED,

6    I received a phone call from Plaquemines Parish asking me if

7    I was still interested in working for Plaquemines Parish,

8    which they said your application's eight years old, but we

9    have an opening now if you're still interested and I said,

10   yes, I am.

11     Q.   So had you originally applied for a Plaquemines

12   Parish position when you first graduated from --

13     A.   Yes, I did.   That was my first application I filled

14   out.

15     Q.   Have you had any discussions in the meantime in those

16   eight years with anybody at Plaquemines Parish?

17     A.   No, sir.

18     Q.   So the call came out of -- strike that.

19          Who called you from Plaquemines Parish?

20     A.   Robin Brewer.

21     Q.   Do you recall when that was?

22     A.   No, sir.   I received a call -- I was in Hattiesburg,

23   Mississippi, when I got the call.

24     Q.   Do you recall what year it was?

25     A.   19 -- no, I'm sorry.   I got the call in 2004.   It

1    was, I believe, the end of October, beginning -- the end of

2    October, beginning of November 2004.

3        Q.  And did you begin working for Plaquemines Parish

4    immediately thereafter?

5        A.  No, sir.  I interviewed with her on the phone.  I

6    told her, she wanted me to come in for an interview.  I told

7    her, I said, give me three hours.  I'd leave Hattiesburg and

8    come straight there and she said, no, we'll just interview

9    over the phone.  Interviewed over the phone.  She said she

10   was going to recommend to the Parish president to hire me,

11   said that I would be contacted later by the Parish to come in

12   and interview with the Parish president at a later date.

13        It was at a later date.  I received the phone call

14   from Benney Rouselle who was the Parish president at the

15   time.  Came in and interviewed with him and was hired and my

16   initial hire date was November 28th of 2004.

17        Q.  At that time, you were living in St. Charles Parish

18   at the same address?

19        A.  Yes, sir.

20        Q.  Were you given a document when you started called the

21   Rules for EMS Pay?

22        A.  No, sir.

23        Q.  I'm going to show you the first page of the document

24   that's been previously marked as Exhibit 9, Rules for EMS

25   Pay.  There's a date on here of February 25, 2005.  Were you

1   already working for the Parish at that point?

2       A.  Yes, sir.

3       Q.  When this document was drafted in February of 2005,

4   were you provided a copy?

5       A.  No, sir.

6       Q.  From 2005 until the beginning of this lawsuit, were

7   you provided a copy?

8       A.  No, sir.

9       Q.  When you began in November 2004, where were you

10  assigned, which region of Plaquemines Parish were you

11  assigned in?

12      A.  I was assigned to the unit of 1896 in the

13  Boothville-Venice area.

14      Q.  And is that the unit you worked at until quite

15  recently?

16      A.  Yes, sir.

17      Q.  When is the last day and last month you worked at the

18  Venice-Boothville station?

19      A.  I would say the end of September.

20      Q.  Of 2019?

21      A.  Of 2019.

22      Q.  And --

23      A.  About the middle -- between the middle towards the

24  end of September 2019 is when I transferred to Pointe a la

25  Hache.

1   Q.   So you've been working at Pointe a la Hache for about

2   the last month --

3   A.   Yes.

4   Q.   -- month and a half?

5   A.   That's correct.

6   Q.   And Mr. Babin was your partner for the entire time

7   you were at the Venice-Boothville from at least 2015 to the

8   present?

9   A.   That's correct.

10   Q.   Have you worked in any other regions during that time

11   period?

12   A.   If I worked -- if I worked extra shifts on my off

13   days.

14   Q.   So does the Parish have a process for people to work

15   extra shifts?  Is that covering for other paramedics or EMTs

16   who are absent or sick?

17   A.   Correct.

18   Q.   What is the process for requesting a sick day or

19   requesting an extra day?

20   A.   If -- if -- someone's out and they need to fill the

21   slot and you want to work it, you can work it.  You may be

22   asked to work it.  Usually the supervisor will send out an

23   e-mail saying you know I have open shifts, anybody want to

24   work it and you notify them you want to work it if you want

25   to work it and you show up that day and work -- work it.

1   **Q.**  So Mr. Babin testified that his shift at Venice was

2   from 9:00 a.m. Thursday to essentially 9:00 a.m. the next

3   Thursday.  Is that essentially the same shift you work?

4   **A.**  Correct.

5   **Q.**  Y'all would come on at the same time, go off at the

6   same time?

7   **A.**  Yes, sir.

8   **Q.**  What is your current shift at Pointe a la Hache?

9   **A.**  06 a.m. to 00 Thursday to 06 a.m. the following

10   Thursday.

11   **Q.**  So it's still 7 days, 24 hours a day but the start

12   and end time is different?

13   **A.**  That is correct.  I just start three hours earlier

14   than what the Venice truck starts.

15   **Q.**  And when you work one of these extra shifts, are you

16   paid extra for working those extra days?

17   **A.**  Paid straight time, not time and a half.

18   **Q.**  I'm going to show you --

19        MR. KOPFLER:  You got it.  It's up.

20        MR. STIEGLER:  It's up?  It's not on here.

21   BY MR. STIEGLER:

22   **Q.**  -- what has been produced as a supplemental exhibit a

23   couple of days ago.  Is that your handwriting on this

24   exhibit?

25   **A.**  Yes, sir.

1    **Q.**  Do you recognize what this document is?

2    **A.**  Yes, sir.

3    **Q.**  Can you please tell the jury what it is?

4    **A.**  This is my payroll time sheet from September 23rd to

5    October the 6th, 2019.

6    **Q.**  And at the top, it says Department Name EMS and

7    Nonexempt is checked off.  Do you know what that means,

8    nonexempt?

9    **A.**  No, sir.  I was just told I was a nonexempt employee.

10   **Q.**  Do you recall who told you that?

11   **A.**  Gina Meyer.

12   **Q.**  So if we -- as Mr. Babin testified, your shift is

13   split across two weeks, correct?

14   **A.**  Correct.

15   **Q.**  So it runs from Thursday until Sunday the first week

16   and then runs again from Sunday until Thursday of the next

17   week?

18   **A.**  Correct.

19   **Q.**  So if you look at the first three days, Monday,

20   Tuesday, Wednesday here, all of those you have marked down as

21   having worked 18 hours.  Is that your handwriting?

22   **A.**  Are you talking about the top of the page?

23   **Q.**  So on week one of this document, Monday, it shows 18.

24   Is that your handwriting?

25   **A.**  Correct.

1    **Q.**  Were you told to mark down 18 hours?

2    **A.**  Was I told?  I wasn't told.  That's what -- that's

3    the hours that I worked.

4    **Q.**  Were you actually at the station all 24 hours that

5    day?

6    **A.**  Yes, sir.

7    **Q.**  For all of these dates that you have marked down as

8    18 hours, were you actually at the station 24 hours?

9    **A.**  Correct.  Now, yes, as far as -- I understand what

10   you're saying now.  Yes.

11         I was told you put 18 hours down because that's the

12   hours I was going to be paid for, not 24.  I used to put 24

13   and was told can't have 24 hours because you're not getting

14   paid 24, you're getting -- you're working 24 hours a day but

15   you're only going to get paid 18 hours a day.

16   **Q.**  On that first Thursday on this time sheet, it's

17   marked as 24 hours.  That's the only day you have marked as

18   24 hours.  Why is that?

19   **A.**  Thursday is the only day you get 24 days because that

20   is crew change day.  So if I'm coming off working my regular

21   crew shift with my partner, say, Keith Babin, and say I'm

22   coming on -- we have crew change now, I'm going to another --

23   I'm staying on because the next paramedic that's coming on is

24   off that day for doctor's appointment or something and I'm

25   staying on to cover that shift, then I would just stay on

1    my -- my time would start from the time that I got off my

2    first shift to the second shift.  Then I would work 18 hours

3    there which would make it 24 hours which I would be paid 24

4    hours for that one day.

5       Q.   Are there any other circumstances that you'd be paid

6    24 hours when you're there for 24 hours?

7       A.   No, sir.

8       Q.   Are your duties any different on those crew change

9    days or shift change days when you work the full 24 as

10   opposed to any other day?

11      A.   No, sir, nothing's changed.

12      Q.   The next day is a Friday and it looks like you also

13   worked an extra day that Friday; is that right?

14      A.   That is correct.  I worked from midnight to 6:00 p.m.

15   that afternoon.

16      Q.   So for that date, you did, in fact, only work

17   18 hours?

18      A.   That is correct.

19      Q.   Towards the right, all the way on the right of this

20   sheet, there's a -- I'm sorry.  Everything written on this

21   section under Week 1, that's in your handwriting?

22      A.   Yes, sir.

23      Q.   There's a section marked code and you've marked 09,

24   do you know what that means?

25      A.   I was told that was marked straight overtime or

1  straight time.

2      Q.  I've now zoomed in on the bottom left-hand side of

3  the document.  It's a little dark.  But it appears to say

4  Chart of Other Codes.  Is that 09 code what you're referring

5  to?

6      A.  That's straight overtime, yes, sir.

7      Q.  Are you paid time and a half for those hours?

8      A.  No, sir.

9      Q.  So it's marked as overtime, but it's not paid as

10  overtime?

11      A.  Correct.

12      Q.  And is that 18-hour payment system the same in Pointe

13  a la Hache as it was in Venice?

14      A.  Yes, sir.

15      Q.  I'm going to ask you a few questions about the Venice

16  area since that's where you spent the majority of your time

17  as an EMT for Plaquemines Parish.  What is the geographic

18  cover of the Venice EMS team?  In other words, what range are

19  you responsible for?

20      A.  Well, the range, the geographical range has changed

21  recently since the fire department took over.  Before, it was

22  the end of the road down in Venice, which is at the bottom of

23  the boot, southeastern part of Louisiana to Highway 11 at

24  Fort Jackson, if you're familiar with Plaquemines Parish.

25  Since the fire department has taken over, they have moved the

1   Buras truck and have discontinued the Buras truck, which

2   extends now -- extended my area from the bottom of the boot

3   down there to the southern end of the Empire bridge, which

4   means that my coverage area used to be approximately 15,

5   20 miles is now 35, 40 miles for one truck to handle the

6   citizens of Plaquemines Parish.

7       Q.   What is the nearest EMS station north of Venice?

8       A.   It would be Port Sulphur, must be 30 miles, 30 miles

9   north.

10      Q.   30 miles from station to station?

11      A.   About 30 to 35, yes, sir, estimating.

12      Q.   In your region, from the Empire Bridge south, is

13  there any other medical assistance available on an emergency

14  basis?

15      A.   No, sir.

16      Q.   There are no after-hours clinics?

17      A.   No, sir, just me and my partner.  That's all you got

18  down there.

19      Q.   Are there any doctors' offices whatsoever?

20      A.   No, sir.

21      Q.   Let's switch to Pointe a la Hache, which is where

22  you're currently working.  What is the geographical range or

23  coverage area of the Pointe a la Hache station?

24      A.   I'm not 100 percent familiar with all that.  All I

25  know is the area goes a couple of miles south of the Pointe a

1    la Hache fire station where I'm at, and I know it's 21 miles

2    north to the Woodlawn station.  And my coverage area is from

3    the end there to midway, which they call White Ditch, which

4    is just a certain area in the marsh that crosses Highway 39

5    and that's my coverage area.

6         Q.   Pointe a la Hache is on which side of the river?

7         A.   It's on the Eastbank.

8         Q.   Is the Eastbank of Plaquemines Parish more built up

9    or more rural than the Westbank?

10        A.   It's more rural.

11        Q.   Are both sides fairly rural?

12        A.   The Eastbank is very rural.  There's hardly anybody

13   in Braithwaite due to the severe flooding from the

14   hurricanes.  Since they closed the Mr. Go, the water has to

15   go somewhere.  It went from area to another area and nobody

16   is rebuilding back there in Braithwaite.

17        Q.   What's the nearest EMS station on the Eastbank to

18   Pointe a la Hache?

19        A.   That would be the Woodlawn station.

20        Q.   Is there any other medical assistance available on

21   Pointe a la Hache in the immediate area?

22        A.   No, sir.

23        Q.   No doctors' offices?

24        A.   No, sir.

25        Q.   How do you get to the Eastbank of Plaquemines Parish?

1    **A.**  By ferry if the ferry's running.

2    **Q.**  Is the ferry always running 24 hours?

3    **A.**  Not 24 hours.  It shuts down at night.  The Belle

4    Chasse stops running at midnight.  The Pointe a la Hache

5    ferry stops running at 10 o'clock at night.

6    **Q.**  When you were at Venice Mr. Babin testified -- strike

7    that.

8         When you were at Venice, what medical facility would

9    you most commonly bring ill patients or individuals to?

10   **A.**  Ochsner Westbank or West Jefferson Hospital.

11   **Q.**  Pointe a la Hache, what facilities do you bring them

12   to?

13   **A.**  I try to bring them where they want to go.  A lot of

14   them want to go to Ochsner Westbank.  But if the ferry is not

15   running, we got to either Ochsner Chalmette which is St.

16   Bernard Hospital, or Tulane University if the ferries aren't

17   running, which is usually after midnight.

18   **Q.**  Do you sometimes have to wait for the ferry?  How

19   frequently do they run?

20   **A.**  Sometimes -- we usually don't have to wait.  Usually

21   when I'm on a call and have a patient when I'm en route to

22   the ferry, I get on my radio and I call a dispatcher and I

23   tell dispatch, notify the ferry and I give them a five,

24   eight, ten ETA and that way, when I drive up to the ferry,

25   the ferry is already there.  Depending on the type of call,

1    I'll tell the ferry whether they can unload the cars and load

2    up or just stop, we're coming on and we taking off.

3        Q.  So the emergency vehicle takes priority on the ferry?

4        A.  Yes, sir.

5        Q.  Is that because time's of the essence on those types

6    of call?

7        A.  Yes, sir, time is very critical.

8        Q.  Is the same true for you in terms of getting from

9    your facility to the location where the call is?

10       A.  Absolutely.

11       Q.  As an EMT, what is your primary job duty or

12   responsibility?

13       A.  Service the Parish, service the citizens of

14   Plaquemines Parish for any medical needs.

15       Q.  What is -- when a call comes in, how are you first

16   notified of it?

17       A.  Pager.

18       Q.  Describe to me what the pager is like.

19       A.  It's a little four-inch by maybe two-inch box that

20   comes with the -- like a loudspeaker it plugs into.  It

21   cranks up very loudly so no matter how deep of a sleep that

22   pager goes off you're going to hear it.  As Mr. Babin said,

23   the minute I come on duty, I get the pager from the person

24   that's getting off duty.  It goes from her hand to my hand,

25   clips onto my belt and stays with me 24 hours a day.  Then

1    when I go to bed at nighttime, I take it off my belt, I plug

2    it in the charger.  And it's got the speaker turned all the

3    way up and it charges overnight.  The next morning or during

4    the night, if I get a call, it comes out, goes on my belt and

5    stays on my belt until it goes back on the charger.

6         Q.  Does the pager just beep to alert you that there's a

7    call or can people actually speak to you through the pager?

8         A.  The dispatcher dispatches a call, and it goes through

9    the paging system.  And the pager goes off and then you

10   listen for the address.  Once you have the address, I get on

11   the radio and I tell the dispatcher 1891, copy, which means

12   I'm letting dispatch know I received a call, I know where

13   it's at, I know where I'm going and I'm getting dressed to

14   get en route.

15        Q.  So you can't speak back to dispatch through the

16   pager?

17        A.  Not on the pagers, no, sir.

18        Q.  And you said you also carry a radio with you?

19        A.  I do have a radio, yes, sir.

20        Q.  Where do you carry that radio?

21        A.  On my left hip, clip it on my belt.

22        Q.  And with the radio, can you speak back to dispatch?

23        A.  Yes, sir.

24        Q.  On the pager, do calls come in only for your unit

25   specifically or for all units in Plaquemines Parish?

1    **A.**   The pager depending on what channel, you can set it

2    on selective, which means the only time you're going to hear

3    that pager is if a call comes out in your area or you can

4    switch it to monitor, which means you want to monitor other

5    areas.  And if other areas get a call, you can hear the calls

6    and you can hear what they have.

7    **Q.**   Are you ever required to monitor other areas?

8    **A.**   No, sir.  Never required to monitor.

9    **Q.**   What if, say, the Woodlawn unit in Pointe a la Hache

10   -- while you're in Pointe a la Hache, say the Woodlawn unit

11   is out on a call.  Are you required to monitor the Woodlawn

12   area?

13   **A.**   No, sir.  If the Woodlawn area is out on a call, I'm

14   going to know they're out on a call because they're going to

15   talk over the radio and I'm going to hear it over the road.

16   And so I know that once they're on a call, if another call

17   comes out in the Woodlawn area, I know that call's coming

18   straight to me.  So when they're out on a call, I just have

19   everything ready, you know, just as I would any other time

20   just to make sure.  So, okay, look, I let my partner know

21   91's on a call, just to let you know in case another call

22   comes in and now we got two areas to cover.

23   **Q.**   When you say you have all your things together, what

24   things do you have together?  What are you referring to?

25   **A.**   You just make sure you have your stethoscope, your

1    bag, your computer, our computer we keep -- sometimes we keep

2    in a charger in the truck but sometimes the chargers don't

3    work in the truck so now we take the computers and we bring

4    them inside and keep them plugged in inside so the batteries

5    doesn't die on us.  So when I am taking a report and getting

6    your information, and I type in the computer all of a sudden

7    the computer don't die on me.  We keep it inside and keep it

8    plugged in, and then when we get a call, we unplug it and

9    take it with us.

10    Q.  What about the radio?  Do you receive calls only for

11    your own area, your own location, or do you receive calls

12    from all over the parish?

13    A.  We only receive calls strictly from our parish, and

14    it's usually over the pager system.  Now, if I have problems

15    with my pager where my pager's not working, then I'll tell

16    dispatch notify me by radio and they would call me by radio.

17    And there's many a times where the pagers have gone off and

18    either my pager or my partner's pager for some reason one of

19    them didn't go off.  Because I've had my partner (knock,

20    knock, knock, knock) on my door in the middle of the night,

21    Dude, we got a call.  Okay.  My pager never went off.  Can't

22    explain why.

23    Tell them -- we've asked -- you know, had

24    communications come down here and check it out.  My radio --

25    my pager's not working and might not work for two days and

1   then all of a sudden it's working again.

2       Q.  So it's intended that the page go out to both of you

3   at the same time, right?

4       A.  Correct.

5       Q.  Is there a telephone in the Venice station?

6       A.  Yes, there is.

7       Q.  Do you ever receive calls by telephone?

8       A.  No, sir.  I've never.  I don't know about the other

9   crew.

10      Q.  What about at Pointe a la Hache?  Have you ever

11  received calls by telephone there?

12      A.  Not since I've been there, no, sir.

13      Q.  Kind of walk us through what you do when a call comes

14  through, when that pager comes off and you hear an address

15  that's nearby you, what is your first thought?

16      A.  Grab my stuff, get to the unit as quick as I can and

17  get en route, get my computer.  If it's raining outside, grab

18  a raincoat, grab my computer, my stethoscope's there, my

19  radio, grab my radio.  If it's in the charger, put it in my

20  belt and get out the door and get in my unit and get to the

21  call as quick as I can.

22      Q.  At Venice, where is the unit, the ambulance parked

23  relative to the trailer?

24      A.  Pardon me?

25      Q.  At Venice, where is the ambulance parked relative to

1    the trailer?

2        A.   About six feet away from the trailer.

3        Q.   Is there a parking garage or something?

4        A.   No, sir, it's just a little parking lot.

5        Q.   What about in Pointe a la Hache?

6        A.   We park in the parking garage under the fire station,

7    under the awning.  The fire trucks are on one side of the

8    station.  We park the unit on the other side.  We back it up.

9        Q.   So at that station, fire and the paramedic are all

10   under one roof?

11       A.   Yes, sir.

12       Q.   You mentioned a short time ago something to the

13   effect of, you know, since the fire department took over.  Is

14   the paramedic EMS department currently under the supervision

15   of the fire department, Mr. Butcher?

16       A.   Yes, sir.

17       Q.   Has that always been the case?

18       A.   No, sir.

19       Q.   Do you recall when that change was made?

20       A.   Maybe 2015.

21       Q.   How did you learn about that?

22       A.   Saw it on the news that the fire department was going

23   to be taking over EMS, saw that our fire department was

24   merging -- EMS was merging with that -- at that time, it was

25   the parish president Amos Cormier and Roy Robichaux was on

1   the news, morning news, talking about.  And that's how --

2   that's how I learned about it at first.

3       Q.  Since Mr. Cormier's the parish president, who is

4   Mr. Robichaux?

5       A.  He was the former superintendent of the fire

6   department that Mr. Butcher has taken his place.

7       Q.  So prior or before you heard this press release on

8   the news that the two departments were merging, did the fire

9   superintendent have any supervision over EMS?

10      A.  No, sir.

11      Q.  It was a wholly separate department?

12      A.  That is correct.

13      Q.  So you heard Mr. Miller refer to downtime.  Is there

14  any time during the week when you were permitted to turn your

15  pager off?

16      A.  Absolutely not.  People's lives are at stake.  Turn

17  my pager off, that's like somebody knocking on the door, my

18  dad's having a heart attack, oh, too bad, my pager's off.

19  That would never happen.  No, sir.  Absolutely not.

20      Q.  There's never a time when they assign another unit to

21  cover your calls so you can have six hours off?

22      A.  No, sir.  No, sir.

23      Q.  You do eat during the week though, right?

24      A.  Yes, sir.

25      Q.  And you sleep?

1      **A.**  Yes, sir.

2      **Q.**  When you are eating and sleeping, are you still

3   subject to calls?

4      **A.**  Yes, sir, absolutely, 24 hours a day.

5      **Q.**  And what happens if you're eating and the pager goes

6   off?

7      **A.**  You stop eating and you get en route.

8      **Q.**  Have you ever been told that you have six minutes to

9   answer your pager?

10     **A.**  Yes, sir.  Six minutes to get en route.  That's from

11  the time that pager goes off until I'm rolling the wheels in

12  that ambulance that I have six minutes.

13     **Q.**  Not six minutes to simply answer a call?

14     **A.**  No.

15     **Q.**  That applies even if you're eating or sleeping?

16     **A.**  Eating, sleeping, cooking, showering, it doesn't

17  matter.  There's been times I've been in the shower, shaving

18  cream all over my face, pager goes off, you wipe it off, get

19  dressed and go.

20     **Q.**  Is that because minutes matter in your profession?

21     **A.**  Absolutely.  Time is life.  Six minutes without

22  oxygen, your brain starts dying.  Seven minutes, it's too

23  late.  Your brain's already dying if I don't get to you in

24  time.  Excuse me.

25     **Q.**  So you're required to remain in uniform at all times

1    during the week?

2        **A.**   Yes, sir.

3        **Q.**   And you're required to stay in the area unless you're

4    on a call?

5        **A.**   Yes, sir.

6        **Q.**   So I'd like you, if you can, to walk us through a

7    typical call.  You mentioned how the pager goes off and you

8    arrange it on the radio.  Are you the one who drives the

9    ambulance generally?

10       **A.**   Sometimes, yes.  Sometimes, it depends.  I drive a

11   good bit of the time, most of the time, but there's times

12   where somebody else would drive, whether it be a paramedic,

13   my partner or if I'm with somebody else, they may want to

14   drive.  That's -- it varies.  But I'm not constantly driving.

15   There's times I'm in the back taking care of the patient.

16           If I'm with a paramedic and it's a patient that

17   requires advanced life support, then, yes, I will drive and

18   the paramedic will give the advanced life support.  If it's

19   something very minor, then the paramedic would drive and I

20   would be in the back taking care of the patient.

21       **Q.**   Is there an average drive distance from station to

22   the location of one of the -- the location of the emergency

23   call, in other words, how long does it usually take to get

24   from the station to the call?

25       **A.**   That depends on where the call now.  Like I said, we

1   went from the 15 range to now 35, 35, 40-mile range.  From

2   the time I get a call now, if I'm on the very southern end

3   and I get a call that says right at the southern end of the

4   Empire Bridge, you're looking at 30 minutes before I can get

5   to you.

6       Q.   And you said that that Buras station was closed down,

7   and that's what expanded your range, right?

8       A.   Correct.

9       Q.   That happened after the fire department took over?

10      A.   Yes.  Mr. Roy Robichaux felt that we did not need the

11  Buras truck any longer.

12      Q.   Was that a combination fire and EMS station or just

13  EMS?

14      A.   No, sir.  That was strictly EMS station.

15      Q.   Do you know if he shut down any fire stations at that

16  time?

17      A.   No, sir.

18      Q.   Once you get to the call, how long are you generally

19  on site providing first aid immediately?

20      A.   If it's -- if it's a trauma call, we usually get on

21  scene, assess the patient and try to have the patient en

22  route to a hospital within ten minutes.  If it's a medical

23  call, we try to do it within 20 minutes.

24      Q.   Can you please explain to the jury the difference

25  between a trauma call and a medical call?

1      **A.**   A trauma call would be, like, you're on a bicycle,

2    you get hit by a car, you got a leg with bones sticking out

3    of your body.  Medical call would be like, oh, I've had this

4    chest cold, my chest is hurting and it's been hurting me for,

5    like, two weeks and I'm on this medicine and that medicine.

6    It's non-life-threatening.

7      **Q.**   And what's the average drive time once you've cleared

8    that 10 or 20-minute hurdle, what's the average drive time

9    from there from Venice I should say to the nearest hospital?

10     **A.**   To Port Sulphur -- oh, well, I'm not going to say

11   that because we really don't -- we don't usually go there.

12   We usually go to Ochsner Westbank.  I would say from Venice,

13   we've made it there 50, 55 minutes.  That's lights and sirens

14   going 75, 70, 75 miles an hour, 80 miles an hour.

15     **Q.**   Do you know what the normal speed limit is on the

16   highway, is that 23?

17     **A.**   It's 55 and 65 and 45 in Port Sulphur.  And then it

18   drops down again to 45 in Belle Chasse.

19     **Q.**   But you're authorized to put your lights on and go 75

20   if necessary?

21     **A.**   If it calls for it, absolutely.

22     **Q.**   What about from Pointe a la Hache to Ochsner

23   Westbank, how far of a drive is that?

24     **A.**   I'd say 30 miles, about 30 miles.  Because it's 21 --

25   well, 30 to 35 miles I would guess, because it's 21 miles

1    from Pointe a la Hache to the Woodlawn station and then from

2    the Woodlawn station to the Belle Chasse ferry I would say is

3    maybe four or five and then from Belle Chasse to Ochsner is

4    maybe four miles.

5        Q.  Is that a slower drive, smaller roads?

6        A.  Highway 39 is -- I mean, it's narrower.  It's a more

7    dangerous highway in the curves because of the standing

8    water.  When it rains, it can be very dangerous, much more

9    dangerous than Highway 23.

10       Q.  A moment ago, you said you didn't like when you were

11   in Venice to bring people to the Port Sulphur medical center.

12   Why is that?

13       A.  Because it's my personal opinion.  It's like a Band

14   Aid station.  If there's something wrong with him, I need to

15   get him to a hospital, I can take him there, but then you're

16   going to get a bill for an ambulance bill for me taking you

17   to that facility.  You're going to get ER bill from that

18   facility.  The doctor's going to examine you and say, well, I

19   think there's something seriously wrong that needs further

20   evaluation so I want to transfer you to Ochsner Westbank.

21   Okay.  Now, you're looking at a second ambulance bill from

22   there to Ochsner Westbank and you're looking at second bill,

23   emergency room bill, at Ochsner Westbank.  So to prevent

24   burdening a patient with two extra bills, if it's not

25   life-threatening, we bypass the urgent care center and take

1   them to a hospital where they need to go.

2        But like my partner said, if it's -- if he is

3   severely critical and I'm with another basic and he needs

4   advanced life support and I don't have a paramedic with me, I

5   will stop there then and let the doctor take over, stabilize

6   the patient.  Then either a paramedic unit will be called out

7   to get him or a helicopter will be called out to fly him out.

8        Q.  Do you ever have calls where a helicopter is

9   required?

10       A.  Many a times.  I wouldn't hesitate to call a

11  helicopter if I need one.

12       Q.  The time's just that precious?

13       A.  Time is that precious.

14       Q.  Once you get to the hospital, what are your

15  responsibilities in terms of getting a patient in?

16       A.  My responsibility is once I get to the hospital is

17  give a report to a nurse, let them know what I have, what I

18  have, what his vital signs are.  Once I give that report, I

19  wait for them to give me a room.  Once I got a room, we got

20  the doctor's signature or I got the nurse's signature, I'm

21  done with the patient.  The patient is now theirs.

22       Q.  If no room is available, you're required to stay with

23  the patient until a room becomes available?

24       A.  Yes, you cannot leave.

25       Q.  Does that sometimes delay your trip as well?

1      **A.**   Yes, sir.  I've waited as much as eight hours on a

2   wall waiting for a hospital room to get a room in an

3   emergency room.

4      **Q.**   Sometimes on your way back from Gretna or West Jeff,

5   would you stop by Taco Bell or Popeye's to get food?

6      **A.**   If we didn't get lunch, absolutely.  I'm borderline

7   diabetic.  I have to eat.

8      **Q.**   Is there a Taco Bell or Popeye's in Venice?

9      **A.**   No, sir.

10      **Q.**   Is there one in Port Sulfur?

11      **A.**   Only thing they have in Port Sulfur is they have a

12   Subway sandwich shop.  There's no Walmarts in Venice.

13   There's no Walmarts in Buras.  There's no Academy in Venice.

14   There's no Academy stores in Buras.  There's no Taco Bells,

15   no Popeye's, no Burger King or nothing.  You have two, maybe

16   two family-owned restaurants down there.  You have one -- two

17   restaurants that belong both to the marinas, which are

18   astronomically high in price if you go eat there.  That's

19   where the fishermen come in, the tourists come in and fish.

20   That's where they eat and their prices are astronomical.  I

21   can't afford it.

22      **Q.**   When you're on your way back from the hospital, do

23   you report back to dispatch at that point?

24      **A.**   When I'm leaving the hospital, I tell them I'm clear

25   from the hospital, back en route to my area.  If I have to

1   stop for fuel, I tell her I'm stopping for fuel.

2       Q.   Where do you have to stop for fuel?

3       A.   Any place that sells diesel.  But it's usually State

4   Oil's where we usually stay at -- stop out.

5       Q.   And then you return to the station?

6       A.   Yes, sir.  Unless we happen to get another call, if

7   another call comes out in the area and they ask what's your

8   location, if I'm closer to that call, they'll dispatch me on

9   that call.

10      Q.   So let's say there has been a call in the middle of

11  the night, brought the patient to the hospital, responded,

12  returned to your station.  Are you able to go back to sleep

13  at that point?

14      A.   That depends on the call.  Some calls, yes.  Some

15  calls you might not sleep for two -- a couple days if it's a

16  bad call.  For instance --

17      Q.   What do you mean by --

18      A.   For instance, him and his partner, Sam, that night --

19  excuse me -- had the house fire with the two kids that

20  burned.  I had a call.  Still bothers me to this day.  Excuse

21  me.  Had an infant in my hands not breathing.  Had a mother

22  holding onto my shoulder, begging me crying, saying, Mister,

23  please, don't let my baby die.

24          And you do everything you're trained to do.  They

25  train you not to get emotionally involved, but sometimes you

1    just can't help it.  And you bring the baby in.  Doctor calls

2    it.  You go back and you think, what could I have done

3    different to save that baby.  Done everything you're supposed

4    to do.  After that, it's in God's hands, with mistakes in the

5    back of your head, that don't never leave until the next bad

6    call that you get.

7    BY MR. STIEGLER:

8        Q.  Is there ever a time when you're down there that you

9    feel that you are off duty from work?

10       A.  I'm never off duty.  From the time I walk in that

11   door and I get that pager from whoever is getting off, from

12   the time I walk out that door handing that pager to them, I'm

13   not off duty.  I'm on duty.  I'm serving the people of the

14   parish and any tourists or people that are visiting, anybody

15   who comes into that parish.

16       Q.  So what do you do when you're waiting?

17       A.  Watch TV, read a book, play my guitar; nighttime, go

18   outside, go look at the sky, count stars, various things,

19   just sit there and wait for the next call.

20       Q.  Do you have your family with you?

21       A.  No, sir.  I've never had my family down there.

22       Q.  How old are your children?

23       A.  My son is 30 years old.  He lives in Denham Springs.

24           I take that back.  He did come down one time to visit

25   during the daytime and my father has come down once.  My wife

1    has never been down all day to visit me or anything like

2    that.  She's been a nurse at the hospital working night

3    shift, so she sleeps during the day.

4        Q.  You have a grandson or a granddaughter?

5        A.  I have a grandson.  I have a granddaughter and I have

6    two step grandsons.

7        Q.  During your on-weeks, you're permitted to go to their

8    events, their baseball games, their school events --

9        A.  No.  They live in Lacombe, Denham Springs.  I mean,

10   how could I serve the parish -- how can I serve the citizens

11   of Plaquemines Parish if I'm in St. Tammany Parish.

12       Q.  So we saw at the beginning of your testimony a time

13   sheet you filled out where you filled out 18 hours even

14   though you were at the station for 24 hours, correct?

15       A.  Correct.

16       Q.  Do you feel that by doing that you agreed to be only

17   be paid for 18 hours and no overtime?

18       A.  No, sir.  My first check I got paid -- as a matter of

19   fact, I got in arguments over that.  My first check, I got

20   paid time and a half and I was told your second check, you're

21   not going to have time and a half on your second check.

22           MR. MILLER:  Objection.

23           MR. STIEGLER:  Hold on.

24           MR. MILLER:  May we approach, please.

25           THE COURT:  Yes.

1          (WHEREUPON, the following proceedings were held at

2    the bench:)

3          THE COURT:  Mr. Miller.

4          MR. MILLER:  You granted the motion *in limine* that we

5    could not talk about anything outside of the statute of

6    limitations.  Now they're --

7          COURT REPORTER:  I cannot hear you, Mr. Miller.

8          MR. MILLER:  That the plaintiffs have said that in

9    testimony.  The question was directed to Mr. Burge.  They

10   opened the door to things that happened prior to August of

11   2015 by asking him questions to which he answered about

12   getting overtime.  That's in direct contradiction to the

13   court's order.

14         THE COURT:  Did he say what date?  In his answer, did

15   he say when he's talking about this happened?  Did he say it

16   was prior to 2015?

17         MR. MILLER:  Well, it is.

18         THE COURT:  I don't think he said it.

19         MR. MILLER:  I mean, even if he didn't, so I'm going

20   to ask him did you get overtime during the time period.  He's

21   going to say, no, it was prior.  I'm still prejudiced by that

22   testimony.

23         THE COURT:  What's your objection?

24         MR. MILLER:  My objection is they violated your order

25   on the motion *in limine* about that testimony.

1        THE COURT:  I'm sorry.  I was looking to see what his

2   question was that he asked.  What was the question that you

3   asked?

4        MR. STIEGLER:  By doing that, did you in other words

5   by putting 18 down on the sheet, did you therefore agree to

6   not be paid overtime?

7        THE COURT:  I don't think he intentionally opened a

8   door.

9        MR. STIEGLER:  I'll move on.

10       THE COURT:  Yeah, I would move on from there and

11  we'll see what you need to do.  But I don't think -- I don't

12  think any date has come in that would violate the order I

13  gave before about outside the statute of limitations.  He

14  hasn't talked about a date.  You know a date because you know

15  the case.

16       MR. MILLER:  I know a date and I know the events that

17  he's talking about prior to the date.  And I don't know how

18  to fix it without prejudicing my client.

19       THE COURT:  I understand your objection.  I suppose

20  I'm sustaining it, your objection.  So that will be struck.

21  So ask a different question and move on from there.

22       MR. MILLER:  Thank you.

23                  (In open court.)

24       THE COURT:  I'll just remind the jurors when we have

25  to have those conferences, if you need to stand up and

1    stretch your legs, the attorneys get to stand, please do for

2    a moment.

3          Please go ahead, Mr. Stiegler.

4    BY MR. STIEGLER:

5       Q.   Mr. Burge, did you ever agree in writing to be paid

6    only 18 hours a day including no overtime?

7       A.   No, sir.

8       Q.   Did you ever complain to anyone about that pay

9    policy?

10      A.   Yes, I did.

11      Q.   And what were you told?

12      A.   I was told that's the way it was, that's the way it's

13   going to be and that was that.  And I said, well, I'm going

14   to go speak to somebody else about that.  I went and spoke to

15   somebody else about that.  And I was told don't go open a can

16   of worms.

17      Q.   Who told you not to open a can of worms?

18      A.   Gina Meyer.

19      Q.   I showed you page 1 of this document a little while

20   ago.  I'm now showing you what is page 3, the Rules of EMS.

21   And this document purports to define a phrase called actual

22   work time.  Have you ever been provided with this written

23   definition of actual work time?

24      A.   No, sir.

25      Q.   Has anybody ever told you verbally these six things

1   that compose quote, unquote, actual work time?

2       A.   No, sir.

3       Q.   Have you ever been given a sheet called an

4   itemization report or any other document to track actual work

5   time?

6       A.   Say it again now.

7       Q.   I asked that two questions at once.  Have you ever

8   been given a document called an itemization report?

9       A.   No, sir.

10      Q.   Have you ever been given any other sheet to track

11  what they've defined here in this document as, quote,

12  unquote, actual work time?

13      A.   At one time I was.  They wanted to know how many

14  hours we were on a call, wanted us to write times down and we

15  were filling them out for a while and it just kind of faded

16  out and nobody was turning them back in.  They wasn't asking

17  for them anymore.  But this was years and years ago.  I've

18  been there 15 years.  This is -- I'm talking eight, nine, ten

19  years ago.

20      Q.   This stopped before August of 2015?

21      A.   Yes, sir.

22      Q.   Is there anywhere on this time sheet to fill out,

23  quote, unquote, actual work time?

24      A.   No, sir.

25      Q.   Is there any other time sheet since 2015 you've been

1   requested or required to fill out?

2       A.   No, sir.  That's been the original time sheet I

3   filled out on an every-other-week basis.

4       Q.   That time sheet is a little bit dark.  I want to

5   provide you with a different copy.

6           Just so you'll see this, this is a time sheet that

7   appears to be from April to May of last year.  And down here,

8   there's that same chart I believe that we looked at on the

9   other page, but this one is a little clearer.  To your

10  knowledge, are any of those codes there on the bottom left

11  paid at time and a half?

12      A.   None of them paid time and a half.

13      Q.   And on this two-week period, this shows the quote,

14  unquote, grand total of 186 hours.  Do you see that?

15      A.   Yes, sir.

16      Q.   Were any of those hours paid at time and a half?

17      A.   No, sir.

18      Q.   They were all paid at straight time?

19      A.   Yes, sir.

20      Q.   Why did you file this lawsuit, Mr. Burge?

21      A.   Because I felt that I should be paid minimum for the

22  amount of hours that I'm there, which I'm not, which is

23  168 hours, which I'm not getting paid 168 hours.  They're

24  taking six hours away from that calling it downtime when in

25  my personal opinion there's no such thing as downtime from

1    the time I get that pager on to the time I get off.  Downtime

2    is when I can take that pager, turn it off, set it there and

3    I don't care who knocks on the door, who is paging what,

4    you're not paging me because I'm not responding.  That never

5    happens.  I'm not allowed to turn the pager off.  I have to

6    respond.

7          I was told by Roy Robichaux at one time, he says you

8    got downtime, wash the unit.  And I said, we wash our unit on

9    Thursdays before crew change.  Pager stays on 24 hours a day.

10         MR. STIEGLER:  Tender the witness.

11         THE COURT:  Thank you.  Mr. Miller?

12                     CROSS-EXAMINATION

13   BY MR. MILLER:

14     Q.   Mr. Burge, going back to the Exhibit 9, which is the

15   pay policy, you're paid for 18 hours, correct?

16     A.   That's correct.

17     Q.   And you're not paid for six hours for sleep time or

18   otherwise downtime, right?

19     A.   That's correct.

20     Q.   And you were told, were you not, that you would only

21   get 40 hours -- overtime for 40 hours on emergency calls,

22   correct?

23     A.   No, sir.

24     Q.   Do you remember giving your deposition testimony?

25     A.   Yes, sir.

1    Q.   I'm going to show you your deposition at page 33

2    where you are asked questions about this document and your

3    pay practice.  Okay.  Did you understand that your on-call

4    time, the wait time that you were not on call of those

5    18 hours per shift would not count towards overtime?

6         No, sir.

7         All right.  Did you understand that your actual work

8    time would be calculated or count towards overtime and those

9    are the emergency calls?

10        You said, no, sir.  They -- they told me that, but I

11   disagreed with it.

12        Do you see that?

13   A.   Yeah.

14   Q.   That's correct?

15   A.   Yes, sir.

16   Q.   I read that correct?

17   A.   Yes, sir.

18   Q.   And going for the jury's, that overtime then issue of

19   actual overtime, we talked about and other folks have

20   testified about it and that's the actual work time, that's

21   the emergency response time.  That was the policy.

22   A.   Correct.

23   Q.   And there's no restriction for you or any other EMT

24   to have any other job, correct?  You can work for someone

25   else on your off weeks?

1    A.   Yes, sir.

2    Q.   Now, on your time sheets -- and we've talked about

3  them.  You complete these, correct?

4    A.   That's correct.

5    Q.   And you put in 18 hours of the regular pay and then

6  if you -- the 09, that's the extra shift that you're pulling,

7  correct?

8    A.   Correct.

9    Q.   And you never requested of anyone or never filed a

10  report that you had more than 40 hours of emergency response

11  time in a week.

12    A.   Correct, no, I never have.

13    Q.   Now, you do get to sleep, right?

14    A.   Yes, sir.

15    Q.   When you're on shift, correct?

16    A.   Yes, sir.  When I'm not -- when I'm not on calls all

17  day long.

18    Q.   When you're not on a call, that is true?

19    A.   When I'm not running calls all day, all night long.

20    Q.   Now, you would agree that you can go a whole day

21  without receiving an emergency call, correct?

22    A.   That's correct.

23    Q.   And you would agree you can go a couple of days

24  without receiving an emergency call?

25    A.   Correct.

1    **Q.**   And you would agree that although it might be rare

2    you could go a whole week without getting an emergency call?

3    **A.**   That's correct, but very unlikely.

4    **Q.**   And during those weeks, you're still being paid the

5    18 hours per 24-hour shift?

6    **A.**   Yes, sir.

7    **Q.**   And generally your shift is 63 hours one week and

8    69 hours the next week?

9    **A.**   Yes, sir.

10   **Q.**   You heard Mr. Babin's testimony.  You would agree

11   that when you received the page you acknowledge to dispatch

12   that the page has been received, correct?

13   **A.**   That's correct.

14   **Q.**   And then you next notify dispatch of when you're en

15   route?

16   **A.**   Yes, sir.

17   **Q.**   And then you next notify dispatch of when you arrived

18   on the scene?

19   **A.**   Yes, sir.

20   **Q.**   And your next communication generally would be when

21   you're en route to the hospital?

22   **A.**   Yes, sir.

23   **Q.**   Then your -- you notify dispatch when you've arrived

24   at the hospital?

25   **A.**   Yes, sir.

1      **Q.**   Then you notify dispatch that you've cleared the

2    patient?

3      **A.**   Yes, sir.

4      **Q.**   And then your last -- generally your last

5    communication with dispatch would be complete, which means

6    you're either back in your area or back to the station?

7      **A.**   Yes, sir.

8      **Q.**   You testified when you're waiting for a call,

9    emergency call, that you eat, you make your meals, correct?

10     **A.**   Yes, sir.

11     **Q.**   You play your guitar?

12     **A.**   Yes, sir.

13     **Q.**   You could watch videos?

14     **A.**   Yes, sir.

15     **Q.**   You can watch TV?

16     **A.**   Yes, sir.

17     **Q.**   You can have family or friends visit?

18     **A.**   During daytime, yes, sir.

19     **Q.**   You could go visit people that live within your area

20    as long as you take the ambulance and your partner?

21     **A.**   Yes, which that don't happen.  I have no family in

22    the Plaquemines -- that lives in Plaquemines Parish.

23     **Q.**   You can surf on the Internet?

24     **A.**   Yes, sir.

25     **Q.**   You can talk on the phone?

1    A.  Yes, sir.

2    Q.  You can shop on the Internet?

3    A.  If I was to shop on the Internet.

4    Q.  You can go to one of the restaurants to eat; it

5    didn't matter how long you stayed, right?

6    A.  If I wanted to with my partner, but I can't afford

7    those prices.

8    Q.  Now, you can hunt or fish while you're waiting on a

9    call?

10   A.  No.  No.

11   Q.  You can run personal errands while you're waiting on

12   a call?

13   A.  No, sir.

14   Q.  In fact, y'all do run personal errands when you're

15   coming back from the hospital back to the area, correct?

16   A.  I don't.

17   Q.  So how was it that the fishing poles fell out --

18   A.  If I come back from a hospital and I have to stop at

19   a store to get some deodorant or shave cream, something like

20   that, yeah, if that's what you mean, yeah.  Yeah, I would

21   stop at the store to pick something up if I run out of

22   something or toothpaste or something like that, yeah, I do it

23   quite a bit.

24   Q.  How was it that the fishing poles fell out of the

25   ambulance when you were doing a patient transport?

1    **A.**   I have no idea what you're talking about.

2    **Q.**   You have no designated sleep time.  You can sleep

3    whenever you want?

4    **A.**   Yes.

5    **Q.**   You can take a nap during the day when you're waiting

6    on a call?

7    **A.**   Yes.  Because you never know if you're going to be up

8    all night.

9    **Q.**   No one is there monitoring, you don't have a

10   supervisor there, correct?

11   **A.**   That's correct.

12   **Q.**   No one's ever told you you have to wear your uniform

13   while you're at the EMS station?

14   **A.**   Yes.  Mr. Roy Robichaux said we had to wear our

15   uniforms, had to be in uniform and be at the station and we

16   couldn't leave the station.

17   **Q.**   Well, isn't it true Mr. Robichaux told you you only

18   had to wear your uniform when you're in public and that you

19   could leave --

20   **A.**   No, sir.

21   **Q.**   Well, isn't it also true that you can leave the area

22   as long as you notify dispatch?

23   **A.**   No, sir, not leave the area unless I'm going to get

24   oxygen, something -- get something medical supplies.  Then I

25   leave the area to get medical supplies.  I would notify

1   dispatch.  If I needed oxygen on the truck or medical

2   supplies.

3        Q.  Now, you testified that you have to be en route

4   within six minutes, correct?

5        A.  That's correct.

6        Q.  When, in fact, the rule is you have to acknowledge

7   the page within six minutes and be en route within 10 or

8   15 minutes.

9        A.  I've never seen that rule.  If you have it, I'd like

10  to see it.

11       Q.  Well, isn't it true that on occasions sometimes

12  you're not en route within that six minutes, that it might be

13  10 or 11 --

14       A.  Sometimes that's correct because sometimes my pager

15  might not go off and my partner's getting dressed and I'm

16  still sound asleep and he's ready to go out within the six

17  minutes and he's just now realizing I'm still asleep because

18  I never got it because my pager never went off and he's got

19  to knock on my door.  When that happens, we tell the

20  dispatcher mark us up a delay on this call due to the fact

21  that my pager never went off and notify communications to

22  have someone to come check these pagers out to make sure they

23  are properly working.

24       Q.  And it's true you've never been disciplined for any

25  sort of not responding to a page or any delay in --

1      **A.**   No.

2      **Q.**   And you've never been disciplined for not timely

3    rolling on an emergency, whether it took 6 minutes,

4    3 minutes, 15 minutes?

5      **A.**   Never.

6      **Q.**   Now, there was no requirement before February of this

7    year that you actually stay in the Parish EMS station?

8      **A.**   I'm sorry?

9      **Q.**   There was no rule that you have to stay at the Parish

10   EMS station, the Parish-provided housing, there's no rule

11   prior to February of this year that you had to stay there,

12   right?

13     **A.**   If I wanted to pay for an apartment, $900 apartment,

14   I could stay there.  But I don't have the money for that, so

15   the Parish provides a place because I live out of town.  I

16   don't live in that parish.  If I lived in that parish, I

17   could run out of my house and I would have ran out of my

18   house had I lived in the parish, but I'm not going to pay

19   $900 to rent an apartment to work down there when the Parish

20   can provide me a trailer down there or I'm not going to spend

21   $150 a night to stay in a motel down there when the Parish is

22   going to provide a trailer for me where I can sleep there.

23     **Q.**   But you could bring a travel trailer if you wanted?

24   I guess you could put a travel trailer somewhere?

25     **A.**   If I wanted to lease a piece of land, piece of

1    property to set one up, which I don't have.  And I wish I

2    wouldn't --

3        Q.  Could you stay with friends?

4        A.  I mean, why would I do that when the Parish is

5    providing me a place to stay as it is?

6        Q.  Could you stay with friends?

7        A.  Yeah, if friends wanted me there.  I mean, I'm not

8    there to be friends with anyone.  I'm there to provide a

9    service for the citizens of Plaquemines Parish.  I'm there to

10   work, not to socialize.

11       Q.  And while you're on shift, you're not restricted

12   about where you can go as long as you stay in the area?

13       A.  As long as I stay in my area, my partner and I are

14   together, we're in that ambulance, and we're ready to respond

15   at any second, the second that pager goes off.

16       Q.  And you're not restricted on what you do while you're

17   waiting on that -- as long as you're together and the

18   ambulance?

19       A.  Yeah.  I mean, I can play guitar, watch TV, do

20   whatever I want in the trailer, you know.  Just...

21       Q.  You currently --

22       A.  It ain't like I can leave and go to the bowling alley

23   and go bowling, you know, out of town.  I mean, there's --

24       Q.  You could go watch the high school football game or

25   the high school basketball game or the high school baseball

1    game?

2        A.   We used to do that until Acadian -- Acadian Ambulance

3    had taken over.  Because I had talked to Gina Meyer about

4    that before, about us.  It used to be -- the Venice unit

5    would go to Venice when it was Venice High School.  The Port

6    Sulphur truck would go to Port Sulphur if their game is in

7    Port Sulphur.  Belle Chasse unit would go to Belle Chasse

8    High School for the football games, but Acadian has taken

9    over the Louisiana High School Athletic Association's

10   football games and they have units at every ball park for

11   every football game on Friday night so therefore we no longer

12   go.

13       Q.   My question was more if --

14       A.   If my partner don't want to go, no, sir, I can't go

15   by myself and leave my partner there.

16       Q.   Right.  But my question then, Mr. Burge, is if you

17   and your partner and you took the ambulance, you're not on

18   duty, but y'all could go watch the football game or the

19   baseball game or the basketball game?

20       A.   I don't know what you mean when we're not on duty.

21   We are on duty.

22       Q.   All right.  When you're not assigned --

23       A.   You mean when I'm not an emergency call?

24       Q.   No, when you're not assigned to the high school.

25   Acadian now is assigned to the high school?

1     A.   Correct.

2     Q.   You could go if you wanted and watch the football

3   game?

4     A.   Correct.

5     Q.   You currently make about $50,000 a year?

6     A.   Correct.

7     Q.   With the benefits loaded, it's about $63,000 a year,

8   correct?

9     A.   I don't know.  I never calculated that into it.

10         MR. MILLER:  That's all of the witness -- I mean, all

11   of the questions I have of this witness.

12         THE COURT:  Thank you.  Mr. Stiegler?

13                    REDIRECT EXAMINATION

14   BY MR. STIEGLER:

15     Q.   Mr. Burge, when Mr. Miller was referring to football

16   games, were you referring to the fact at one point you were

17   providing on-field services in case a player got injured at

18   the local football game?

19     A.   Correct.

20     Q.   And he was also referring to jobs at some point,

21   having a second job.  You could have a second job during the

22   week you're not working?

23     A.   Correct.

24     Q.   What about during the week you are working in

25   Plaquemines Parish?

1    **A.**  No, sir.

2    **Q.**  He talked about restaurants in Venice.  What about in

3    Pointe a la Hache, are there any restaurants at all?

4    **A.**   There's one store in Pointe a la Hache, it's called

5    DJ's Grocery that sells sandwiches.  There's no restaurants,

6    no grocery stores other than that, and that's right there

7    at -- where the ferry crosses, which is right next door to

8    the courthouse and I believe that's the only reason why it's

9    there because it's next door to the courthouse.

10   **Q.**  And you agreed with Mr. Miller that you could go a

11   day without a call?

12   **A.**  Yes, sir.

13   **Q.**  A whole day?

14   **A.**  I have gone a day.  I have gone two days without a

15   call.  I have gone a day with seven or eight calls a day.

16   **Q.**  And after going a day or two days without a call, you

17   could then in the next ten seconds have one of those house

18   fires you were telling us about?

19   **A.**   Absolutely.

20   MR. STIEGLER:  No further questions.

21   THE COURT:  Thank you.  You're excused.

22   All right.  Counsel, if it's okay with you, I believe

23   our jury got here very early this morning, so I think it

24   might be a good time to recess today.  It's a natural break.

25   And have them come back tomorrow.  Tomorrow we will go longer

1    than this.  Is that okay, Counsel?

2           MR. MILLER:  Sure, Your Honor.  That's perfect.

3           THE COURT:  Mr. Kopfler?  Mr. Stiegler?  Is that --

4           MR. KOPFLER:  Yes, Your Honor.

5           THE COURT:  So to our jurors, again, thank you for

6    your attention today.  I'd ask that you leave your notebooks

7    here in your seat.  They will be locked up.  Nobody will read

8    your notes or have access to them.  We will lock them safely

9    this evening.

10          I want to remind you, your family is naturally going

11   to be interested in your jury service.  You need to advise

12   them that you cannot speak about it, can't speak about this

13   case at all, until after I receive your verdict and you're

14   discharged as a juror.

15          Please don't discuss with anyone.  Please don't do

16   any outside research in any way by looking at maps, by

17   Googling, by any Internet search or anything else.

18   Everything you receive from this case will come from this

19   witness stand and from the court, and it should not come from

20   any outside source.

21          Please remember this thing I will tell you at every

22   break.  Keep an open mind until all the evidence has been

23   received.

24          And with that, anything else that I forgot to advise

25   the jurors?  Mr. Kopfler?  Mr. Miller?

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  Please let me know if so.

3          MR. KOPFLER:  No.

4          THE COURT:  Melissa, anything I have forgot to advise

5    them?

6          THE DEPUTY CLERK:  No.

7          THE COURT:  That's why I have good people around me.

8          Thank you.  You are excused for the evening.  I

9    understand you will be back here by 9:00 a.m. tomorrow in

10   place.  We will be ready to begin right at 9:00 a.m.

11   tomorrow.

12         Thank you.  All rise.

13                   (Jury exits courtroom.)

14         Thank you.  So, counsel, if you can approach the

15   bench and also I will need you here tomorrow at 8:30 in the

16   morning to go over some preliminary matters.  We will start

17   as soon as the jury is here at 9:00 and tomorrow we will go

18   until at least 5:00.

19         Please approach.

20         (WHEREUPON, the following proceedings were held at

21   the bench:)

22         THE COURT:  So I'm going to provide you right now

23   with some preliminary closing instructions just so you have

24   time to go over them, and then tomorrow I'll give you the

25   interrogatories that I'm going to give to the jury, but this

1    way you'll have enough time to go over the instructions.

2           MR. MILLER:  Thank you.

3           THE COURT:  One for each side.

4           You want to hand yours off also?

5           MR. MILLER:  I tend to lose things.

6           MR. KOPFLER:  That's right.  You have a bad rep about

7    losing things.

8           THE COURT:  Anything else you want to discuss with me

9    or both sides before we recess for the evening?

10          MR. KOPFLER:  I don't think so.

11          MR. MILLER:  I think we went over everything at

12   lunch.

13          THE COURT:  It's been very smooth.  Mr. Miller?  Mr.

14   Landin?

15          MR. MILLER:  We'll be done.

16          THE COURT:  I'm sorry?

17          MR. MILLER:  Are we going to be close to being done

18   tomorrow?

19          MR. KOPFLER:  Yes, we have two more witnesses.  They

20   should be finished before noon.

21          THE COURT:  Starting at 9:00 may be difficult.

22          MR. STIEGLER:  It should be but the rest of the time.

23          MR. MILLER:  By Wednesday for sure I would think.

24          THE COURT:  You'll make the jury very happy.  Off the

25   record.

1              (WHEREUPON, the proceedings were adjourned.)

2                           * * * *

3                    REPORTER'S CERTIFICATE

4          I, Nichelle N. Drake, RPR, CRR, Official Court
   Reporter, United States District Court, Eastern District of
5  Louisiana, do hereby certify that the foregoing is a true and
   correct transcript, to the best of my ability and
6  understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

7

8                        /s/ Nichelle N. Drake
                         Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    OFFICIAL TRANSCRIPT
                        Page 223